2:22-cv-00509-SRB - November 9, 2023 P.M.

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | |
|---|---|
| **Mi Familia Vota, et al.**, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) 2:22-cv-00509-SRB |
| | ) |
| **Adrian Fontes, et al.**, | ) |
| | ) Phoenix, Arizona |
| Defendants. | ) November 9, 2023 |
| _____ | ) 1:01 p.m. |

**BEFORE:   THE HONORABLE SUSAN R. BOLTON, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**BENCH TRIAL - DAY 4 P.M.**

(Pages 884 through 1016)

Official Court Reporter:
**Elaine Cropper, RDR, CRR, CCP**
Sandra Day O'Connor U.S. Courthouse
401 West Washington Street
Suite 312, SPC 35
Phoenix, Arizona  85003-2150
(602) 322-7245

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

United States District Court

2:22-cv-00509-SRB - November 9, 2023 P.M.

**APPEARANCES**

For Plaintiff United States of America:

> **RICHARD DELLHEIM, ESQ.**
> **SEJAL JHAVERI, ESQ.**
> **MARGARET TURNER, ESQ.**
> U.S. DEPARTMENT OF JUSTICE-CIVIL RIGHT DIVISION, VOTING SECTION
> 950 Pennsylvania Avenue NW
> Washington, D.C.   50530

For Plaintiff ADRD Action, Arizona Students' Association, League of United Latin American Citizens Arizona, Living United for Change in Arizona:

> **DANIELLE MARIE LANG, ESQ.**
> **HAYDEN JOHNSON, ESQ.**
> **MOLLY DANAHY, ESQ.**
> **ROBERT BRENT FERGUSON, ESQ.**
> CAMPAIGN LEGAL CENTER
> 1101 14th Street NW, Suite 400
> Washington, D.C.   20005

For Plaintiff Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition:

> **NIYATI SHAH, ESQ.**
> ASIAN AMERICANS ADVANCING JUSTICE
> 1620 L Street NW, Suite 1050
> Washington, D.C.   20036
>
> **SADIK HUSENY, ESQ.**
> **AMIT MAKKER, ESQ.**
> **EVAN OMI, ESQ.**
> **CATHERINE ANNE RIZZONI, ESQ.**
> **SCOTT KANCHUGER, ESQ.**
> LATHAN & WATKINS
> 505 Montgomery Street, Suite 2000
> San Francisco, California 94111
>
> **ANDREW MARK FEDERHAR, ESQ.**
> SPENCER FANE, L.L.P, - Phoenix, AZ
> 2414 E. Camelback Road, Suite 600
> Phoenix, Arizona   85016-4251

United States District Court

2:22-cv-00509-SRB - November 9, 2023 P.M.

**APPEARANCES (Continued)**

For Plaintiff Arizona Democratic Party, Democratic National Committee:

**DANIEL S. VOLCHOK, ESQ.**
WILMER CUTLER PICKERING HALE & DORR, L.L.P.
2100 Pennsylvania Avenue NW
Washington, D.C.  20037

For Plantiff Poder Latinx:

**JOHN A. FREEDMAN, ESQ.**
**LEAH MOTZKIN, ESQ.**
ARNOLD & PORTER KAYE SCHOLER, L.L.P.
601 Massachusetts Avenue NW, Suite 100
Washington, D.C.  20001

**BEAUREGARD WILLIAM PATTERSON, ESQ.**
**JONATHAN SHERMAN, ESQ.**
FAIR ELECTIONS CENTER
1825 K Street NW, Suite 701
Washington, D.C. 20006

For Plaintiffs Tohono O'odham Nation and Gila River Community:

**ALLISON NESWOOD, ESQ.**
NATIVE AMERICAN RIGHTS FUND
250 Arapahoe Avenue
Boulder, Colorado 80302

For Plaintiff Voto Latino, Mi Familia Vota:

**CHRISTOPHER DODGE, ESQ.**
**MOLLIE DIBRELL, ESQ.**
**ELISABETH C. FROST, ESQ.**
**ALEXANDER ABRAHAM ARELLANO, ESQ.**
ELIAS LAW GROUP, L.L.P.
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20001

**DANIEL ABRAHAM ARELLANO, ESQ.**
Herrera Arellano, L.L.P.
1001 North Central Avenue, Suite 404
Phoenix, Arizona  85004

United States District Court

2:22-cv-00509-SRB - November 9, 2023 P.M.

**APPEARANCES (Continued)**

For Plaintiff Promise Arizona, Southwest Voter Registration Education Project:

> **ERNEST ISRAEL HERRERA , ESQ.**
> **ERIKA CERVANTES, ESQ.**
> MALDEF
> 634 Spring Street, 11th Floor
> Los Angeles, California  90014
>
> **DANIEL R. ORTEGA, JR., ESQ.**
> Ortega Law Firm, P.C.
> 361 E. Coronado Road, Suite 101
> Phoenix, Arizona  85004

For Defendants State of Arizona, Kris Mayes, Jennifer Toth:

> **JOSHUA MICHAEL WHITAKER, ESQ.**
> **TIMOTHY E. HORLEY, ESQ.**
> ARIZONA ATTORNEY GENERAL'S OFFICE
> 2005 N. Central Avenue
> Phoenix, Arizona  85004

For Intervenor-Defendants State of Arizona, Kris Mayes, Ben Toma::

> **KATHRYN E. BOUGHTON, ESQ.**
> ARIZONA ATTORNEY GENERAL'S OFFICE
> 2005 N. Central Avenue
> Phoenix, AZ  85004
>
> **HANNAH HATCH PORTER, ESQ**
> GALLAGHER & KENNEDY, P.A.
> 2575 E. Camelback Road, Suite 810
> Phoenix, Arizona 85016-9225

For Defendant-Intervenor Republican National Committee:

> **KORY A. LANGHOFER, ESQ.**
> STATECRAFT, P.L.L.C.
> 649 North 4th Avenue, Suite B
> Phoenix, Arizona  85003

United States District Court

888

2:22-cv-00509-SRB - November 9, 2023 P.M.

## I N D E X

### TESTIMONY

| WITNESS | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Plaintiffs' Witnesses | | | | |
| MARTIN QUEZADA | | 889 | 920 | |
| TRACI BURCH, PH.D | 922 | 969 969 | 993 | |
| TERRY RAMBLER | 995 | 1004 | 1008 | |

## E X H I B I T S

| Number | | Ident | Rec'd |
|---|---|---|---|
| Imp 191 | Tweet by Martin Quezada | | 898 |
| 554 | U.S. Government Accountability Office. 2007. "States Reported That Citizenship Documentation Requirement Resulted in Enrollment Declines for Eligible Citizens and Posed Administrative Burdens." | | 975 |

## RECESSES

| | Page | Line |
|---|---|---|
| (Recess at 2:50; resumed at 3:05.) | 964 | 22 |

United States District Court

MARTIN QUEZADA - Cross

**P R O C E E D I N G S**

(Court was called to order by the courtroom deputy.)

(Proceedings begin at 1:01.)

THE COURT:  Good afternoon.  Please sit down.

Mr. Langhofer, you may cross-examine.

MR. LANGHOFER:  Thank you, Your Honor.

(MARTIN QUEZADA, a witness herein, was previously duly sworn or affirmed.)

**CROSS - EXAMINATION**

BY MR. LANGHOFER:

Q.   Senator Quezada, would it be fair to say that during your tenure at the state legislature you had a reputation as being particularly outspoken?

MR. HERRERA:  Objection.  Vague.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  I'm not sure I can speak to what my reputation was in general but I would consider myself to have been an outspoken member.

BY MR. LANGHOFER:

Q.   Even relative to the other members of the legislature at the time?

A.   I guess that's somewhat fair, yeah.

Q.   Who is the prime sponsor of 2243?

United States District Court

MARTIN QUEZADA - Cross

A.    I would have to look at that one again.  It was either --

Q.    It's in the record.  I'll represent to you it was Jake Hoffman.

A.    Okay.

Q.    Who was the prime sponsor of 2493?

A.    I believe that was Hoffman as well.

Q.    Okay.  You and Mr. Hoffman have a strained relationship; correct?

A.    I'm not sure I would frame it that way.  I don't know how Mr. Hoffman feels about me.  He's -- he was a legislative colleague of mine.

Q.    You were recently called to question -- called to a committee that he was chairing, weren't you?

A.    I was, yes.

Q.    And the question before the committee was whether they should confirm you to a statewide position that you had been nominated to by Governor Hobbs?

A.    That's correct.

Q.    Fair to say that committee was very acrimonious, that committee hearing?

A.    I guess that's fair to say, yes.

Q.    And the entire committee hearing was about you and your nomination?

A.    Yes, that's correct.

Q.    During that committee meeting or at the end of it, the

United States District Court

committee voted to recommend against your confirmation?

A.    That's correct.

Q.    One of the bases for that was that you had a history of making false accusations of racism against members of the state legislature; correct?

            MR. HERRERA:  Objection.  Relevance.

            THE COURT:  Overruled.  You may answer.

            THE WITNESS:  I'm not sure that they made very clear what the exact reason for their non-confirmation was.  Each member had a different vote explanation.

BY MR. LANGHOFER:

Q.    Would it help you to see some documents about that?

A.    Sure.

Q.    Okay.

            MR. LANGHOFER:  Elaine, if you could have the HDMI cable connected, please.

BY MR. LANGHOFER:

Q.    What I'm showing you here is a press release put out by the Senate Republicans.  The date is Wednesday, May 31, shortly after your hearing; correct?

            Okay.  Why don't you just read through the words here and see if it refreshes your recollection about the bases for revoking you?

            MR. HERRERA:  Objection, Your Honor.  This is extrinsic evidence attempting to impeach and there are

MARTIN QUEZADA - Cross

accusations that are unrelated to the matters in this case.

THE COURT:  This is not evidence.  This is a document that he's been asked to read and if he's asked a question about the document, that would be the time to make your objection.

THE WITNESS:  I've read it.  Do you want to tell me your question again?

BY MR. LANGHOFER:

Q.   One of the reasons the committee voted against your confirmation was because, in their view, you have a history of making false allegations against Senate Republicans; correct?

THE COURT:  Not in reference to what the document says.  If that is --

MR. LANGHOFER:  Right.

BY MR. LANGHOFER:

Q.   I'm not asking you to read this document.  This document is not in evidence, at least not yet.  Does this help you remember at least one of the reasons they voted against you was their perception of you have a history of making false accusations against Republicans?

THE COURT:  Let me just ask a question because I heard him say something earlier.

So when the votes were being taken, were they being explained sometimes?

THE WITNESS:  Yes.

THE COURT:  Okay.  So I think were some of the

United States District Court

MARTIN QUEZADA - Cross

explanations from the Senators who voted against your confirmation that you had a history of making false allegations against Senate Republicans?

THE WITNESS:  I don't remember that specific phrase ever being mentioned in any of those vote explanations.

THE COURT:  Okay.  Thank you.

BY MR. LANGHOFER:

Q.   Do you recall from those hearings that they recounted how -- what happened when you and the Senate passed a school voucher program?

MR. HERRERA:  Objection.  Calls for hearsay.

THE COURT:  No.  Do you recall that that was one of the things that -- one or more of the Senators who voted against you mentioned?

THE WITNESS:  I believe so although, to be honest, I haven't looked at that committee hearing since that time so my memory of it is not --

THE COURT:  Is that a recorded hearing?

MR. LANGHOFER:  It is.

THE WITNESS:  I believe so.

THE COURT:  And there would be a record of what was said?

MR. LANGHOFER:  Yes, Your Honor.  I'm going to get to and in a bit why we don't have all of these records here, because we didn't know this was -- we're going to get to that.

THE COURT:  Okay.

BY MR. LANGHOFER:

Q.   Representative Hoffman who was chairing the committee specifically pointed to your comments about the school voucher bill as one of his reasons for rejecting your nomination, did he not?

A.   That may have been the case.  I think that topic came up. I'm not sure if that was part of his vote explanation or not but I think that topic did come up.

Q.   Let's just get to the substance of it.  When the state legislature and the Governor passed a law on the school voucher program, you accused Republicans of being racist; correct?

MR. HERRERA:  Objection.  Your Honor, best evidence. We wouldn't object to the hearing transcript or audio or video coming in.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  I'm sorry.  Say that same question again.

BY MR. LANGHOFER:

Q.   When the House and the Senate and the Governor passed the school voucher program in 2022, you accused the legislative Republicans of being racist, did you not?

A.   I don't believe that's accurate at all.  I very often talked about implications on -- that policy would have on

United States District Court

MARTIN QUEZADA - Cross

certain groups of color in the state but I was always very

careful not to say "you" or "you are a racist."  I would say

that the policies had racist implications.

Q.   Did you say that the school voucher program -- was the

voucher available to everyone regardless of the color of their

skin?  Let's start with that.

THE COURT:  Okay.  Let's not start with that.  I

think your question had to do with what he did or didn't say

about Senate Republicans and I think he's answered that.  You

can follow up on that.  But I don't want to get into the school

voucher program.

MR. LANGHOFER:  I don't want to transgress your

instructions here and if I've gone too far, please let me know

of course.

BY MR. LANGHOFER:

Q.   Didn't you say that that bill perpetuated discrimination,

perpetuated inequity, and codified the segregation of schools?

A.   If that's a quote, then I probably did.  It sounds like

something I would say, but I would say that that is not calling

the sponsors racism whatsoever.

Q.   Okay.  You have said that voter suppression is a purely

Republican effort?

A.   I'm not sure if I've said that.

THE COURT:  Is that your view?

THE WITNESS:  I'm sorry?

896

MARTIN QUEZADA - Cross

THE COURT:  Is that your view?                    01:09:40

THE WITNESS:  That --

THE COURT:  That voter suppression is a purely Republican effort.

THE WITNESS:  Sadly, no.  I think that voter    01:09:51
suppression happens across this nation and there have been
instances where the other party is part of it as well, so I
think that voter suppression is a problem throughout this
country and the state.  This state just happens to be led by
Republicans.                                      01:10:09

BY MR. LANGHOFER:

Q.   If you didn't believe it, did you say in 2021 that voter
suppression is a purely Republican effort?

A.   I would have to look at the context of that statement but
if it was in Arizona, again, there is one party that is in the   01:10:24
majority in Arizona that is driving a policy here.

Q.   Would you have said it then, at least about in Arizona,
voter suppression is a purely Republican effort in 2021?

A.   I would have to look at the context of that.

MR. LANGHOFER:  Elaine, can we have the computer   01:10:44
again?

BY MR. LANGHOFER:

Q.   Can you see that, sir?

A.   Yes, I see it.

Q.   And you did tweet that?                       01:11:05

United States District Court

MARTIN QUEZADA - Cross

A.   Yes, looks like it, yes.

Q.   So in 2021 you said that at least in Arizona voter suppression was a purely partisan, in parentheses, Republican effort?

A.   In that tweet, yes, that's what I said.

Q.   You don't believe that, though?

A.   Well, I think, again, going to the context of you look at what that tweet is about, it's about an expected vote that was to take place and that vote did not happen because Republican members were absent.  And so the Republican members were needed in order to advance that bill forward.  So in the context of this particular bill in this particular instance, I would say that statement is fairly accurate.

Q.   Okay.  You ultimately lost the job that Katie Hobbs nominated you for because of the votes of the Senate Republicans; correct?

A.   Not necessarily because of the vote of the Senate Republicans but it was a mutual decision between myself and the Governor that I was going to look at other opportunities.

Q.   And you made that decision with the Governor after Jake Hoffman's committee voted down your nomination?

A.   That's correct, yes.

Q.   This is the first time you've testified in this courthouse about election regulations, is it?

A.   One other time I've testified before, yes.

United States District Court

MARTIN QUEZADA - Cross

Q.   In 2016?

A.   I believe so.

Q.   And that was about the ballot-harvesting ban that eventually became *Brnovich v. DNC?*

A.   I believe so, yes.

Q.   You said that was racist as well, didn't you?

A.   Again, I would have to go back and look at the specific statements.

Q.   Let's do that.

A.   Okay.

Q.   Impeachment Exhibit 191.  Did you tweet that, sir?

A.   Yes.

Q.   Did you tweet that on your way to this courthouse to give your testimony?

A.   I don't know the timing of that or the date but I'm assuming it was around the same time.

Q.   Okay.  And in this tweet you do say that the -- well, the ballot-harvesting law was an assessment to make participation in our democracy more difficult for low income and voters of color; right?

A.   That's what the tweet says, yes.

Q.   Do you recall whether this court concluded that, in fact, the ballot-harvesting ban was motivated by racial animus?

        MR. HERRERA:  Objection.  The ruling speaks for itself, Your Honor.

MARTIN QUEZADA - Cross

THE COURT: Do you know? You said "this court." It's not me but there was a case before a different judge. Do you know what the outcome of that case was?

THE WITNESS: I mean, I would have to go back and kind of look at all of that right now.

BY MR. LANGHOFER:

Q.   Have you read *Brnovich v. DNC*?

A.   I'm sure I did when it came out but it's not at the top of my memory right now.

THE COURT: Is it your recollection that the statute was upheld?

THE WITNESS: Is it this one right here?

THE COURT: This one right here.

THE WITNESS: Yes, this one was -- yeah, I believe this one was upheld, yes.

BY MR. LANGHOFER:

Q.   All right. Who is Ben Toma?

A.   Toma is a State Representative in I believe the Northwest Valley and I believe he's the Speaker of the House now.

Q.   Is he an immigrant?

A.   I'm not sure. I don't know him personally.

Q.   Do you know whether he's a refugee?

A.   I don't know him personally, no.

Q.   Okay. Who is Walt Blackman?

A.   He is a -- I'm not sure if he's a current or former state

United States District Court

legislator.  I believe he's from up north.

Q.    What's his ethnicity?

A.    He's black.

Q.    Who is T.J. Shope?

A.    T.J. Shope is a current State Senator from central Arizona.

Q.    He's Latino?

A.    I believe he's half but I'm not sure.

Q.    Didn't he tell you during that Senate confirmation hearing that he was Latino?

A.    I don't remember that part now.

Q.    Okay.

A.    He might have.

Q.    Lupe Diaz, who is that?

A.    I'm not sure I know a Lupe Diaz.

Q.    What about Theresa Martinez?

A.    I think she is a state representative.

Q.    Latina?

A.    Yes.  I think so.  I believe so.  I'm not sure.

Q.    What about Quang Nguyen?  Q-U-A-N-G.  The last name is N-G-U-Y-E-N.

        MR. HERRERA:  Objection.  Relevance, Your Honor.

        THE COURT:  Overruled.

        You may answer.

        THE WITNESS:  I am not sure who that is.

MARTIN QUEZADA - Cross

BY MR. LANGHOFER:

Q.   Do you know any Asian American Republicans in the House in 2022?

A.   I figure that's where you were going and that might be him but I'm not sure, to be honest.

Q.   Do you know whether he's an immigrant?

A.   I don't know him personally.

Q.   Do you know whether he's a refugee?

A.   I don't know him personally.

Q.   Do you know whether him and Walt Blackman, the African-American man we discussed, were the sponsors of the bills being challenged here?

A.   I don't know that, no.

Q.   You do know Warren Petersen?

A.   I do, yes.

Q.   Do you know where his wife's from?

A.   I don't know Mr. Petersen's wife, no.

Q.   Do you know whether she's Mexican American?

A.   I don't know that, no.

Q.   Okay.  The members that you said -- that I've just listed that you say you know, all of them voted for these laws, didn't they?

A.   I would assume so, yes.

Q.   We're going to get to Borrelli in a minute but first I want to talk about some of the procedural points that you were

United States District Court

making earlier.  You said that in legislative hearings there was testimony about voter fraud but it was nonspecific.  In those hearings, the committee hearings you were talking about, not the Senate audit, that's sort of a different track, the public hearings where members of the public testified, were subpoenas issued, to your knowledge, for testimony in those hearings?

A.    I don't believe so.

Q.    Were there lawyers appointed to represent both sides of the argument in those hearings?

A.    I mean, I believe there were lawyers that testified but I'm not sure what their role was in terms of, like, who they were representing or not.  That I'm not sure.

Q.    You're a lawyer?

A.    Yes.

Q.    So you understand the adversarial process, what we mean by that?

A.    Yes.

Q.    There's not an adversarial process with appointed lawyers on either side of the legislature hearings?

A.    In those types of hearing, no.

Q.    Rules attorneys, are they judges?

A.    They are not judges, no.

Q.    This idea of forwardable mail, do you know whether ballots are only sent by forwardable mail in Arizona?

MARTIN QUEZADA - Cross

A.    Whether ballots are sent by?

Q.    Sent by forwardable mail?

A.    I would have to go look at the -- I mean, I don't work in elections so I'm not sure.

Q.    Okay.  If one of the questions in sending a piece of mail is whether the person actually lives at the address they have provided, wouldn't you agree it makes sense to not send that letter by forwardable mail?

A.    Can you repeat the question?

Q.    If one of the reasons for sending a letter is to determine whether the person votes at the address that you're sending the address to, isn't that a good reason to not send that letter by forwardable mail?

A.    I guess the answer to that question kind of depends on, yeah, what the goal of that effort is and if there are better ways to make that determination, and there may be better ways to make that determination.  I mean, that's something I would have to go back and kind of study to see.  So whether that is -- whether that is in and of itself an effective manner or if it's one of many ways in which to determine the residency of that voter, you know, that's a whole process that I'm not an expert on.

Q.    Okay.  We'll leave it there.  Let's talk about Borrelli.  What are the exact words that you're saying he spoke to you when he leaned over in this committee hearing and -- please

United States District Court

remind me of the rest of it.  What are the exact words he said?

A.   You'll have to specify at which time.

Q.   I think you recall about 15 minutes before we broke for lunch you said he muted his microphone and leaned over and said something to you about "you people" or something along those lines.  I want to understand exactly what it is that he said.

A.   Oh.  Okay.  Well, if you kind of go back to the nature of those committee hearings, I sat next to Borrelli actually for many years and so it was a constant muting of his microphone and leaning over because he was talking all the time.  So there was -- it would be hard to specify any one particular instance.  But it was an ongoing dialogue from his end to my end.

Q.   Do I recall correctly that you testified during a committee hearing on the bills that are challenged here, he leaned over to you, muted the microphone and said something along those lines?

A.   I believe so, yeah.  Because that was when -- that was when the crowd was getting upset and there was another person who had testified and, yeah, it was during that committee hearing, yeah.

Q.   Which committee hearing exactly?

A.   The ones regarding these bills that we've just been discussing.

Q.   There were a lot of hearings though.  I want to know which hearing he said that at.

MARTIN QUEZADA - Cross

A.    I'm assuming it was a Government Committee because that's the committee that we shared and I don't know the specific date.

Q.    Okay.

A.    I would have to go back and look.

Q.    On which bill?

A.    Well, whichever bills were assigned to the Government Committee.

Q.    There are two bills at issue here, 2243 and the other one is 2492.  I think -- I'm always having trouble with these numbers.  2243 and 249 -- X bill.  Which bill was before the Senate Government Committee when Borrelli muted his microphone and leaned over to you and said to you what you testified he said?

A.    That one I'm not sure.  I would have to go back and kind of look at my notes and look at the record.

Q.    Well, hopefully the -- well, let's just -- you think it was the hearing where they had to recess because of the disruption in the audience?

A.    I know that he was leaning over and talking during that committee.

Q.    To you?

A.    To me and even like outside of the committee as well.  I mean, he was -- like I said, whenever we -- the Senate is a very small place.  We share the hallways.  We're always walking

United States District Court

MARTIN QUEZADA - Cross

next to each other.  So it could have been at any one of those places.

Q.   Right.  But on direct examination you talked about, if I recall correctly, you were in a committee hearing.  Apparently it was a Senate Government Committee; right?

A.   I believe so, yes.

Q.   You were sitting next to him?

A.   I did sit next to him in that committee, yes.

Q.   And he muted his microphone and leaned over and said something about you people, your people -- I don't want to put words in your mouth.  This is your testimony?

A.   Well, my testimony was that he did make those comments.  I don't know if it was specifically in that committee at that instant or if it was after the committee or before the committee.  But it was in regard to these bills and in regard to these types of issues, so --

Q.   Before you said it may have been on a break from the committee.

A.   Might have because we did take a break in that committee as well.

        MR. HERRERA:  Objection.  Misstates the testimony.

        THE COURT:  Overruled.

        The answer will stand.

BY MR. LANGHOFER:

Q.   Do you know whether it was on a break?

907

MARTIN QUEZADA - Cross

A.   I don't know for sure.

Q.   Do you know whether it was on the committee hearing on these particular bills?

A.   I remember that he was -- I mean, like I said, before, he was commenting in every single committee so that dialogue -- because those issues were about these bills.

Q.   Now I'm confused and I would like this to be very clear. Are you saying that in every committee meeting he would lean over and say things like this to you?

A.   I'm saying that he would -- he would talk in every committee.

Q.   Okay.  That's what legislators do.

A.   This was outside of, like, normal talk.  His was where he was -- I guess I would frame it in this way:  Senator Borrelli was always saying things that he could not say if the microphone were on and that's why he muted the microphone, in order to lean over and say those types of things.  And so that happened in every single committee that I sat with him on.  It happened when we were on the floor of the Senate because I sat not far from him there.  He would walk across the aisle over to my desk and engage in those conversations.  It would happen in the Senate gallery or in the Senate lobby or the members' lounge.  So it was a consistent dialogue with that Senator.

Q.   How many times do you think he made comments like this to you?

United States District Court

MARTIN QUEZADA - Cross

A.    Like that?

Q.    Yeah.

A.    It was quite common.  I mean, at one point the Senate President made him come to my office and apologize for making those types of comments.  So I very distinctly remember at one instance he came in and he said, "Hey, you know, President Biggs informed me that I need to come in and apologize because I was out of line and I need to tone it down and" -- yeah.  So that type of instance happened.

Q.    Senate President Biggs has been out of the state legislature for seven years or so; is that right?

A.    Yeah.  And it may not have been Biggs.  It was the Senate President.  Whoever was the president at the time but, yeah, that did happen.

Q.    Okay.  If it happened this often, are you having a hard time remembering whether he said this to you in connection with these bills?

A.    No.  These bills were like the hottest topics of the legislative session that year.  So these were, like, the voting, you know, rights issues bills.

Q.    So if we want to go back and look at the recordings of a meeting that you say this happened, at which meeting should we look at?

A.    I would say look at all of them.  There's not too many of them.  There's only a Government Committee and a committee of

01:25:14

01:25:24

01:25:40

01:25:53

01:26:15

01:26:32

United States District Court

909

MARTIN QUEZADA - Cross

Q.    So -- and you don't remember whether he said this during a break or during the meeting?

A.    I couldn't tell you, no.

Q.    Okay.  What were his exact words, sir?

A.    I don't know what his exact words were.  I mean, this was several months ago but it was something to that effect that I mentioned earlier.

Q.    Let's talk about the timing.  You said it was several months ago.  When was the first time you told someone else about this exchange?

A.    About which exchange?

Q.    The exchange you had with Mr. Borrelli where he said something like "you people"?

A.    I'm sure we discussed it with staff immediately after.  It was a pretty common knowledge amongst kind of everybody in the Senate that Borrelli was a talker, that Borrelli said things that were out of line.  And so it was -- it was a well-known I guess fact, so those conversations happened often.

Q.    Which staffer did you talk to it about immediately after?

A.    I don't even remember who the members of the -- it was probably a member of whoever staffed my committee at the time.

Q.    Who would that be?

A.    Let's see.  For Government, it was either Lisette or Vicente or there may be -- there may be others.  I would have

United States District Court

910

MARTIN QUEZADA - Cross

to go back and look at my -- I have been away for a year.

Q.   What is Lisette's last name?

A.   Flores.

Q.   Vicente, what's his last name?

A.   Reyna I believe.

Q.   How do you spell that?  R-E-Y-N-A?

A.   I believe so, yeah.

Q.   All right.  We'll track that down.

I've tried to get clear on this a couple of times. I'm not sure whether we're there yet, whether this comment was made during the debate on these particular bills or just sometime during the session and you think the bills permeated the whole session.  Help me understand that.

A.   Like I said before, these were two of the biggest bills in regard to voter rights and elections in general.  And I know that I sat next to Borrelli on the floor and I sat next to Borrelli in the committee hearing.  And I know that he was a nonstop talker in that sense.  And I know that he said inappropriate things pretty consistently, that he developed a reputation for that.  And I know that at one point the Senate President made him come into my office.

Q.   Yes.  We've gone through this.  My question was, did he say it to you in connection with these bills specifically or just at some point during the session and you think because it was in the session that concerns the bills?

United States District Court

911

MARTIN QUEZADA - Cross

A.   I'm trying to remember back.  I'm almost certain he said something during that committee as well.

Q.   Okay.  But you don't remember which bill?

A.   I don't.  I would have to go back and look at the record.

Q.   Did he say "your people," "your district"?  Help me understand the words that he spoke.

A.   It was usually -- with Borrelli it was usually -- I very distinctly remember him saying, "Yes, this is your people that are doing this, your people."

Q.   Did he say "your ethnicity"?

        MR. HERRERA:  Objection, Your Honor.  This question has been asked several different ways, several different times rather, and it's cumulative.

        THE COURT:  That's where you start.  You start with the evidentiary basis, cumulative, not with the speaking objection.

        Sustained.

BY MR. LANGHOFER:

Q.   After disclosing this to your staff immediately after the conversation, who did you disclose it to next?

A.   I don't think I disclosed it to anybody.  This was a common occurrence so it's not like it was something I needed to disclose.

Q.   Are you familiar that the Senate has an Ethics Committee?

A.   Yes.

United States District Court

01:29:36

01:29:49

01:30:09

01:30:20

01:30:34

01:30:50

912

MARTIN QUEZADA - Cross

Q.   In fact, you're very familiar with it because you, in fact, submitted a successful complaint to the Ethics Committee before?

A.   Yes.

Q.   You submitted more than one complaint to the Ethics Committee?

A.   I'm not sure that I have.  I know I've done one but I'm not sure if I've done more than one.

Q.   Okay.  And the Ethics Committee has the power to hold hearings and censure or even expel or recommend expulsion of members; correct?

A.   Yes.  That's correct.

Q.   And the Arizona State Senate has actually recently exercised that power against another Senator for making what were perceived as racially inappropriate remarks; right?

A.   Yes, I believe so.

Q.   Okay.  That wasn't Borrelli?

A.   I'm sorry?

Q.   It wasn't Borrelli?

A.   Oh, no.

Q.   And, in fact, I think that censure was in the same session as what we're talking about here, 2022; right?

A.   The years mix up, in my mind, but that may be correct, yes.

Q.   Okay.  Where would we find a copy of the ethics complaint

01:30:51

01:30:59

01:31:13

01:31:30

01:31:40

01:31:51

913

MARTIN QUEZADA - Cross

you filed against Borrelli for making these comments?

A.   I didn't file an ethics complaint against Borrelli.

Q.   Oh.  Do you remember where you mentioned on the floor of the Senate that Mr. Borrelli had said these things to you about race?

MR. HERRERA:  Objection.  I think misstates the testimony, Your Honor.

THE COURT:  Overruled.

BY MR. LANGHOFER:

Q.   I'll ask it a different way.  Did you ever say on the floor of the Senate that Mr. Borrelli had said these things to you about race?

A.   Senator Borrelli made comments --

THE COURT:  No.  No.  Did you ever say on the floor of the Senate that these things had happened -- I assume the rest of that so that it would be part of the record.

THE WITNESS:  Is that the question?

THE COURT:  That's the question.

THE WITNESS:  If that's the question, I am not sure that I ever did that.  I would probably lean towards no, I don't think I ever did that.

BY MR. LANGHOFER:

Q.   What about in the committee hearing?  If it was on a break or the middle of the committee hearing, Senator Borrelli leans over -- he was sitting to your left; correct?

United States District Court

MARTIN QUEZADA - Cross

A.    Yes.

01:33:09

Q.    And he leans over to his right, your left, towards you and he mutes the microphone and said whatever words he said.  Did you put that on the record in committee hearing?

A.    No.

01:33:21

Q.    Did you text anyone about this exchange with Mr. Borrelli?

A.    I don't remember.

Q.    Have you got your phone with you?

A.    I do.

Q.    Maybe we'll check it on the break or see if you can.  What about an email?  Did you email anyone about this?

01:33:34

A.    Probably not, no.

Q.    You can access your email from your phone?

A.    I'm sorry?

Q.    You can access your email from your phone.

01:33:44

A.    My legislature I don't have any access to any more but my personal email I do but I probably didn't do that via email.

Q.    Okay.  And you don't think you have a text message either?

A.    I don't know.  I mean, that was a long time ago.  So even if I had, it's probably not there any more.

01:34:02

Q.    You denounced these bills on the floor of the Senate, didn't you?

A.    Yes.

Q.    And you got to list contemporaneously your reasons for thinking these were improper?

01:34:17

MARTIN QUEZADA - Cross

A.   Yes.

Q.   Did anyone cut you off there?  Did anyone not let you finish on the floor of the Senate your reasons?

A.   For these bills, I don't believe that happened for these bills but I was cut off quite frequently when other bills of a very similar nature came up and I did raise those objections. In fact, it became one of the strategies of the caucus to always call a point of order whenever I raised any issues of race whatsoever; so I learned very quickly that if I'm going to discuss the disproportionate impact of their policies on certain racial ethnic minority groups, I was going to get shut down because that was their strategy to call a point of order.

          So the strategies that we used in return was to try to get on record other issues that didn't involve race so that we could at least get something on the record without being shut down.

Q.   So on floor of the Senate, was there a point of order when you were denouncing these bills?

A.   On these bills, I don't believe so, no.

Q.   When did you first disclose this exchange to the plaintiffs in this case?

A.   I'm sure it was the first time we met to -- when I was invited to testify on committee and we talked about the nature of what I would testify about.

Q.   And when was that?

United States District Court

A.    I'm not sure of the exact date.   It was -- I'm not sure to     01:35:52
be honest.

Q.    Roughly.

A.    I believe I was invited to testify or I was reached out in
regards to possibly testifying maybe two months ago but only --     01:36:04
it was only very recently, within the last few days, that we
actually sat down and talked about the actual content of
testimony.

Q.    You think you disclosed this exchange to them, though, in
your first meeting; right?     01:36:19

A.    I'm not sure.   We only met two or three times and I'm not
sure when during those conversations.   But did it come up in
the conversations.   I'm just not sure when.

Q.    And the first time was a couple months ago you said?

A.    No.   No.   They reached out to me a couple months ago about     01:36:44
possibly testifying about these bills but we didn't talk about
the content of that until much more recently, within the last
couple of weeks.

Q.    And that would be the first time you disclosed to them
this alleged statement from Senator Borrelli?     01:37:01

A.    I believe so, yes.

Q.    So it was after Senator Hoffman voted down your nomination
to the Registrar of Contractors?

A.    I would assume so, yeah.   I think that's the timeline.

Q.    The vote on -- we've already talked about it -- vote on     01:37:18

United States District Court

MARTIN QUEZADA - Cross

Q.    your nomination was in May; right?

A.    Yeah.  That's a safe guess, yeah.

Q.    Okay.  It was before this disclosure then?

A.    Yes.

Q.    Okay.  You're lawyer again so you're familiar with the disclosure rules in litigation?

MR. HERRERA:  Objection, Your Honor.  Relevance and legal conclusion.

THE COURT:  No.  He was asked if he was familiar with them.  He didn't ask to draw any illegal conclusions.

Do you know about the disclosure rules that are applicable in federal court?

THE WITNESS:  I am familiar with them but I don't practice civil litigation in federal court so I would not claim to be an expert whatsoever.

BY MR. LANGHOFER:

Q.    Did you -- have you seen the disclosures of your testimony in this case that were made by the plaintiffs?

A.    I haven't -- they are work product I haven't been involved with other than -- yeah.  I haven't seen any of their written work product, no.

Q.    Did you discuss with them what was going to go into the disclosures about your testimony?

A.    No.

Q.    If you've already said this, I apologize for asking.  I'm

United States District Court

not trying to be redundant.  But the first time you would have

told them about this exchange would have been, at the earliest,

a couple months ago.  I think I've got that right.  And that

the latest when?  What's the earliest time you can remember

discussing with the plaintiffs this allegation?

A.   I'm not trying to avoid your question but in general, I'm

not really good at kind of identifying time -- periods of time.

That's always been one of my weaknesses.  But I think the first

time we met to talk about testimony was within the last month,

month and a half maybe.  But the soonest or the most recent

would be just a couple days ago, earlier this week I believe.

Q.   Okay.  The first time you met with them, did you discuss

this?

A.   Possibly.  I don't know for sure.

Q.   Okay.  You talked to them about it before you were in the

courtroom today?

A.   Well, yes, yes.

Q.   You met with them prior to your testimony?

A.   Yes.

Q.   When was that?

A.   I believe it was Monday or Tuesday.  I'm not sure but

earlier this week.

Q.   Certainly would have discussed it with them then I take

it?  Certainly is my characterization.  I'm sorry.

A.   Probably.

MARTIN QUEZADA - Cross

Q.   Okay.  Well, you talked to them about it before you got in the courtroom.  Was it right before the time you got into the courtroom?  When was that?

A.   The last time I met with counsel was -- I believe it was Monday or Tuesday of this week.  It was earlier this week.

Q.   Okay.

A.   That was the last time before coming to the stand today.

Q.   Okay.  All right.

MR. LANGHOFER:  Just one moment, Your Honor, if I may look over my notes.

BY MR. LANGHOFER:

Q.   All right.  This is a little less interrogative.  You're aware of the rules in Senate about impugning the motives of another Senator?

A.   Yes.

Q.   What is that rule, roughly?

A.   In general, you can't imply or say that a member has bad motives for proposing or suggesting legislative changes or proposed law changes.

Q.   And do you know whether those rules are common?  Like, for example, do they also exist in United States Congress?

A.   I would assume so, yes.

Q.   And when you said there's points of order because of -- when you give comments about race, that Senate rule about impugning motives, is that the basis for the point of order?

MARTIN QUEZADA - Redirect

A.    That was the basis that they called the point of order, yes.

Q.    But there are -- there is a way in the Arizona State Senate where you can raise issues of race without transgressing this rule, is there not?

A.    Absolutely, yes.

        MR. LANGHOFER:  Your Honor, I think that's all the questions we have.  We would object to his release because as you've no doubt gathered --

        THE COURT:  You don't have to object.  When I say, "May this witness be excused?"  You just say, "No."

        MR. LANGHOFER:  Thank you.

        THE COURT:  Mr. Herrera, redirect?

        MR. HERRERA:  Yes, Your Honor.

**REDIRECT EXAMINATION**

BY MR. HERRERA:

Q.    Mr. Quezada, the counsel with the RNC asked you about your conversations with Senator Borrelli that might have happened at one of the committee hearings right?

A.    Yes.

Q.    And I think counsel asked you directly, would that have been 2492 or 2243 I believe; right?

A.    I believe so, yes.

Q.    But another committee that you were a part of was also the Government Committee which also heard H.B. 2617; right?

United States District Court

A.   That's correct, yes.

Q.   Earlier counsel from the Attorney General's office asked you about comments from the public.  Did -- if you recalled any comments or support for these types of laws from the public. Do you recall what the substance of those were in terms of the reasoning for why there is voter fraud?

A.   Yeah, and I think that the reasoning was placed in very broad terms, in terms of there's voter fraud out there.  Like there was a belief that voter fraud is happening but there was no specifics about what it looked like, where it was happening or how this -- or how the proposed legislation was going to fix it.  It was just kind of a general, broad belief that it was out there.

MR. HERRERA:  Okay.  Your Honor, no further questions.  We have no further questions, Your Honor.

THE COURT:  Thank you.

Thank you very much, sir.  You may step down.  You are not excused as a witness which means you may be subject to recall later in the trial.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  Counsel will get in touch with you if we need you.

Plaintiffs next witness, please.

MR. BABBITT:  Your Honor, the next witness is sitting

United States District Court

in the back and making her way up here.

THE COURT:  I just heard the name Traci.  Dr. Burch, are you the next witness?

MR. BABBITT:  Dr. Burch, yes.

THE COURT:  You can come forward and be sworn to this lady with her hand up.

(TRACI BURCH, PH.D., a witness herein, was duly sworn or affirmed.)

COURTROOM DEPUTY:  Can you please state your name and spell your last name for the record?

THE WITNESS:  Traci.  T-R-A-C-I.  Burch, B-U-R-C-H.

COURTROOM DEPUTY:  Great.  And you can go ahead and have a seat in the witness box.

MR. BABBITT:  Good afternoon, Your Honor.  Christopher Babbitt for the DNC and Arizona Democratic Party.

THE COURT:  Please proceed.

**DIRECT EXAMINATION**

BY MR. BABBITT:

Q.   Professor Burch, could you please introduce yourself to the Court?

A.   Yes.  My name is Traci Burch.

Q.   Have you proposed some demonstrative slides to assist the Court with your testimony today?

A.   I have.

THE COURT:  I can't wait to see.  There's a high bar

TRACI BURCH, PH.D - Direct

on the demonstratives slides that has been established.

MR. BABBITT:  We'll try to meet that bar.

MR. LANGHOFER:  We do object to the use of a demonstrative.  The demonstratives that we've seen so far are in the order of clarifying, you know, charts.  What we have here is a 38-page slide deck.

THE COURT:  Well, let's wait and see.  If I find it helpful, it's just a demonstrative.  It's not evidence so I haven't seen it.  I'm going to just look at it here on the screen.

BY MR. BABBITT:

Q.    Professor Burch, are these the demonstratives that you prepared in connection with this litigation?

A.    Yes.

Q.    If you could please describe your educational background for the Court.

A.    Yes.  So I finished my undergraduate work at Princeton in politics, which is what they call political science.  I was a minor in African-American studies.  And my Ph.D. at Harvard in Government, which is what they call political science, and social policy, which is a separate field.

Q.    And what is your current position?

A.    Currently I am both an associate professor of political science at Northwestern University and a research professor at the American Bar Foundation.

United States District Court

Q.   How long have you been employed with Northwestern?          01:48:00

A.   Since 2007.

Q.   And do you have tenure at Northwestern?

A.   Yes.

Q.   What courses do you teach at Northwestern?                  01:48:08

A.   So I teach courses for both Ph.D. students and undergraduate students.  I've taught courses in race and public policy for both undergraduates and Ph.D. students.  I've taught political behavior for graduate students.  I've taught -- which would be the Ph.D. students.  I've taught intro to American   01:48:27 politics for undergraduates, our intro to the court system which is law and political arena.  I've also taught criminal justice politics and policy, also courses on the American welfare state for both Ph.D. and undergraduate students.

Q.   And so you teach courses on political participation.  Is   01:48:50 that fair?

A.   Yes.

Q.   How long have you been employed by the American Bar Foundation?

A.   Also since 2007.                                            01:48:59

Q.   What does your work at the American Bar Foundation entail?

A.   Typically, I do my same research that I do at the -- at Northwestern at the American Bar Foundation but I also have some committee assignments and work.  So I might chair -- so a couple years ago I chaired our search for our Executive         01:49:15

United States District Court

TRACI BURCH, PH.D - Direct

Director and right now I sit as an associate editor of our in-house journal.

Q.   Have you received any professional awards or recognition for your research?

A.   Yes.   So for my dissertation I received several awards and that dissertation was looking at how people with felony convictions participate before and after their criminal convictions.   And so I received the best dissertation on the subject of political science from Harvard as well as several national awards from the American Political Science Association and different branches of the American Political Science Association.

My book, Trading Democracy For Justice, also won several national awards from the American Political Science Association as well.

Q.   Have you ever served as a peer reviewer for any scholarly journals?

A.   Yes.   All the time.   Scholarly journals, for -- such as the *American Political Science Review*, the *American Sociological Review*, *Nature Science*.   I've served as a reviewer of proposals for the National Science Foundation.   I write reviews for tenure and promotion as well as other kinds of evaluations.

Q.   In the course of your work at Northwestern and the American Bar Foundation, do you have experience conducting

01:49:18

01:49:30

01:49:51

01:50:04

01:50:22

01:50:41

United States District Court

TRACI BURCH, PH.D - Direct

quantitative analysis related to voter participation?

A.   I do.  So most of my work involves quantitative analysis and I look at voter participation and political participation more broadly such as thinking about protests as well.

Q.   Dr. Burch, did you prepare a written report in connection with this litigation?

A.   I did.

Q.   Is the image on the screen, is that an image of your report for this case?

A.   It is.

Q.   Does your report accurately describe your experience as of September 14, 2013, the date it was submitted?

A.   '23.

Q.   Excuse me.  2023.

A.   Yes.

Q.   Since the time you submitted your report in this case, have you been engaged as an expert in any other litigation?

A.   So -- I testified last Tuesday in a preliminary injunction hearing.

Q.   And in how many cases are you provided expert testimony in court before?

A.   So I believe this is my -- if we count the preliminary injunction hearings, I believe this is my ninth time in court. One of those was a state court case.

Q.   And at a general level, what was the -- what subjects were

United States District Court

TRACI BURCH, PH.D - Direct

you asked to opine on in court?

A.   So I've been asked to talk about the experience of people who are trying to get re-enfranchised after a felony conviction.  I've done some work on Section 2 of the Voting Rights Act with respect to some of the Senate Factors, typically Senate Factors 5 through 9.  I've also done work on the Arlington Heights Factors as well as some other kinds of voting cases, such as a voter ID case and a case about voting during COVID.

Q.   And were you qualified to serve as an expert in those cases?

A.   Yes.

Q.   And as far as you know, have courts relied on your expert testimony in those cases?

A.   Yes.

        MR. BABBITT:  Your Honor, at this time the plaintiffs would offer Dr. Traci Burch as an expert in political science, political participation and behavior pursuant to Rule 702.

        MR. LANGHOFER:  Again, I don't think we did that in this court, Your Honor, but we would prefer to object to specific questions where appropriate.

        THE COURT:  Yes.  Wait and see if there's any objections to opinions offered by an expert.

        MR. BABBITT:  Okay.  And just to belabor the formalities, Your Honor, we have put Professor Burch's report

United States District Court

on the screen.  My understanding is that the status of the                01:53:22

expert reports is still pending with the Court for decision.

THE COURT:  That's right.  And I'm not going to make

a decision about their -- so as I said before, they are either

all coming in or they are all staying out as admitted exhibits    01:53:36

and I will not decide that until I've heard from all the

experts and see if I think I want them all or if I'm just happy

with the testimony.

MR. BABBITT:  I understand, Your Honor.  I just

wanted to make sure that Dr. Burch's report would be included    01:53:52

and I take it that it would be.  It's either all or none.

BY MR. BABBITT:

Q.   Professor Burch, let's now turn to your assignment in this

case.  What were you asked to do as an expert in this

litigation?                                                       01:54:07

A.   So I was asked to assess whether the provisions of H.B.

2492 and 2243 would impose burdens on the right to vote, and

the specific provisions that I talk about in my report are

really about the documentary proof of citizenship being

required to vote the full ballot as well as the potential for    01:54:26

investigation and prosecution if a person -- for people who

haven't provided that documentary proof where there's

information that they aren't citizens.

Under 2243 there's also the issue, again, of

documentary proof of citizenship for people who -- if they are    01:54:45

United States District Court

TRACI BURCH, PH.D - Direct

doing a check of voter registration rolls, if they are requesting those documents in order for people to stay registered.

Q.   At a high level, can you describe the methodology that you used to reach the opinions in this case?

A.   Yes.  So with respect to my methodology, I conducted a review of the published research in political science as well as some other related disciplines such as public administration, and I also looked at some work from sociologists and economists as well.  I looked mainly at peer-reviewed articles but I also look at some Government reports.

I looked at some census data, some news reports as well and I applied the frameworks from that literature -- that came from that review of the literature to think about the costs associated with these laws in Arizona.

MR. LANGHOFER:  Your Honor, the display of Government seals is an attempt at vouching for the credibility of the witness.  We object to this.

THE COURT:  So noted.  These are demonstrative.  They are not admitted in evidence and I specifically rejected a paper copy of them so once they are off the screen, they are gone.

BY MR. BABBITT:

Q.   Professor Burch, is a review and analysis of the materials

United States District Court

TRACI BURCH, PH.D - Direct

and sources that you described typical of what you do as a political scientist?

A.    Yes.

Q.    If you would, could you please summarize at a high level the opinions that you've reached in this case?

A.    Yes.  So I have several conclusions and the first baseline is that in my opinion, rational choice is the framework that is most often used in political science and other social sciences to explain human behavior.  And it's appropriate for evaluating the effects of these Challenged Laws here and how they will affect registration in voting.

THE COURT:  Hold on a second.  When you say rational choice, I have a layperson's view of that.  Is there a political science specific definition or is it just what I think rational choice, make a choice after you think about it rationally?

THE WITNESS:  Well, yes and no.  So it is -- the idea is that you weigh costs and benefits and then you -- and then that exercise determines for an individual whether it's worth it or not to undertake an activity.

THE COURT:  Thank you.

BY MR. BABBITT:

Q.    Professor Burch, would you continue summarizing your opinions?

A.    Yes.  So another opinion that I established through the

United States District Court

TRACI BURCH, PH.D - Direct

literature is that even incremental changes to voting laws can have some effect on voters and they can affect the participation of people who are kind of at the margins of making that decision, which I'll talk about more in detail.

The other -- some other -- another conclusion that I draw is that socioeconomic status can affect the ability of people to bear the costs of voting.  And given all of those documents, the documentary proof of citizenship requirements and the investigation and prosecution provisions, in my opinion, do increase the costs to voting in Arizona.  And for that reason, the Challenged Laws will likely decrease voter registration and thus voting among some otherwise eligible voters.

Q.   So Professor Burch, if we could turn to the analytical framework that you applied here, the Court had asked you to elaborate on rational choice theory.  This may be exactly what the Court wanted or maybe it is as boring to Judge Bolton as it is to me.  If you can explain what this formula does with respect to the rational choice framework?

A.   Yes.  So, Your Honor, rational choice is actually a really complex mathematical model and this is the simplified version of it.  Basically, for political science, it says that R, the reward for voting, is a function of the probability, P, that someone will get some benefit from voting and also a function of other things that they get benefits like -- that might be

United States District Court

TRACI BURCH, PH.D - Direct

your civic duty or that joy, that benefit you get from fulfilling your civic duty or upholding democracy minus the costs of voting, C. So it really is exactly, as I said, this idea of benefits, the probability of benefits, such as your candidate will win or saving democracy or whatever you think minus the cost.

Q. And so if we could turn to the next slide just to illustrate the point and practice.

A. So just to make that a little -- take it out of mathematical form. It really is a focus on this idea of benefits versus costs. And so it's a rational -- rational choice is this framework for understanding all kinds of human decision-making and behavior so it's not just a political science framework. We also think about it in terms of, like, the decision to buy a car, for instance. But it is useful I think in terms of envisioning how people are doing that balancing.

And so individuals can differ in their evaluation of costs and benefits. Some people might place a really high value on the expressive power of voting for -- of voting or they really, really, want to vote to see a particular candidate win where other people might not care as much. Similarly, people are different in terms of their ability to be able to bear the costs voting.

Q. So let's see if we can take this down a level about

United States District Court

TRACI BURCH, PH.D - Direct

distraction.  Can you talk more concretely about what sort of costs are relevant to whether someone participates in the voting process?

A.    Yes.  So the literature that I outline in my report talks about three kinds of costs that we need to look for when we're thinking about voting.  And those are balanced against those benefits that I talked about.  But this is true, again, not just for voting but for other kinds of administrative participation in general, so applying for Government programs. So it's a much more expansive literature than just voting.

Q.    Okay.  Let's go through those one by one.  What are learning costs?

A.    So learning costs are exactly what you would expect.  So the learning cost is the cost of acquiring information and trying to figure out whether you're eligible for a program or how to apply.  And those costs can be really big for some people.  And if you think about -- I have a picture here of a form to apply for EITC.  Research has shown that these forms, while they may seem simple to whatever IRS person that wrote it, it actually makes it hard for people to understand if they are eligible or not.

        So research has shown that if you even just help people fill out these kinds of forms or fill out their FAFSA for their college admissions or something like that, you can actually increase program participation.

United States District Court

TRACI BURCH, PH.D - Direct

Similarly, the published research with respect to voting shows that these learning costs or matter for voting as well so people -- people can find it difficult if they call an office and don't get proper information from people in the Elections Division, for instance.  So in that article that I cite in my report is from Ariel White and some other co-authors.

Q.   Let's move on to compliance casts.  What are compliance costs as understood in the literature?

A.   So compliance costs are probably the ones we all experience the most with respect to thinking about participation in voting or other kinds of bureaucracies.  Those are just the time, the effort, and the financial costs that are required to meet those kinds of administrative demands, those rules.  So those can be completing paperwork.  They can be requiring a face-to-face interview where you have to go somewhere, travel time or other kinds of costs, wait times.

It can also include some kind of documents if you have to provide a document.  That is a compliance cost and those documents, again, to the extent that they are available or unavailable, may make it more difficult to -- for people to participate in the program and those have been shown -- those kinds of costs have been shown to affect participation in all kinds of programs, including SNAP, which is the newer name for food stamps our SSI or Medicaid.

United States District Court

TRACI BURCH, PH.D - Direct

Q.   And is this what we just think of as red tape in the vernacular?

A.   It can be a little bit different.  The literature does distinguish between regular compliance costs and red tape.  Red tape is kind of thought of as a more extreme version of this.  For instance, we all have to go to the DMV to get our drivers' licenses renewed.  But, for instance, I'm a safe driver so in Illinois, I can renew by mail rather than having to go down to the office.  So these are kind of like a sliding scale in the idea that almost all administrative processes have some compliance costs but they can be more or less onerous and more or less unnecessarily so.

Q.   And so let's move on to the third category of costs which you identify as psychological costs.  What are those?

A.   So psychological costs are those kinds of costs that are associated with the emotional burden of having to participate in a policy.  So -- of trying to participate in a policy.  So that could be anything from stigma to anxiety to fear that sometimes can happen, especially when you're thinking about the kind of program or the kind of administrative apparatus where a person might be subject to increased surveillance or the threat of prosecution.

So examples, again, of these kinds of threats mattering, can be found and I cite in my report with respect to uptick in the supplemental supplemental nutritional assistance

United States District Court

TRACI BURCH, PH.D - Direct

program, SSI, Medicaid, even among citizens. So I cite here, I talk about an article in my report where they conclude that evidence showing system avoidance among Latino U.S. citizens who adopt these strategies to minimize their risk of experiencing harassment associated with questions about their citizenship status. So that kind of finding is a psychological cost.

Q. Okay. So Dr. Burch, we've now covered the three buckets of costs that you identified. Let's move on and apply them to voting specifically.

So what are you showing on either side of the scale here?

A. Here again we have just the simple kind of balancing idea and on the left in the blue triangle we have all of these learning costs, but I have some examples of those as they are specific to voting.

So learning costs here would be things like how do you register in time? Where do you go to register? Where is my polling place?

Compliance costs are a little different. They might be the paperwork and time that it takes a person to register. But we can also think about the time it takes to cast a ballot. So if you go to vote and you have to wait in line or you have to go quite a distance to your polling place, that's one of those compliance costs.

United States District Court

TRACI BURCH, PH.D - Direct

We can also think about the issues related to having to pay to get documents, that's another kind of compliance cost.

Finally, there are some psychological costs to trying to vote and those might include fear of prosecution or reprisal or they might also include, just in general, the costs of increased -- having to have increased interactions with the Government.

Q.    So over on the right side, though, we have the benefits of voting.  So what does the political science literature understand to be the benefits of voting?

A.    Sure.  So there are quite of few.  This isn't an exhaustive list but a few examples.  I've talked about the pride in performing your civic duty.  Some people their -- you know, there is social pressure to vote.  If you're not a voter and are surrounded by other people, you might feel that this is a social expectation.  You can be voting for altruistic reasons, to help a cause or group.  Or you might just be, of course, interested in helping a preferred party or candidate. So there are lots of reasons that people vote.

Q.    Let's talk more specifically about how this might work for that for an individual voter.  Who is it that might be affected by the balance of cost and benefits as understood in the framework?

A.    So here again I'm thinking about balancing.  So if you

United States District Court

938

TRACI BURCH, PH.D - Direct

imagine on one hand the kind of person who really values voting. They always do it. There's nothing that can stop them. You can heap costs on those kinds of people and it's not really going to affect their turnout.

On the other hand, you might think about the kinds of people who just see no benefit to voting at all. There's nothing you can do to convince them to vote. You heap costs on them, they weren't going to vote anyway. It's not going to make a difference.

So what I'm interested in here is with these people who are kind of in the middle. So these are called the group of marginal voters. That is the people for whom even small increase in costs will make that decision more or less rational. So if you take -- so this person has some benefits here and it has some costs here. If you remove just those top two rocks, it kind of shifts their calculus in a way that for, again, those other people who have really had benefits or really -- just like no benefits of voting. It doesn't matter. So it's just that smaller group of marginal voters where you are expecting to see those incremental changes making a difference.

Q.   Let's take a break from the graphics for a minute and move to sort of the research. So given the extent of the research that you cite in your report, could you just walk us through a sample of the literature that you cite with respect to the

United States District Court

939

TRACI BURCH, PH.D - Direct

different steps in the voting process?  Let's start with the registration.

A.   Yes.  So there are several studies that I highlight in my report that can help us think about the kinds of policies and places that we should expect -- that we political scientists have seen that the costs of voting matter for turnout.  And one of those is just basic registration.

There are a number of studies that show that the cost of having to register itself does discourage and can discourage participation.  More research also shows that the more or less restrictive -- some of those registration laws are, for instance, a 45-day window between elections, between registration closes and the election versus a 15-day window or something like that can make a difference and reduce turnout.

Q.   Okay.  So let's move beyond registration to the act of voting.  What does the rational choice framework say about costs in the context of actually voting?

A.   So there are several kinds of costs that have been analyzed.  Some examples include if you increase the distance between your polling -- a person and their polling place, for people who don't have cars, that could make it harder for them to vote and reduce their turnout.

For people who -- if you change someone's poll place at the last minute, it makes it harder for them to find the information to be able to get to the right polling place and

United States District Court

TRACI BURCH, PH.D - Direct

vote.

Even long wait times have been shown to discourage voting so people might leave the polling place.  And, finally, there are some strict forms of voter ID that have been shown in some studies to affect voter turnout negative.

Q.   Okay.  So let's move back to graphics.  What is this depicting here?  What are you trying to illustrate?

A.   My favorite little lady here.  What this slide is doing is it's kind of helping us think about this role -- the role of resources.  And so here on her feet I have these costs which are -- could be something like documentary proof of citizenship or the cost of interacting with the Government.  Those are kind of like weights holding her down.  But then you have all of these other kinds of resources that I talk about in my report such as educational attainment, such as like having a college degree or English fluency or having a flexible job or Internet access, so other kinds of resources that can make -- that can help offset the weight of some of those costs so that some people are better able to bear costs than others.

Q.   Okay.  So let's move on to the application of your analysis to Arizona specifically.  On page 12 of your written report, which I appreciate the Court has not seen and sort of in a moment of suspense, you state in your report that research consistently shows a strong relationship between voting and socioeconomic status and educational level.  Can you talk about

United States District Court

TRACI BURCH, PH.D - Direct

why those are relevant to voting?

A.   Yes.   So thinking back just to the lady with balloons, education as I said were you wasn't of those things that raises people up and helps offset the cost of voting and that happens through a number of different pathways.  It could happen because education affects income but it also happens because education makes it easier for people to navigate bureaucracies. There's just a number of ways the research.

Specifically, it helps people acquire things like time, money, and what they -- what some call civics skills. Here, for that reason, I do point to resources in Arizona and provide information about resources in Arizona to help us think about the extent to which some people may find it difficult to offset costs.

So I have here a chart of people in Arizona, citizens, the left hand of this is like the percentage of citizens age 25 in each racial group at the bottom.  And you can see for each group here that there's a significant number of people in each of these groups who don't have a high school diploma.  Those numbers are worse for certain groups but, again, there's a non-zero number of people in each group who, again, would face -- don't have as much of those resources, that educational background that we think helps people offset the costs of voting.

Q.   Okay.  And I see at the bottom of this slide that you've

United States District Court

cited the American Community Survey.  What is that?                    02:14:52

A.    These data come from the American community survey which
is a survey that is run by the Census Bureau every year and
what they do is between censuses, they use it to select more
detailed data than they do on the census and they use it to    02:15:06
produce some of the estimates for population updates.

Q.    And how did you use that data for the purposes of your
analysis in this case?

A.    You can download custom tables from the census website, so
I put in these variables and downloaded the table.             02:15:25

Q.    And are these data and that methodology typical in the
field of political science?

A.    Yes.

Q.    And is it something that you work with in the course of
your every day academic career?                                02:15:36

A.    Yes.

Q.    Okay.  Let's move to the next slide and can you talk about
the importance of income as it relates to voting?

A.    Yes.  So income, again, is one of those kinds of factors
that you think shouldn't matter to voting but, again, to the   02:15:51
extent that there are costs associated with voting, it's easier
for some people to pay those costs than others.

          So I have here a slide that shows the percent of each
group and this is the whole group below the poverty line and
here you can see that for each group, again, there's a non-zero 02:16:10

United States District Court

TRACI BURCH, PH.D - Direct

number of people who live 100 percent or below the poverty line.  And of course those -- again, those numbers are very different across groups so that there may be larger proportions in some groups than others who also are in poverty.

Q.   So let's talk about on slide 23 we have data that you've prepared about homes without Internet access or households without Internet access, without vehicles at home.  I see, again, a range of estimates here but, again, a non-zero number to take your phrase.

So what's going on here?  Why is Internet access or vehicle access relevant to voting?

A.   Yes.  So here I do have -- again, we're switching to households here because this is asked as a class of households and so along the bottom we have the race of the house holder and the ethnicity of the house holder.  And here we can see there's a non-zero number of people that don't have Internet. Similarly, a non-zero number of households that don't have access to the Internet in each group and also a percent that don't have access to a vehicle.

So I already talked about vehicles before because remember when I talked about even polling place location or thinking about the facts that if you can't or find it's difficult to vote by mail, you have to drive to a polling place.  And, again, there's a large number of people that don't have vehicles in some groups.

United States District Court

TRACI BURCH, PH.D - Direct

Similarly with respect to not having Internet access, it's just easier to do things like order a birth certificate from out of state or register to vote if you can access the Internet versus having to go in person or do it by mail.

Q.   And how about on our last slide here with the tables which is language fluency, how is that relevant to voting?

A.   So this is a graphic of Arizona citizens who speak English, not very well or not at all and, again, here this is from the American Community Survey five-year study and there are non-zero numbers of people in each group who say that they don't speak English very well or not at all, but, again, those are more prevalent in certain racial and ethnic groups.

Q.   So let's move on to the laws themselves that are at issue in this case and everybody in this courtroom is by now very familiar with the requirements of the law so I won't ask you about those.   I just want to confirm that what is shown on slide 25 is consistent with your understanding of the laws at issue?

A.   Yes.

Q.   Let's talk about applying that framework that you just described to these laws.   Can you talk about the compliance costs as you understand it associated with the laws at issue?

A.   Yes.   So for this report, I did some research on some of these compliance costs.   So to get a birth certificate, a copy of a birth certificate, in Arizona a certified copy is $35.50

United States District Court

TRACI BURCH, PH.D - Direct

for people who were born after 1948.  If you are Native American and want to apply for a delayed certificate of Native American birth, to get that document is a total cost of $40. But in other states they also charge for birth certificates. So New Mexico they charge $10; Texas they charge $22; Nevada, they charge $25.

Q.   Okay.  So those figures, I mean, they may not seem like a lot for some people in this room perhaps.  But why is that, you know, a material number, a material cost in your view?

A.   It's a material cost, again, because we just talk about the number of people who are in poverty for whom those represent a much higher percentage of their income than some of us in this room.

Q.   Talk about that a little bit more concretely.  Let's take somebody who is living below the poverty level, can you explain the math and how your framework would apply to someone in that setting?

A.   Yes.  So in my report I talk about what the poverty line is and for a single person in 2021, that line was $13,788; and for a family of four, I believe it's about $27,700.  And if you think about what that means in terms of real numbers as I have here, 10 to 35 -- you know, so that -- for a single person, that equates to something like $265 a week or less in income.

So then for a single person who has a birth certificate, that $35 could be like a day of your income.

United States District Court

TRACI BURCH, PH.D - Direct

Similarly for the delayed certificate of Native American birth, it's still just over a day of income.  So it's not a non -- it's not a trivial amount of money.

For people who may need -- if they don't have either access to their naturalization number or the documents to show to a registrar if they have to order copies of those documents, it can cost hundreds of dollars, as I show here, and that could be more than two weeks of income.

Q.    So it's your view that those costs could tip the balance for people who find themselves in that situation?

A.    Yes.

Q.    Let's move on to psychological costs.  What do you understand the psychological costs to be associated with the laws at issue here?

A.    Yes.  So I talk about in my report the fear of surveillance or investigational prosecution and show how those have been shown by research to affect uptake of several different kinds of programs such as SSI, SNAP, Medicaid; but there's also evidence that associating voting with prosecution or deportation can also help reduce turnout.

So -- and this can be worse among people who have a kind of history of fraught relationships with authorities.  So I talk about several different kinds of evidence such as news reports of people who say that they are feeling -- are not going to vote because they are aware of prosecutions of people

United States District Court

TRACI BURCH, PH.D - Direct

like them who have felony convictions who don't vote.  And so even though they are eligible themselves, they, because of those -- they know about those and learn about those prosecutions, they don't vote.

There are -- I cite a study that talks about how people were deterred and intimidated when an officer was placed in a polling place, for instance, and talk about instances in the past of voter intimidation being associated with police at polling places and associated with voting.

Q.   Professor Burch, does the political sciences literature reflect that those concerns or dynamics are particularly acute among particular demographic groups?

A.   Yes.  And they have been shown, like I said, to be acute among racial and ethnic minorities and they have also been shown to affect citizens as well.

Q.   Great.  And so I think we talked about, you know, in the previous slide about costs.  Before we move on to the rebuttal reports, I just want to sort of make sure that I understand your view of costs.

So we talked about a person in poverty and the costs of getting DPOC birth certificates.  Can we go back to -- maybe one slide.  Let's walk through the end of this table.

So $1170 for a citizenship certificate, what does that refer to or entail?

A.   So as I say on the slide before that, it is a --

United States District Court

948

TRACI BURCH, PH.D - Direct

sometimes, again, if someone I think is either born -- I think    02:24:40
the citizenship certificates are maybe for people who are born
abroad or for other reasons need to prove citizenship not
through something like a birth certificate.  You have to
request that through the U.S. Government and that can cost    02:24:55
$1170.

Q.    And your analysis of that is set forth in your report to
the extent it comes in or is referred to; is that right?

A.    Yes.

Q.    Let's move on to the rebuttal reports.  Are you aware that    02:25:11
the defendants have submitted or at least served on us written
rebuttal reports in response to your written report in this
case?

A.    Yes.

Q.    And have you read those reports?    02:25:26

A.    I have.

Q.    At a high level, what is your understanding of the
criticism reflected in the rebuttals?

A.    So my understanding of the criticisms are, first, that my
analysis is premature because the policies haven't been    02:25:43
implemented yet and we need to study them after they have been
implemented.

        I also understand them to be saying that my analysis
of the political science literature is incomplete and ignores
some of the literature that find what they say no effect or    02:25:57

United States District Court

even a positive effect on turnout for imposing costs of voting.

I also understand Dr. Hoekstra could be saying that some of the published research in political science is not -- it's unreliable and not -- the empirical method are not reliable.

And, finally, Dr. Hoekstra, my understanding is that he believes the these laws may have a positive effect or no effect on voting.

Q.   And have you considered the criticisms reflected in those reports?

A.   Yes.

Q.   And do they affect your opinions in this case?

A.   No.

Q.   Let's talk about why that is.  Let's talk about the first bucket of criticism primarily from Professor Stein regarding the contention that your conclusions are premature because the laws have not been implemented.  Can you speak no that?

A.   Yes.  So I don't think that my conclusions are premature first.  I'm aware of the fact that there is a federal-only list with thousands of people on it who have not provided documentary proof of citizenship, so I'm not -- so it doesn't make me uncomfortable because I know that these people exist to some degree in Arizona.

The second issue is that I think political science provides plenty of past research and a framework for helping us

United States District Court

TRACI BURCH, PH.D - Direct

think through what those costs are and also our expectations of what should happen when we impose those kinds of costs on voters, so we can rely on studies of increased costs and political science to help us think about what costs happen and also costs have happened in other administrative contexts as I do in my report.

Q.   So let's move on to second bucket of criticism which is essentially the contention that there's a body of political science that are, particularly in the voter ID context, that said that increasing costs on voters in certain manners just does not, in fact, lead to a reduction in participation.  Can you speak to that?

A.   Yes.  So those studies primarily focus on voter ID and some other kinds of research with some fairly big data sets that are examining the effects of laws by comparing certain kinds of -- certain kinds of states.  So there may be states that have strict ID laws and other states that don't, either over time or in specific kinds of contexts.

And what they find is really interesting because I think that if -- my understanding of their findings isn't that they find no effect.  They find a null statistical effect or their analysis can't detect an effect, which is I think is a slightly different thing worth exploring further.

The second thing is that these studies address, and the authors are really careful to talk about what it is the

United States District Court

TRACI BURCH, PH.D - Direct

limitations of their studies and what they can and can't show. And they can show what we are calling net effects or aggregate effects. They are this big data sets that are examining overall aggregate turnout and it could be that one person is -- their voting is suppressed and another person their voting is increased and they cancel each other out. So you find a null effect even though there are people whose votes are actually suppressed.

The final thing is that all of these studies that they cite in saying there's no effect, they are actually not saying there's no effect of the change to voter ID. What they are finding is voter ID might have a slight negative against effect that is offset by something else and that something else, if you think back to that lady with balloons, is usually something like mobilization by campaigns or it's -- in another instance cited by Dr. Hoekstra, the state actually sent out letters to people who didn't have the proper kind of license and they found the letters were mobilizing.

Q.   So let's go in detail into that first point which is that your explanation that a null statistical effect doesn't mean that there are zero affected voters. Can you elaborate on that, including with respect to the Cantoni and Pons articles that are featured predominantly in the rebuttal reports?

A.   Yes. So what's interesting is so Cantoni and Pons actually state their own conclusion, which is we can rule out

United States District Court

TRACI BURCH, PH.D - Direct

that strict ID laws reduce aggregate registration and turnout by more than 2.3 and 3.0 percentage points.

And they actually find that the effects that they find are like these negative .1 percent and they can't distinguish it from zero.  So they actually report that there's kind of a range of where that could be.  It could be positive. It could be negative.  But they can't -- their analysis here isn't sensitive enough to detect it.

What I think is interesting about Cantoni and Pons is that their sample size is like 1.6 billion events of voting. If you think about 2.3 percent of 1.6 billion, it's like 38 million.  So even if they say it's a small effect or null effect, their study just isn't sensitive enough to detect anything smaller in that range.

Q.   Professor Burch, just on that, since the Court hasn't seen the articles themselves, can you elaborate on what the methodology was in Cantoni and Pons and how they came up with 1.6 billion voting events?

A.   Yes.  They take a huge data set which I think is from Catalyst, which is an organization that -- a company that aggregates all of these voters -- voter registration files from across the United States.  And they look to see both registration and voter turnout from all of these voters over I think six different elections and they compare turnout in states that have strict voter ID at various points in time with

states that don't.  And what they find is that, again, they can rule out that strict ID laws reduce aggregate registration and turnout by more than 2.3 and 3.0 percentage points.

And they have some other kinds of analyses of voter ID as well using slightly different data sets but; again, they kind of have the same -- you know, they may find smaller effects using some kinds of data and analyses but that's their main finding.

Q.   And then before we move on beyond this slide, can you sort of speak to what Komisarchik and White are getting at as you understand it with this quote?

A.   Yes.  So this is another one that Dr. Hoekstra I believe cites is -- in response to my report and they themselves in this article say voter identification laws appear to directly reduce turnout among the small number of people who do not have the required forms of identification; Grimmer and Yoder 2019 puts the size of this effect at several thousand voters in North Carolina's 2016 elections and they say that it's a small fraction of the state's electorate but it's still several thousand people.

Q.   So moving on, I think we see a little bit more of this on slide 34.  And I think you spoke to this earlier.

So can you elaborate more on what you're getting at here with slide 34?

A.   So with respect to net effects, these articles that are

cited -- actually are pretty clear about expressing limitations about what they are finding.

So, again, if you think about the fact that if you're doing a big aggregate data analysis, sometimes some people might be negatively affected, some people might be positively affected, some people might not be affected at all and so some of those people cancel each other out.

And so Komisarchik and White say quite specifically that it's plausible that some small number of voters are deterred by changes to election practices while a different pool of voters are mobilized by concerns about voting rights or Get Out The Vote efforts.

And so they talk about that dynamic in terms of how they might be finding null effects because voters are actually canceling each other out and they worry about that. They say we might see stable rates of black or Hispanic participation but it's possible that the set of people casting those votes is shifting in patterns that shape local politics in important ways.

Q.   So what does that mean? Can you elaborate on what that dynamic is on the ground?

A.   Yes. So they are specifically talking about a dynamic in which you might have some voters who don't have money who can't come up with the documentation they need who are suppressed. And some other voters who are the same race and ethnicity might

TRACI BURCH, PH.D - Direct

see that and get mad and turn out more.

So you get this canceling out of the effect where it looks like there's no change to voting among that ethnic group but what they are actually -- Komisarchik and White are saying no, it could be a real important change in the electorate, especially if the people that are turnout more are better off. So it actually shifts the electorate.  Even though it's the same racial group, it doesn't affect -- that of those people might be better off so that's the argument they are making, that it still has an effect on certain voters and stops them from voting.  But it also might affect the shape of who is voting and the voices that are coming through in the electorate.

Q.    So let's shift now to the mitigation that you had described and the intervention of sort of people other than the voter to offset some of these costs.

So what are you describing here on slide 35?

A.    So here on slide 35 I'm talking about the fact that each of these articles that are -- my understanding is there they say specifically that they are not attributing the increase might come from turnout to voter ID or the change in the voting law.  Rather, they are saying that there's two different forces going on.  So, again, there might be the weights on the lady's feet but then there's another balloon.  It's like a campaign mobilization.

United States District Court

So here in Cantoni and Pons they say, "However, the laws increase the likelihood that nonwhite voters report being contacted by a campaign by 4.7 percentage points, suggesting that parties and candidates who fear they might lose votes as a result strict ID requirements mobilize their supporters around this issue.  These mobilization efforts might have offset small direct negative effects on the participation of ethnic minorities."

There's this give and take.  And so you have people again who are negatively affected but other factors make it really hard to detect that in a kind of aggregate analysis they are doing.

Q.   To be clear, Dr. Burch, this is not literature that you cited in your affirmative report.  Rather, this is your response to the rebuttal experts' citation of these authorities to rebut your conclusions; is that correct?

A.   Yes.

Q.   So I think we've talked about this at the kind of -- at the broader level.  I would like to turn now to the specific example or episode of the introduction of a documentary proof of citizenship requirement in the Medicaid program in 2006 which I know that you -- you feature very prominently in your report and draws very focused criticism from Dr. Hoekstra in the rebuttal report.  Just to be clear, you rely on a report from the Government Accountability Office in support of your

United States District Court

TRACI BURCH, PH.D - Direct

affirmative opinion; correct?

A.    Yes.

Q.    And as I understand it, Dr. Hoekstra criticizes the reliability of that report from 2007 because in his view, a 2010 academic study by a Harvard medical school professor did an empirical analysis which he found to be inconsistent with the GAO's findings so he calls into question the reliability of the GAO report that you rely upon.  Is that fair, at least with respect to your understanding?

A.    Yes.

Q.    Okay.  So let's talk through the GAO report.  What is going on with the GAO report.  Would it help to sort of pull it up?

A.    Sure.

        MR. BABBITT:  Again, to be clear, Your Honor, we're not asking for this to be moved into evidence.  We just want to have it up so that it's available for Dr. Burch to address if that's okay with the Court.

        THE COURT:  It's fine with me.

        MR. LANGHOFER:  We would be fine admitting it into evidence, Your Honor.

        THE COURT:  Well, I'm, again, I'm not fine with it. It's a report on a different subject.  I would rather hear her explanation for why this is reliable and analogous to our situation.

TRACI BURCH, PH.D - Direct

BY MR. BABBITT:

Q.    With that queue, Dr. Burch, perhaps you could sort of speak to how you use GAO reports in the field of political science and address the Court's questions?

A.    Yes.  So the GAO, just for the record, is the -- part of their job in the federal government is to evaluate the effect of federal programs.  And so I have relied on their reports and their research in the past to talk about different things in political science.

But I think what's interesting about this program is that this is an episode in which documentary proof of citizenship was introduced, sort of the Deficit Reduction Act in 2005.  And then went into effect I think July 1 of 2006.

And so there have been some efforts by the GAO in its report to think about what the impact of starting to require documentary proof of citizenship for Medicaid and moving from a regime in which I think it was by attestation of citizenship before, how -- what impact did that have on Medicaid uptake in the aftermath of the program.

And so what's interesting is that the GAO went about studying this by going to Medicaid administrators in all of the 50 states and kind of surveying them and asking what their experience with the program had been.

They found that 22 out of the 44 states that were able to respond said that they had some experience where people

United States District Court

had been taken off of the Medicaid rolls even though they were, 02:41:24
in the opinion of the administrators, eligible because of this
documentary proof of citizenship requirement.

Q.   So just to be clear, right, before the Deficit Reduction
Act there was not a hard DPOC requirement in Medicaid.  It was 02:41:41
introduced.  Afterwards the GAO did a field study speaking to
state administrators talking about what their experience and
the GAO requirement met in the context of the program.

        Steve, if we could turn to the first page of that
report. 02:42:03

BY MR. BABBITT:

Q.   Dr. Burch, what did the GAO find?

A.   As I just said, so the GAO found that not all of the 22
states reporting declines could quantify enrollment declines
due specifically to the requirement; but a state that had been 02:42:18
tracking the effect identified 18,000 individuals in the seven
months after implementation whose applications were denied or
coverage was terminated for inability to provide the necessary
documentation, though the state believed most of them to be
eligible citizens. 02:42:35

Q.   Okay.  So just to be clear, there was one state reported
18,000 individuals were affected by the DPOC requirement and
the state's judgment was that they were citizens; right?

A.   Yes, in seven months.

Q.   So my understanding is that the GAO looked at other states 02:42:50

United States District Court

TRACI BURCH, PH.D - Direct

as well.

MR. BABBITT:  And so, Steven, if we could turn to the next page.

Q.   Dr. Burch, could you speak to what the GAO found there?

A.   So here they are just restating their conclusion, state one had begun tracking the effect, reported denying an average of 15.6 percent of its monthly applications because of insufficient citizenship documentation in the first seven months following implementation and, two, terminating eligibility for an average of 3.2 percent of beneficiaries at redetermination per month over the same period and for the same reason.

Overall, these denials and terminations represented over 18,000 individuals who the state generally believed were eligible citizens.  While not tracking the effect of the requirement on enrollment explicitly, 10 other states that attributed enrollment declines at least in part to applicants who were delayed or denied coverage also reported increases in monthly denials ranging from one to 14 percent after implementing the requirement.

Q.   So 18,000 individuals in one state.  A range of one to 14 percent in other states.

So I appreciate that that is what the GAO found. Professor Summers comes along in the article that Professor Hoekstra relies upon three years later and, as I understand it,

United States District Court

TRACI BURCH, PH.D - Direct

sort of did a broader statistical survey based on 50 states' data over time and concluded that, at least as reported in the article, that the introduction of DPOC was not, in fact, having this deleterious effect on citizens.

So why doesn't that affect your confidence in the GAO's conclusions?

A.   Well, there are several reasons.  The first is that so you have a state saying we've denied 18,000 people because of this requirement versus a statistical analysis that says they can't find any effect of the analysis.

But I also think that if we look at some of the Summers' piece, what Dr. Summers is doing is kind of similar to what we're doing with voter ID in those studies.  And what he's doing is he's taking a big aggregate data set from the current population survey, which is another surveillance ray that is run by the census, and he's looking at Medicaid uptake in states that there are four states that had Medicaid documentary proof of citizenship prior to the implementation of the law.

And he's comparing those with states that only got documentary proof of citizenship after the law.  And so that he's got this control group of people who he argues weren't affected by the DPOC requirement at the federal level compared to this treatment group of 46 states that were affected by this law and this change.

And so he's analyzing what happens to these states

United States District Court

962

TRACI BURCH, PH.D - Direct

and how do they diverge after July 1, 2006.  I thought that there were several problems with that analysis, some of which are pointed out by the GAO report.

For instance, there is some evidence that -- it's not entirely clear that July 1, 2006, makes sense in terms of implementation.  So as I show -- could you make that bigger again for me, please.

So as the GAO report talks about here, there are -- so the way that this requirement is implemented, it actually is the case that there are -- it's something called a reasonable period in which you can get documentary proof of citizenship. And people are supposed to be allowed to continue on as beneficiaries during that reasonable period.

And in some states that reasonable period -- it says here:  In total, 33 states reported that the number of days they allowed applicants and beneficiaries to meet the requirement before denying applications or terminating eligibility, with limits generally ranging from ten days to one year.  And so there's also evidence that some states allowed applicants and beneficiaries this reasonable opportunities period that is close to one year.  So these -- or even longer.

There's other evidence that states just let people keep going for an indeterminate amount of time for a reasonable opportunity period.  So it's not clear that states are actually fully implemented documentary proof of citizenship in ways that

United States District Court

TRACI BURCH, PH.D - Direct

would be resulting in people getting kicked off the rolls in this period that Dr. Summers actually studied.

Q. Dr. Burch, to that point --

MR. BABBITT: Steven, if you could pull up and blow up the text that is highlighted just below PX 544-21. I think that's where it references the indefinite grace period that Professor Burch referenced.

Q. Professor Burch, is that what you are referring to?

A. Yes. It says: Some states' written policies indicated that the reasonable opportunity period could be extended provided that individual notified the state that he or she was making a good-faith effort to obtain the documentation but needed more time.

And then just above that: A few states reported allowing applicants and beneficiaries an indefinite amount of time to obtain and submit the necessary documentation, provided they were deemed as making a good-faith effort.

Q. Please go ahead.

A. So I was just going to say so, again, this idea that there's this on/off switch from July 1 of 2006 in which 46 states just snapped on and started implementing documentary proof of citizenship. There is no -- Dr. Summers in his report doesn't really take into account the fact that it's not actually how the implementation roll-out happened.

Q. Just to be clear, there's two things going on. One is

964

TRACI BURCH, PH.D - Direct

that this is sort of one way to implement a DPOC requirement with an indefinite grace period allowing accommodations for good-faith efforts.  That is point one.  But then, more broadly, your understanding is that is why the conclusions that Professor Summers reaches, in your view, don't override with the studies that the GAO found in its field studies; correct?

A.   Yes.  Because, again, it's not clear to the extent to which those changes -- he's managed to take into account the fact that those changes aren't being implemented in all 46 places in that immediate time.

        In fact, in this GAO report, they highlight the fact that at the beginning, there's only 44 states that are surveyed because four states are being implemented as of January of 2007.

Q.   Okay. So that was a deep dive on the DPOC context.  Let's zoom back out because I think Professor Hoekstra makes a larger criticism --

        THE COURT:  Mr. Babbitt, we're going to have to take our afternoon break before we move into these next questions.

        Court is in recess for 15 minutes.

        COURTROOM DEPUTY:  All rise.

        (Recess at 2:50; resumed at 3:05.)

        (Court was called to order by the courtroom deputy.)

        THE COURT:  Thank you.  Please sit down.

        Mr. Babbitt, you may continue with your questioning.

United States District Court

TRACI BURCH, PH.D - Direct

BY MR. BABBITT:

Q.   Professor Burch, before the break, we had been talking about the GAO report and I thought we were prepared to move on. But I just want to go back to that for one moment because I think we talked about the sort of dynamic between Professor Summer's criticism of the GAO which I believe sort of you've responded to at length.  But another point that Professor Hoekstra makes is that CMS, the Centers for Medicaid Studies, also sort of responded to the GAO report and sort of had its own concerns with the reliability of that report.

Can you sort of speak to kind of the GAO report as a whole and your understanding of the CMS criticism and sort of why that doesn't affect your conclusions?

A.   Yes.  So as part of the process, the GAO solicits feedback from the -- in this case the Center for Medicaid Services and they provide a feedback, which is attached to the report, and then the GAO considered that feedback and either amend its report, the final version of the report, accordingly or address it.  And they seemed not to be that concerned about the Medicaid response from CMS.

THE COURT:  Does that mean the draft report and the final report didn't change in light of the comments that Medicare Services made?

THE WITNESS:  They may have changed it a little bit but they actually address it in the report.  They respond to

United States District Court

TRACI BURCH, PH.D - Direct

the response.

THE COURT:  So the actual final report contained response to the attacked criticisms from Center for Medicare Services?

THE WITNESS:  That's right.

THE COURT:  Okay.

BY MR. BABBITT:

Q.   And so okay.  Now I think we can move on beyond the GAO report.

MR. BABBITT:  And so Steven, if you could pull up slide 37 in the demonstratives.

Q.   So Professor Burch, zooming back out, when we think back, another criticism that Professor Hoekstra levies against your report is, as I understand it, a concern or a criticism contention that the empirical analysis that you rely on from the field of political science isn't sufficiently rigorous to support the conclusions because he is an economist sort of who looks more rigorously as it were at the relationship between correlation and causation, and he doesn't believe that the kinds of methodologies that are used in political science are reliable.

What's your response to that criticism?

A.   So I think that as a political scientist, I reject it and I think many political scientists would reject it because in political science, we use a number of different methodologies

TRACI BURCH, PH.D - Direct

such as we look at surveys.  We look at interviews.  We do

analyses of observational data but we also -- we also do the

kinds of causal analyses like experiments or natural

experiments that an economist might do as well.

But I think as a political scientist, the way we think about methodology and the way I train my students is that you should have a number of tools in your toolbox because you can learn different things from different kinds of analyses.

So if I had to give an example of what I mean here, so say I'm an enterprising young political scientist as I was a long time ago, longer time than I care to admit, and I wanted to go out and figure out something like what's the effect of fentanyl on families in my community.  Now, I would go out and I would interview -- so say I wanted to interview police officers and social workers and prosecutors and families and maybe even some judges and ask questions like what do you see in your courtroom?  What do you see in your practice?  What do you see?  And then I could write a report that talks about the impressions of those different kinds of front-line workers who are dealing with the issue, kind of like what the GAO did in its report.

An economist might say that that kind of study, we can't learn anything rigorous from that kind of study even though you're talking about -- talking to and observing people who are directly involved, because they would say, no, what you

United States District Court

TRACI BURCH, PH.D - Direct

need to do is a causal analysis where you randomly assign people to be addicted to fentanyl and then see what happened to their families.

And so I think that I reject the second the idea, that the first kind of study where you're talking to people who are directly involved in a situation, you can learn things from that. You can learn about their experiences and what they are seeing in courtrooms. You can learn about the mechanism that is are in play and, yes, you can also learn from a bigger kind of study or a sample size with an experiment, but you might learn different things and so kind of analyses have limitations, too.

So in my own work I often try to do -- 'I might do an actual experiment and a set of interviews to answer different kinds of questions that kind of point to the same topic. And for these reports, I often rely on different kinds of evidence in these -- in pages that I cite. So some might have those kinds of causal, like, experimental analyses but some might be interviews and some might be surveys, but they are all kind of talking about the same issue and coming at it from different directions.

Q.   And so you didn't do any of those interviews or studies in this particular case. Rather, you relied on the extant literature that you thought relevant and then applied them to the facts that we talked about earlier today; correct?

United States District Court

A.    That's right.                                                            03:12:26

Q.    Okay.  So now I'm at the end and if you could just summarize your conclusions for the Court that you've reached in this case based on your expert analysis?

A.    Yes.  So just to remind you of my opinions, so requiring    03:12:36 documentary proof of citizenship to register and avoid removal from the rolls, and the potential for investigation, it does impose costs, those compliance costs, the psychological costs on voters that want to vote in Arizona.  And if fully implemented, then because of those costs, I think H.B. 2492 and    03:13:02 2243 will likely decrease registration and voting among people who are otherwise eligible to vote.

Q.    Okay.  And you believe you can reach that conclusion with a reasonable degree of certainty?

A.    Yes.                                                          03:13:17

        MR. BABBITT:  No further questions.  I'll pass the witness, Your Honor.

        THE COURT:  Thank you.

                      **CROSS - EXAMINATION**

BY MR. WHITAKER:                                                      03:13:26

Q.    Good afternoon, Professor Burch.  This is Josh Whitaker representing the State Attorney General.

A.    Yes.

Q.    So let's talk about compliance costs first.  I understand your testimony to be that in order to get proof of citizenship,    03:13:44

TRACI BURCH, PH.D - Cross

those documents may cost money; right?

A.   Yes.

Q.   But I think we need to think about costs for whom and I think there are a few different categories here.  One is --

            THE COURT:  Let's try asking a question rather than you summarizing your view.

            MR. WHITAKER:  Fair enough.

BY MR. WHITAKER:

Q.   Is one category of persons to consider citizens who already have proof of citizenship?

A.   I'm sorry.  I'm -- category to consider for?

Q.   Let me ask it this way:  Would there be compliance costs for citizens who already have proof of citizenship?

A.   There can be but maybe not related to that.  So they may have to go and turn it in or something like that so it's still a cost but then having to buy the document, for instance.

Q.   But they wouldn't have to buy a birth certificate, for example?

A.   Right.

Q.   All right.  As for citizens that don't already have proof of citizenship, do you know of any?

A.   Yes.

Q.   You know of a specific person in Arizona who is a citizen and doesn't have one of the proofs of citizenship listed in the statute?

TRACI BURCH, PH.D - Cross

A.    Oh, I'm sorry.  Your first question wasn't specific.  Not in Arizona.

Q.    Okay.  And you didn't attempt to try to quantify how many citizens in Arizona don't have proof of citizenship; right?

A.    That's right.

Q.    All right.  For non-citizens, the compliance costs would be I think impossible to try to get proof of citizenship; right?

A.    Probably, yes.  I don't know if there's, like, some kind of legal way to do it.

Q.    Okay.  Setting aside black market --

A.    Right.

Q.    -- considerations.

      Let's turn to psychological costs.  As I understand your testimony, the laws provide for the possibility of investigations and even prosecutions which may follow from the investigations for folks who don't provide proof of citizenship at registration.  Is that part of it?

      THE COURT:  I thought it was if you didn't provide it within 35 days.

      MR. WHITAKER:  Right.

      THE COURT:  Then the statute goes on and says turn it over to the Attorney General.

      MR. WHITAKER:  Right.

\\\

                      United States District Court

TRACI BURCH, PH.D - Cross

BY MR. WHITAKER:

Q.   So as I understand your testimony, people who don't provide proof of citizenship within the appropriate amount of time could be subject to investigation and that could cause a fear of investigation.  Is that about right?

A.   So it could be just the very nature of you could be subject to this investigation if -- also if you're found -- there's some information that comes on, like, say you have a common name and someone says like, "Oh, you're not a citizen. We're going to investigate."  So it doesn't just have to be I think with the 35 days.  It doesn't just have to be from the voter -- sorry.  It just doesn't have to be from 2243.  I thought it could also be from the 2492 as well.

Q.   Maybe I'll ask you to clarify.  Who is it, in your view, that would have this fear of investigation?

A.   So it could be anyone who is thinking about registering to -- registering to vote who is, like, "Oh my goodness, they might question my citizenship," or, "If I provide this -- even if I provide this document or I provide this driver's license number, if it comes back that, like, my dad isn't a citizen, they might confuse us," or something like that.  Or, "My brother, they might confuse us."  So I don't know if it -- it could be a pretty wide group of people who might be hesitant.

Q.   Have you identified anyone in Arizona who has this fear?

A.   No.

United States District Court

TRACI BURCH, PH.D - Cross

Q.   And I think you mentioned you haven't spoken with Arizona voters at all you mentioned on direct?

A.   Right.

Q.   On the fed-only list, you mentioned the fed-only list I think on direct exam; right?

A.   Yes.

Q.   Okay.  Can you remind me, did you have an opinion on notion on the fed only list?

THE COURT:  She just talked about that there were a lot of people on it and that there was some indication that they might not have easy availability of documentary proof of citizenship.

Am I paraphrasing correctly?

THE WITNESS:  Yes.

MR. WHITAKER:  All right.  Thank you, Your Honor.

BY MR. WHITAKER:

Q.   Did you attempt to quantify how many people on the fed-only list don't have easy access to proof of citizenship?

A.   No.

Q.   Is it possible that some people on that list have easy access to it; they just didn't provide it for whatever reason at the time of registration?

A.   It could be possible.

Q.   It is true -- but is it at least possible, based on what you know, that some of those folks are not citizens and misread

United States District Court

974

TRACI BURCH, PH.D - Cross

the form didn't understand they had to be citizens; they just filled it out, sent it in?

A.   But the form says that you have to be --

Q.   Yes.

A.   -- a citizen.

Q.   I'm talking about inadvertent you fill out the form quickly.  You don't pay attention.

        THE COURT:  Well, you must have paid some attention because you had to check the boxes.

        THE WITNESS:  Yeah.  I think you have to -- yeah.  So you mean like they checked the box and they are not citizens?

BY MR. WHITAKER:

Q.   Yes.

A.   I am unaware of anyone doing that but it's possible.

Q.   Are you aware of any investigation that it has happened as a result of these laws?

A.   I'm not sure that these laws have -- I'm not sure if they have been implemented fully yet so I don't know of any details about any investigation.

Q.   You didn't identify anyone specific who will be affected by these laws; right?

A.   No.

Q.   You didn't attempt to quantify how many people will be affected by these laws; right?

A.   No.

975

TRACI BURCH, PH.D - Cross

Q.   And you didn't analyze whether the laws could yield a benefit; you looked at costs; right?

A.   Yes.  That's right.

Q.   Let's look at the GAO report you talked about.  I think it's Plaintiffs' Exhibit 554.

     Well, while that's getting sorted out, let me ask about the background there.  As I understand it, you've always needed to be a citizen in order to get Medicaid; right?

A.   No.

Q.   Oh.  Okay.  From when have you needed to be a citizen in order to get Medicaid?

A.   So Medicaid does allow non-citizens to participate in the program, especially pregnant women for instance.

Q.   Okay.  So as I understood the GAO report, it was about a federal -- a change to federal law.  It required people who were previously just attesting to citizenship to start providing proof of citizenship.  Did I get that right?

A.   Yes, in cases.

Q.   In some cases.  What are those cases?

A.   So there are a number of exemptions.  So for instance, people who are already getting Medicare are exempt.  I think some children in foster care.  There's also people who, for instance, have severe either physical or other kinds of disabilities, the state has the responsibility to do that. They don't have to provide it because they can't.

United States District Court

Q.   All right.  Let me amend my earlier statement.  Am I right that unless an exemption applies, you need to be a citizen in order to get Medicaid?

A.   No.

Q.   Okay.

A.   Because there are still some non-citizens who can and are eligible for Medicaid?

Q.   All right.  So there's a group of people, then, who previously had to -- who previously could get Medicaid simply by attesting to their citizenship and then Congress changed it and said no, you actually have to provide proof of citizenship.  Is that fair?

A.   Yes.

Q.   And is that requirement still in effect today, to your knowledge?

A.   I think so.

Q.   And this GAO study was about effects of that early on; is that right?

A.   Yes.

Q.   Okay.  Well, we're having technical difficulties but I'll try to ask you about it from memory.  Oh, never mind.  Here we go.

        MR. WHITAKER:  Can we go to the next page?

        THE WITNESS:  I don't have it here.

        THE COURT:  Sorry.  Now it's there.

                United States District Court

MR. WHITAKER:  Okay.  Can we go to the next page?          03:24:33

Q.   So I'm looking at the first few sentences, what GAO found. Can you just read those first few sentences and then I'll ask you a couple of questions?

THE COURT:  Well, it would be a whole lot easier for          03:24:49
us if it were bigger.

MR. WHITAKER:  Oh.  Okay.

THE COURT:  And I know you can do that.  There.  All right.

THE WITNESS:  "States reported" --          03:25:02

BY MR. WHITAKER:

Q.   You don't have to read it out loud.

THE COURT:  Just to yourself.

THE WITNESS:  Oh.

BY MR. WHITAKER:          03:25:31

Q.   And I'm only going to ask about the first few sentences. As I understand it, 22 states reported declines in enrollment due to the requirement and a majority of those states attribute declines to delays or losses in coverage of people who appeared to be eligible citizens.  Is that right?          03:25:47

A.   That's right.

Q.   Okay.  But 12 states reported that the requirement had no effect; right?

A.   That's right.

Q.   Okay.  And ten reported that they didn't know the effect          03:25:57

United States District Court

TRACI BURCH, PH.D - Cross

either way; is that right?    03:26:01

A.    That's right.

Q.    All right.  Now, you mentioned in your testimony earlier what did you call, it the Center for Medicare/Medicaid Services.  CMS?    03:26:12

A.    Yes.  CMS.

Q.    And it's a branch of the Department of Health and Human Services?

A.    Yes.

Q.    They criticized the report?    03:26:18

A.    Yes.  They responded.

Q.    Okay.

          MR. WHITAKER:  And can we go to page 38 of the document.  Can you zoom in on that first paragraph.

          THE COURT:  It didn't help much.    03:27:00

BY MR. WHITAKER:

Q.    All right.  Can you take a quick look at that and I'll ask you a couple of questions.  Did CMS express concern that the title of the report was misleading given the survey results and lack of supporting data?    03:27:39

A.    That's what they said.

Q.    And did CMS say that they thought GAO reached conclusions largely based on state responses that weren't substantiated by enrollment data?

A.    That's what they said.    03:27:52

United States District Court

TRACI BURCH, PH.D - Cross

Q.   Okay.  That's all the questions I have for you.  Thank you.                                                                03:27:53

**CROSS - EXAMINATION**

BY MR. LANGHOFER:

Q.   Good afternoon, ma'am.                                    03:28:19

A.   Hi.

Q.   I don't have a lot of questions for you but just some in the way of clarification.  Let's --

            MR. LANGHOFER:  Elaine, would it be possible for me to use the laptop here at the podium, please.                   03:28:38

BY MR. LANGHOFER:

Q.   Thank you for your patience.  Still looking at this first sentence from the GAO report -- excuse me, the end of the second sentence, "The declines in Medicaid coverage were described as for people who appeared to be eligible citizens."  03:29:12 Do you know what it means to appear to be a citizen?

A.   They don't specify right there in that part.

Q.   Is that based on ethnicity or language?  Do they just define that?

A.   Not there but in other places, for instance, they use     03:29:33 different language.

Q.   Okay.  They use different language to determine what?

A.   So I believe in one of the later points of the report they talk about the 18,000 people -- I don't know if they use "appeared" there.  I think they use another word that might be   03:29:59

TRACI BURCH, PH.D - Cross

helpful in clarifying what that means.

Q. Okay. And for the 18,000 from the one that was tracking it, it's not that the GAO found that the state believed that all of them were eligible but that most of them were eligible; right?

A. Yes, most of the 18,000.

Q. Okay.

Your report, did it address the study that Professor Hoekstra relies on, the one that's based on data?

A. The -- which study?

Q. The one from the professor that Mr. Babbitt asked you about during direct examination?

A. You mean the Summers report for Medicaid?

Q. Yes, ma'am.

A. No, I don't rely on it.

Q. Did you consider it?

A. I already told you I think that it is -- has some flaws.

Q. The one from Professor Summers was peer-reviewed?

A. It was.

Q. Was the GAO report peer-reviewed?

A. No.

Q. I want to shift gears somewhat and talk about your concerns -- I think this fits into the psychological costs part of your framework concerns. As I understand it, your concern as you articulated previously in report, is primarily that

United States District Court

TRACI BURCH, PH.D - Cross

associating law enforcement with voting will deter African-American voters; is that right?

A.    No.  I also talk about the extent to -- I cite an article that talks about other groups as well.  So it's not -- it doesn't necessarily have to be African-American voters.  So some of the work that I cite on, for instance, Medicaid or court usage is about Latino voters.

Q.    Okay.  Let's start with the African-American voters and on page 25 of your report, you say that Niven, another author, finds that police presence in polling places deters African-American voting.  Do you remember that?

A.    Yes.

Q.    I would like to show you the Niven article that you're relying on.  David Niven, "Policing Polling Places in the United States."  This is the article; right?

A.    Yes.

Q.    Can you -- do you recall the methodology that he used in this article to establish that policing -- police presence deters African-American voting?

A.    Can you scroll through it just so I can refresh my recollection?

Q.    Yeah.  I sure can.  What I'm going to actually do, I'm going to flip to page six, which may be where it starts to get more helpful.  Actually, we'll go to the bottom of page five which is page six of the PDF.  Take some time to read this.

United States District Court

TRACI BURCH, PH.D - Cross

This is not a hide the ball.  Let me know when you want me to turn the page so you can see the rest of this.

A.   Okay.  I've read it.

Q.   Okay.  Let's take a look at the beginning of the next page.

A.   Okay.

Q.   Okay.  So why don't you describe the methodology as you understand it.  Again, I'm not asking you to read from the document.  It's sort of not kosher in this context.

A.   So, again -- my memory isn't completely recollected because I didn't get a chance to see the whole thing but here it's talking about the fact that they -- the authors were able to look in a couple of places with respect to the help line where callers reported police outside of four polling places in a city and then they also tried to verify that information with a FOIA request to the city to see police activity in the areas around polling places.

Q.   You said something that concerns me, which is this didn't fully refresh your recollection.  I'm not trying to, you know, make you answer questions in the dark.

Do you want to see other pages here?  I'm happy to show you what you need to answer questions.

A.   Yeah.  If you can --

Q.   I'm scrolling down a little bit more still on page seven of the PDF.

United States District Court

983

TRACI BURCH, PH.D - Cross

A.    Can you keep going down?

Q.    Yes.  We're going to turn to the next page.  I think we're already at the bottom.

A.    Can you scroll down one more time for me?

Okay, I've read that section.

Q.    Okay.  If I ask you a question and you feel like you need to see something else, let me know.  Again, not trying to make you answer in the dark.

A.    Okay.

Q.    As I understand it, there were some reports of police presence and the author pulled traffic tickets, parking tickets and other citations to see if police had, in fact, been near polling places on a particular election day.  Fair?

A.    Yes.  So there was -- there was a FOIA request for that and also the verification of -- so two different sources.

Q.    And he used those documents to confirm the presence of police what he calls near the four polling places in question; right?

A.    M'hum.

Q.    I'm sorry.  For the record, I need you to say "Yes" or "No."

A.    Yes, that's what it says.

Q.    Okay.  Thank you.  And does the author define what it means to be near a polling place?

MR. BABBITT:  Your Honor, objection.  To the extent

United States District Court

984

TRACI BURCH, PH.D - Cross

this is an impeachment exhibit, it would be helpful for us to have had a copy or Dr. Burch to have had a copy. I don't believe this was turned in.

MR. LANGHOFER: It's cited in her report, Your Honor.

THE COURT: It's an article that was cited in her report. I think it's fair game for cross-examination.

THE WITNESS: I might need you to scroll out a little bit so I can see if there's any information there. And I don't know if there's an appendix, too, that you have available. Can you keep going to the next page? Oh, so they have end notes. Can you flip to the next page? Keep going.

BY MR. LANGHOFER:

Q. To the next page?

A. Next page. Keep going to the next page. Keep going to the next page. Keep going. I can't see any -- keep going. I guess there are no footnotes here that explain what "near" means.

Q. Okay. So he's relying on citations that are near a polling place, we don't know what that means. Do you recall anything where he required these parking tickets that are near a polling place to be visible from the polling place?

A. No.

Q. Okay. Do you remember anything where he required the police officers to be there for anything longer that it takes to write a parking ticket?

United States District Court

TRACI BURCH, PH.D - Cross

A.   I believe he says not just parking tickets.  If you go back.

Q.   Yes.  Let's get this right.  Traffic tickets, parking tickets, and warnings.

A.   Yes.  So I don't know necessarily if those are necessarily traffic warnings.

Q.   It could be -- do you know of anything in this article that requires, for the purposes of this experiment, the police to have been there for more than, say, ten minutes to write the citation in whatever form it takes?

A.   Again, they do talk about the people, the calls to the help line who say that there are specific polling places where there are police officers, plus the overall data with respect to the warnings.  I don't know how long the traffic tickets or the parking tickets or the warnings took.  It could be extensive stops.  I don't know.

Q.   Right.  That's -- it doesn't say, does it?

A.   No.

Q.   Okay.  And then they ran some statistical tests and included this affected African-American turnout in these four precincts on that day?

A.   Could you scroll down to the bottom?  Let me just make sure that -- keep going.  Go back.  Yes.

Q.   The report itself, though, expresses concerns about this method, does it not, that it's not a controlled experiment?

A.   Yes.  So then in the next paragraph they go on to talk about why they are alleviating those concerns.

Q.   Okay.  And how do you understand that part of their analysis to go?

A.   So here what they are doing is they are talking about the race party and voting history that were compared to determine whether those precincts are distinguishable.  So the idea of random assignment is to create two groups that are distinct from each other -- I'm sorry, that are similar to each other along all of the relevant dimensions except for the thing you care about studying which is like police presence.

So here what he does in the next paragraph is to talk about race, party, and voting history and some -- and those kinds of factors and comparing those across the two groups and finding that they are similar.

Q.   Okay.  You, therefore, think this is reliable basis for concluding that he finds police presence in polling places deters African-American voting?

A.   Yes.

Q.   Let's look a couple of papers later here.  We're on page 11 of the PDF, ten of the document.

Why don't you read the qualification at the top of the page?

A.   Yes.  So Niven said, "This study" --

Q.   I'm sorry.  Not out loud.  To yourself.  I should be

TRACI BURCH, PH.D - Cross

clear.  Okay.  Sorry.

I take it that you're done?

A.    Yes.

Q.    You've read that?

A.    I have.

Q.    He does not purport to say that he finds the results of this study would apply outside the context of this report with whatever methodology that he uses, does he?

A.    No.  He says you can't assume that.

Q.    And this is, in fact, the only article you cited for the conclusion that police presence in polling places deters African-American voting?

A.    I think I also cite a review article that talks about some court cases.

Q.    We can talk about that one.  I think the court case is one is for Latino voting.  Am I tracking you?

A.    No.  So I think -- I'm sorry.  I don't have my report in front of me.  But I think on maybe the bottom of that paragraph I talk about some -- a discussion of voter caging I think is in the title of the article that talks about some more specific examples.

Q.    Bear with me.

A.    It might not be voter caging but I think there's a paragraph at the bottom of that where it discusses.

Q.    We'll come back to that.  I don't want to take the Court's

United States District Court

TRACI BURCH, PH.D - Cross

precious time.

You cite on page 21 of your report you have a block quote about birth registration.  Do you remember -- I'll show it to you.  Here with go.  All right.  That block quote that you can see on the page.  Do you remember that?

A.    It hasn't come up.

Q.    Oh, I'm sorry.  I've made the same error.

A.    Yes.  I see this.

Q.    Okay.  The article you cite for this is titled "Birth Registration and the Administration of White Supremacy"; right?

A.    Yes.

Q.    You're not taking position that birth certificates are an instrument of white supremacists, are you?

A.    No.

Q.    Do you know who Eitan Hersh is?

A.    Yes.  I'm familiar with his work.

Q.    Is he well regarded in the political science community?

A.    Yes.

Q.    Has he -- are you familiar with a study that he co-authored with someone from Stanford on the effects on voter turnout of voter ID laws?

A.    Which article?

Q.    I can show it to you.  It's called "Obstacles to Estimating Voter ID Laws' Effect on Turnout" by Justin Grimmer

United States District Court

and Eitan Hersh.  Are you familiar with this?

A.    Yes.

Q.    Perhaps for the sort of net effect reason that you were talking about earlier, if you apply rigorous methods to the question of whether voter ID laws can be shown to affect voter turnout, there's not a strong argument to be made that it reduces turnout.  Is that a fair characterization?

A.    If I remember correctly, this article is a response to another study so I'm not quite sure if -- I have to go -- I don't cite this in my report so I would have to go down and see -- read it more carefully to recall exactly what they conclude and how -- if they were really rejecting the findings of another study or whether they were positively -- or affirmatively studying it in their own way to draw conclusions themselves.

Q.    Let's look at page four of their report and I'll pull up this part first and then when we're done, I'll scroll up so you can see the rest of it.

A.    Okay.  Yes, so there I think the whole paragraph is important because I think that is saying that they are looking at what the other study did and not themselves, like conducting their own study from scratch.  So they are saying that they are trying to draw these conclusions from imperfect data and they are drawing the conclusion that unlike the people who originally used the imperfect data, they find no effect.  So I

TRACI BURCH, PH.D - Cross

think that's a different argument from -- so they are saying if when we reanalyze this bad study, we find no effect, which is different from saying we did our own study in the way we would like to do it and find no effect.

Q.   Let's take a look also at page seven of this report.  This is near the Conclusion section.  Let me know if you want me to scroll.

Finished reading?

A.   Yes.

Q.   DID stands for differences in differences?

A.   It does.

Q.   What does that mean?

A.   So my best explanation is that what it's doing is kind of looking at two different, say, groups that -- sort of similar to what happened in some of the other studies I talk about earlier.  So you have two different groups and you can compare them and then say something happened to one and not the other and then what you're studying is the difference in those groups going forward and, like, so did they change differently going forward.

Q.   That's actually -- well, you have experience with quantitative methods.  Would you believe that is an accepted approach for comparing data sets that are inherently dissimilar, like, for example, election turnout in different election cycles?  Does that make sense?

United States District Court

991

TRACI BURCH, PH.D - Cross

A.   I don't know that's what differences in differences -- I mean, you can use it for that but I don't know if that's what it's for, if that makes sense.

Q.   Okay.  I would really prefer that you explain what differences in differences is rather than me.  I think it's going to be much better.

A.   Yeah.

Q.   So in any event, you can use differences in differences model in order to test whether the change in the voter ID laws has affect longitudinally on voter turnout; right?

A.   Yes.  People have done that.

Q.   And it looks like, in fact, Professor Hersh did that in preparing this report we were just looking at?

A.   Can you put it back on the screen real quick?

Q.   Yes, I can -- I'm sorry.  I'm doing it again for the third time.

A.   Yes.  So what it looks like they did here is they did differences in differences.  But if you look at the last sentence, again, what they are doing is talking about the fact that they are kind of trying to show that somebody else's work is bad.  So they are just saying using these data and this research design, we can draw no firm conclusions.  So I think that that still -- you know, I don't know the validity or if there are limitations to differences and differences in this particular case that they are talking about.

United States District Court

TRACI BURCH, PH.D - Cross

Q.   Are you familiar with someone named Lorraine Minnite. M-I-N-N-I-T-E?                                                      03:51:00

A.   Yes.  I know her work.

Q.   And, you know that she's expected to testify in this case as an expert for the plaintiffs?                                 03:51:11

A.   I've heard that, yes.

Q.   Are you aware of her publication saying that data does not allow you to prove that voter ID laws cause a drop in turnout?

A.   I would have to see the full study to see exactly what -- thank you -- what it says.  Okay.  Scroll up for me, please.    03:51:31
Okay.

Q.   You're aware of this article or you were before just now?

A.   Yeah.

Q.   Did you discuss either this article or Professor Hersh's article in your report?                                          03:52:10

A.   No.  There are several articles on voter ID I didn't discuss in my report, including ones that find an effect.

Q.   For example, the one that Eitan Hersh was criticizing.

A.   No.  The one that I talked about that -- one of the articles that Dr. Hoekstra talks about, so the                         03:52:29
Komisarchik-White article, for instance, where they find in North Carolina 5,000 voters were affected.  So I don't cite that one either.

Q.   The gross effect, not the net effect you mean?

A.   Yes.                                                                                                                       03:52:44

United States District Court

TRACI BURCH, PH.D - Redirect

MR. LANGHOFER:  I think those are all the questions we have for this witness.

THE COURT:  Thank you.

Mr. Babbitt, redirect?

**REDIRECT EXAMINATION**

BY MR. BABBITT:

Q.   Professor Burch, I'll be very brief.  Mr. Whitaker asked you about who might have some fear of investigation in prosecution in the context of psychological cost.  Do you recall that?

A.   I do.

Q.   And in your opinion, could such fear be felt by people who are citizens and are otherwise eligible to vote?

A.   Yes.

Q.   Is that because of the possibility that -- of mistakes by election officials?

A.   It could be.

Q.   Is it also because there are certain communities that have a fraught relationship with law enforcement?

A.   Yes.  For instance, many people might fear deportation or targeting by law enforcement because of past experiences.  The United States has, in fact, at various points in our history deported people who were citizens.  For instance, during the Great Depression.  So those historical memories might still play a role in thinking about how people feel about the

United States District Court

security of their status.

Q.    And so for an individual, even if they might not have personal exposure to liability because of, you know, anything they might do wrong individually, communal fear might, nonetheless, amount to a psychological cost that political science would recognize; is that right?

A.    Yes.

MR. BABBITT:  No further questions, Your Honor.

THE COURT:  May this witness be excused?

MR. BABBITT:  Yes.

THE COURT:  Any objection?

MR. WHITAKER:  No.

THE COURT:  Dr. Burch, thank you very much.  You may step down and you are excused as a witness.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  Plaintiffs may call their next witness.

Sir, if you come up and stand here in front of that microphone to be sworn.

(TERRY RAMBLER, a witness herein, was duly sworn or affirmed.)

COURTROOM DEPUTY:  Can you please state your name and spell your last name for the record?

THE WITNESS:  Terry Rambler.  R-A-M-B-L-E-R.

COURTROOM DEPUTY:  Thank you.  And you can go ahead

United States District Court

and have a seat up there.

MR. DIAZ:  Good afternoon, Your Honor.  Jonathan Diaz for the LUCHA plaintiffs.

**DIRECT EXAMINATION**

BY MR. DIAZ:

Q.   Good afternoon.  Can you repeat your name one more time for the record?

A.   Terry Rambler.

Q.   Are you affiliated with a federally recognized Native American tribe?

A.   Yes.

Q.   Which tribe is that?

A.   San Carlos Apache Tribe.

Q.   And do you currently hold a leadership position with the San Carlos Apache Tribe?

A.   Yes.

Q.   And what position is that?

A.   Chairman.

Q.   How did you become Chairman?

A.   By popular vote of the people.

Q.   Of the people of the San Carlos Apache tribe?

A.   Yes.

Q.   Can you tell us little bit about your role and responsibilities as Chairman?

A.   Through our tribal constitution and bylaws, I have about

United States District Court

TERRY RAMBLER - Direct

19 duties that I'm mandated to do for the people.  And one of those is that I preside over all of our council meetings.

Q.   Do you also oversee programs conducted by the tribal Government?

A.   Yes.  Both tribal departments and enterprises of the tribe.

Q.   Does that include voter registration and civic engagement work conducted by the tribe?

A.   Yes.

Q.   Does the San Carlos Apache Tribe have a reservation?

A.   Yes.

Q.   Where is the reservation located?

A.   Southeastern Arizona.

Q.   In which counties?

A.   In Pinal, Graham, and Gila.

Q.   How large is the reservation?

A.   Almost 2 million acres.

Q.   And how many members of the tribe reside on reservation?

A.   About 13 to 14,000.

Q.   Out of how many total members?

A.   17,300.

Q.   Is there a uniform street numbering system for residences on the reservation?

A.   No.

Q.   Do residences on the reservation typically have street

TERRY RAMBLER - Direct

Q.    names?

A.    No.

Q.    Or building numbers.

A.    No.

Q.    Do you have a residential street address?

A.    No.

Q.    How does that affect things like mail delivery for tribal members?

A.    All of our mail a delivered to post office boxes on the reservation and since we don't have a street address system, home deliveries are especially hard.

Q.    Do you have an Arizona driver's license?

A.    Yes.

Q.    What does it say in the address file on your driver's license?

A.    295 East Highway 70.

Q.    And is that where you reside?

A.    No.  That's the nearest address I was able to find to get my driver's license.  It's about maybe a quarter mile from that milepost on Highway 70.

Q.    So the number in your address on your ID corresponds to the nearest mile marker?

A.    Yes.

Q.    And about how many residences are there between that mile marker and where you live?

United States District Court

TERRY RAMBLER - Direct

A.   About 20.                                                      03:59:37

Q.   Has the tribe looked into creating a uniform address system?

A.   Yes.  We are currently in the feasibility study of that       03:59:55
trying to get mapping system for whole reservation so we could
have addresses for all tribal members' residences and our
businesses and departments on our reservation.

Q.   And has the tribe determined how much implementing such a
system would cost?

A.   About $10 million.                                             04:00:13

Q.   Does the tribe create and distribute IDs to its members?

A.   Yes.

Q.   And so do those tribal IDs contain a residential address
on them?

A.   No, they don't.  They only contain post office box            04:00:31
numbers.

Q.   Are there members of the tribe who lack a permanent
residence altogether?

A.   Yes.

Q.   So that would be someone who is staying with a relative or    04:00:43
is homeless perhaps?

A.   Yes.

Q.   Is there any way you're aware of for members who live on
the reservation to obtain documentation of their residential
address?                                                           04:00:59

United States District Court

999

TERRY RAMBLER - Direct

A.   I'm sorry.  Say it again.                                    04:01:01

Q.   Is there any way you know of that tribe members who live

on the reservation can obtain a document that shows their

residential address?

          THE COURT:  Well, if he don't have a residential      04:01:12

address, they can't get a document that shows something that

doesn't exist.

          MR. DIAZ:  Fair enough, Your Honor.

BY MR. DIAZ:

Q.   Are there members who don't have Arizona drivers'          04:01:23

licenses?

A.   Yes.

Q.   Does the San Carlos Apache Tribe run its own elections?

A.   Yes.

Q.   Is that for tribal offices only?                           04:01:36

A.   Yes.

Q.   Does the tribe encourage its members to participate in

non-tribal elections?

A.   Yes.

Q.   Does the tribe conduct voter registration for non-tribal   04:01:44

elections?

A.   Yes.  We work with our County Recorders offices to do

voter registration drives.

Q.   If tribe members were required to provide proof of

residence to register to vote, how would that affect the       04:02:04

TERRY RAMBLER - Direct

tribe's voter registration activities?

A.    It would affect it very much because right now we don't have a system, mapping system, in place and any requirement for a residency would really affect the ability of our tribal members to violate.

Q.    Does the tribe work from a fixed budget?

A.    Yes.

Q.    Who approves that budget?

A.    The San Carlos Council, the governing body.

Q.    Has the 2024 budget already been finalized?

A.    Yes.

Q.    So how would a change to that budget take place?

A.    The council would have to amend the budget.

Q.    If council were -- sorry.  Strike that.

        What sorts of things does the tribe fund out of its budget?

A.    Public safety, education, natural resources election, veterans, elders.

Q.    And so would the tribe's voter registration and civic engagement activity also be funded from that budget?

A.    Yes.

Q.    If the tribe had to allocate additional resources to voter education or voter registration --

        THE COURT:  Can I just interrupt you here?  Are there questions of the standing of the San Carlos Apache Tribe?

United States District Court

TERRY RAMBLER - Direct

MR. LANGHOFER:  I thought these issues had been resolved, Your Honor.

MR. DIAZ:  Your Honor, it was our understanding that defendants were challenging the standing of --

THE COURT:  I'm asking them right now because I realize that the San Carlos Apache Tribe has already received all of the relief they sought in this case by my prior order.

MR. DIAZ:  Your Honor, there's I think still an open question as to the applicability of the proof of residence primer for State-Form applicants, for Federal-Form applicants. In our trial brief I think we identified that sort of outstanding issue about the differential treatment between State-Form and Federal-Form applicants who lack documentary proof of residence.

THE COURT:  I thought that the Attorney General agreed with exactly what the San Carlos Apache Tribe asked for with respect to what constitutes proof of residence for individuals without street addresses and specifically for tribal members.  Am I --

Is there still an open issue here, Mr. Whitaker?

MR. WHITAKER:  Your Honor, so a point of clarification.  I believe, if I'm not mistaken, the San Carlos Apache Tribe is one of what the plaintiffs call LUCHA plaintiffs.  Your Honor may be thinking of the Tohono O'odham plaintiffs which have recently withdrawn.

United States District Court

1002

TERRY RAMBLER - Direct

THE COURT:  You're right.  Thank you.

MR. WHITAKER:  So I think there's at least a minor claim that LUCHA plaintiffs are seeking with respect to DPOR has to do with the different treatment between federal and state forms with respect to DPOR.

THE COURT:  Okay.  I'm sorry.  I was forgetting that it was the release that the Tohono O'odham asked for and now they have been dismissed from the case.

MR. DIAZ:  Right.  There are two sets of tribal plaintiffs which explains the confusion.  And just to further clarify Mr. Whitaker's comments, I think it also relates to the LULAC Consent Decree and the way that federal versus state forms are treated.  Of course the LULAC Consent Decree only applies to documentary proof of citizenship because the proof of residence requirement didn't exist at the time that that consent decree was entered.

THE COURT:  Okay.  I'm back up to speed.

MR. DIAZ:  Great.  Where was I?

THE COURT:  We were on the tribal budget for voter registration.

BY MR. DIAZ:

Q.   So if the tribe had to increase the resources budgeted to voter registration, where would those resources come from?

THE COURT:  But you know what, that didn't answer the question.  Are the defendants challenging the standing of the

United States District Court

TERRY RAMBLER - Direct

San Carlos Apache Tribe in this litigation?

MR. LANGHOFER:  I think the answer to that is yes because nobody can not provide the form as Your Honor has construed it.  There's a statement as to their residency.  As long as they are good with that, there's no injury.

THE COURT:  Okay.  Continue.  Apparently the answer is yes.

BY MR. DIAZ:

Q.  I'll take a step back to reorient you.

So the tribe's voter registration and civic engagement activity is funded from that same general budget?

A.  Yes.

Q.  If the tribe had to increase resources devoted to voter registration to address the proof of residence requirement, where would those resources come from?

A.  From the same budget.

Q.  How would other programs funded by the budget be affected if civic engagement budget had to increase?

A.  It would affect the delivery of sources that we are currently doing for other sources such as education, natural resources, elders, veterans, and our youth.

Q.  Is it important to the San Carlos Apache Tribe that its members be able to vote in state and local elections as well as federal elections?

A.  Yes.

United States District Court

TERRY RAMBLER - Cross

Q.   Why is that?

A.   If I might expand on this a little bit.  You know, throughout our history, the way we have been treated throughout our history by the federal government and then also state Governments and then moving forward coming here today always being on lookout to protect our waters, our lands, our natural resources and our identity of who we are as Apaches and going back to World War II as an example.

Our people, because they are so dedicated to protected our home land, a lot of them went to go fight in World War II against Hitler.  But when they came back, they weren't allowed to vote in the State of Arizona and -- it took sixties to the eighties to finally be able to vote.

It's kind of a shame that I have to be here to defend this and ask why when so much has already been done to my people and it is very important.  We want to be a part of the process.  We want to be a part of democracy.  We want to be able to have the ability to vote and say who we want to represent us because, you know, we're supposed to be equal.

Q.   Thank you.  Mr. Chairman.

MR. DIAZ:  I have no further questions.

THE COURT:  Any questions on cross?

MR. LANGHOFER:  Thank you, Your Honor.

**CROSS - EXAMINATION**

\\\

United States District Court

1005

TERRY RAMBLER - Cross

BY MR. LANGHOFER:

Q.    Sir, if your members can prove their residence by filling out a form and not providing driver's license or traditional street address, will your members be able to do that, fill out the form and describe their residence?

A.    Can you repeat again, please.

Q.    Yes.  Let me maybe come at it from a -- with a little bit more background.  Are you familiar with a voter registration form in Arizona with the way that you show your address on the form?

A.    Yes.

Q.    And you know that there's a portion on the form where if you don't have a normal street address, you can draw a little map to show where you live; right?

A.    Yes.

Q.    Has that worked okay for your tribe?  Have they been able to fill out that form haven't it counted?

A.    Right now about 13,000 to 14,000 of our tribal members that live on the reservation, they -- about half of that population is over the age of 60 and a lot of those still speak our Apache language but they are not fluent in the dominant society ways of understanding the English language.  So it would be difficult for some of our -- a lot of our population.

Q.    So which counties does your land --

A.    Graham, Pinal, and Gila.

United States District Court

TERRY RAMBLER - Cross

Q.   So to the extent the members of your tribe have filled out the form and used the map option instead of the central additional street address option, have the County Recorders been good about accepting that and registering your people to vote?

A.   I'm sorry.  Say it again.

Q.   Yeah.  When someone in your tribe fills out the voter registration form and they use the portion of the form where they can draw on the map instead of writing the traditional street address, have the County Recorders been good about accepting those forms and registering your people to vote?

          MR. DIAZ:  Objection.  Is that a question?

          THE WITNESS:  I was trying to wait for a question.

          THE COURT:  Do you know if that is the case that they have been able --

          THE WITNESS:  He asked me if I'm aware of that.

          THE COURT:  He wants to know if you're aware of that.

          THE WITNESS:  No.

BY MR. LANGHOFER:

Q.   Okay.  Do you have any reason to believe that the members of your tribe could not fill out a form and state where they live, even if they don't have a traditional street address?

A.   I'm sorry.  Can you repeat again?

Q.   Yes.  I understand that members of your tribe, sounds like most of them don't have a traditional street address.  Would

United States District Court

TERRY RAMBLER - Cross

they, though, be able to fill out a form or draw a map that shows where they live?

A.   I'll just take my case, like what I was describing earlier, living near a milepost and there's other homes in that area.  I could potentially draw a map, but I'm not sure who can be able to find me when there's no street addresses because we're talking about dirt roads.

Q.   But the description you gave near a milepost, I guess we don't -- I won't ask you which milepost it is but near a particular milepost.  You have been able to use that sort of description for your people to register to vote?

A.   For the -- if I can recall.  I reside in Graham County on the reservation so on that one, they sent it to me post office box.

THE COURT:  I was going to ask him, when you registered to vote, did you -- for the address, did you use your post office box?

THE WITNESS:  Yes.  That's where they send me mailing information.

THE COURT:  So you get your mail there and -- do you vote by mail?

THE WITNESS:  Yes.

THE COURT:  Do you get -- your ballot comes to the P.O. Box?

THE WITNESS:  Yes.

United States District Court

1008

TERRY RAMBLER - Redirect

MR. LANGHOFER:  I think I'm done unless the Court has further clarifying questions.  I think perhaps we've got what we need.  Thank you.

MR. WHITAKER:  Nothing further from the State and Attorney General, Your Honor.

MS. PORTER:  No.  No further questions.

THE COURT:  Mr. Diaz, redirect?

MR. DIAZ:  Just a couple, Your Honor.

**REDIRECT EXAMINATION**

BY MR. DIAZ:

Q.   Mr. Chairman, given the language barriers that you described when you were talking with Mr. Langhofer, would any additional documentation requirement pose a serious burden to folks who are not fluent in English?

A.   Yes.

Q.   Is Apache a written language?

A.   Some -- some parts are, like numbering system or identification of animals.

Q.   Would it be a challenge for the tribe to translate a form from English into Apache and in written format?

A.   Yes.

THE COURT:  Could I ask a question about members of your tribe that are not English speakers?  Do you happen to know any of them that are registered to vote?

THE WITNESS:  Yes, I know people that are registered,

United States District Court

yes.

THE COURT:  So do you know what kind of assistance they received in filling out the form since it's in English and apparently the Apache language is not written sufficiently that it would be able to be translated?  Do you know how it was that they were able to complete their forms?

THE WITNESS:  We work as best as we can with our -- for example, Gila County and Graham County Recorder's office that assist our tribe with that.

THE COURT:  Okay.  Thank you.

BY MR. DIAZ:

Q.   Does the tribe work with the County Recorders to provide translators to orally translate some of these forms?

A.   Yes.

Q.   I think that's how it's done.

MR. DIAZ:  I think that's everything I have, Your Honor.  Thank you.

THE COURT:  May this witness be excused?  Is there any objection?

MR. WHITAKER:  No.

THE COURT:  Sir, you may step down.  You are excused as a witness.

(Witness excused.)

THE COURT:  Do plaintiffs have another witness?

MR. MAKKER:  Your Honor, Amit Makker on behalf of the

United States District Court

Arizona Asian American Native Hawaiian And Pacific Islander For Equity Coalition.

Our next witness is -- he has a teaching obligation. He'll be an expert witness. We'll be ready to go with that witness on Monday. We're still on schedule to complete our case by the end of Tuesday, though we have been discussing with the defendants about their expert that we discussed in the morning, Dr. Stein, about potentially testifying via Zoom which may be out of time sort of, on Monday or Tuesday.

THE COURT: When is it that you would -- if Dr. Stein is on -- is that the plan now, that Dr. Stein will testify by Zoom or is it still up in the air?

MR. WHITAKER: He would prefer that. I haven't communicated to him yet.

THE COURT: What day would that be?

MR. WHITAKER: I believe it would be Thursday or Friday.

THE COURT: Oh. Okay. I was just going to say if there's anything that has to happen like that on Monday, as you know, the courthouse is closed tomorrow so we can't do anything on Monday that we don't already know about.

MR. MAKKER: Understood, Your Honor. And then so given that we don't have another witness today, perhaps testing the Court's patience a little bit, I did want to raise the issue I raised this morning again about the intervenors'

adverse party objection because that does impact potentially the length of trial and the need to call additional County Recorders.

THE COURT: Just out of curiosity, I checked to see what time these things that you think I should have had an opportunity to read were filed and noted that I was sound asleep in bed last night when some of these documents were filed and I have been in court all day. So, no, I have not read them. I will not -- I will not be reading them until after we recess today.

And so I am not prepared to discuss them but will be prepared to discuss them on Monday.

MR. MAKKER: Understood, Your Honor.

THE COURT: I understand the plaintiffs filed new things, too.

MR. MAKKER: Yeah. So I think the filings that we filed last night, at least two of them, were part of this specific objection issue. So there's specific objections of the defendants to our exhibits that we've responded to sort of line by line and then deposition designations as well that we've responded to line by line.

The motion that we had filed on Monday primarily was to address the adverse party issue but did capture some I think more categorical objections that we thought we could address by motion but is probably better handled in the line-by-line

United States District Court

objections which, you know, I think it's the intervenors, their opposition they filed last night does address the adverse party issue which is the one that I do feel is important.

And then the other issues are sort of -- we can probably take them up in the line by line but there may be opportunity to categorically overrule the objections as well, just to preview it for you.

THE COURT:  Okay.

Who wants to talk about the redaction of the expert's retention letter?

MR. MAKKER:  I'll hand it over to Mr. Dodge.

THE COURT:  I am mystified by the justification for the redactions.  I didn't read anything here that I thought was particularly private, confidential.

MR. DODGE:  That's fair, Your Honor.  We asked Mr. Langhofer repeatedly for case law reflecting his view, as I understand it, which is that an engagement letter is, per se, discoverable under Rule 26.  That case law was not forthcoming.  Based on our own research, we made --

THE COURT:  Okay.  I didn't ask for the background.  I said I am mystified by the redactions and don't understand why you can't just give them the full engagement letter because I read it and I thought there's nothing secret, confidential, embarrassing, no trade secrets, no proprietary information.  What's the harm?

United States District Court

1013

MR. DODGE:  I guess I would put it the other direction, Your Honor, which is that typically within the Ninth Circuit, these sorts issues, there needs to be some sort of showing of prejudice or need and there hasn't been from --

THE COURT:  So why did you produce anything?

MR. DODGE:  They are entitled to certain materials under Rule 26(d) and we provided hundreds of documents from this litigation.  We provided the redacted engagement letter.  We also made a proffer of how many hours Dr. Minnite had worked on this case.

THE COURT:  I didn't ask you -- you produced -- you decided it was appropriate to produce the engagement letter; correct?

MR. DODGE:  Yes, Your Honor.

THE COURT:  And then you redacted a whole bunch of it.  I'm asking -- once you decided it was going to be produced, what is the justification for redacting a substantial portion of it?

MR. DODGE:  We left unredacted those portions that went directly to her compensation rate, which is what the other side is entitled to under Rule 26, specifically her rate and matters related to that.  It's our view that the remaining portions of the engagement letter did not go directly to compensation and thus they are not entitled to them.

THE COURT:  What's the harm in giving them the rest

United States District Court

of it?

MR. DODGE:  Your Honor, if you would like to us turn over the engagement letter, which I sense you do, we will.

THE COURT:  I do.  It just solves this whole problem of them wondering what you're hiding from them when there's nothing in here that anybody should be concerned about other people seeing.

MR. DODGE:  Fair enough, Your Honor.

THE COURT:  Okay.  Terrific.  I'll give you back both of the things that you gave me.

MR. DODGE:  If I may approach.

THE COURT:  Is there anything else that we need to talk about before I see you on Monday?

MR. LANGHOFER:  Yes, Your Honor.

As you will not be surprised to hear, we have a concern about the absence of any disclosure of Mr. Quezada's accusation against Senator Borrelli.  I can walk you through the documentation on that.

I think we need to caucus and just think about how to handle this.  It may be best to do is this in writing.  But perhaps I'll just for now plant a flag.  We are going to be coming back to you with something on this issue.

THE COURT:  So basically, you received the disclosure of the nature of his testimony and it didn't give any hint about some of the things that he had to say today.

MR. LANGHOFER: Nary a -- Your Honor, I saw the description perhaps in the JPTO where he's listed as a witness. The description of his testimony is exactly the same as the description of the President of the Senate and the Speaker of the House and apparently one more witness. Nothing. And he wasn't included in the initial disclosure statement by Promise Arizona. I think he was added in their last one. I would have to just retrace everything. I know he was certainly in the last one and, again, there nothing like this was disclosed. Obviously it could be significant and we just need to think about how to handle this.

THE COURT: Okay. Well, you can think about it. We're not going to talk about it because they are just thinking now.

MR. HERRERA: We still don't have their legislators' documents.

THE COURT: What is to talk about when they are still thinking that by Monday, they may be on to something else and not concerned about this?

Is there anything else from anybody?

MR. DODGE: Nothing from plaintiffs.

THE COURT: Okay. Court is in recess until Monday morning at 9 o'clock.

COURTROOM DEPUTY: All rise.

(Whereupon, these proceedings recessed at 4:24 p.m.)

C E R T I F I C A T E

I, ELAINE M. CROPPER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control, and to the best of my ability.

DATED at Phoenix, Arizona, this 10th day of November, 2023.


s/Elaine M. Cropper

_____
Elaine M. Cropper, RDR, CRR, CCP




United States District Court