UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Mi Familia Vota, et al.,          )
                                  )
            Plaintiffs,           )   No. 2:22-cv-00509-SRB
v.                                )
                                  )   Phoenix, Arizona
Adrian Fontes, et al.,            )   November 13, 2023
                                  )   8:58 a.m.
            Defendants.           )
_____)


*BEFORE:   THE HONORABLE SUSAN R. BOLTON, JUDGE*

*REPORTER'S TRANSCRIPT OF PROCEEDINGS*


**BENCH TRIAL DAY 5 - AM SESSION**
(Page 1017-1142)


Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251


Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription


UNITED STATES DISTRICT COURT

***A P P E A R A N C E S***

For Plaintiff United States of America:

    U.S. DEPARTMENT OF JUSTICE - VOTING - M STREET
    By:  **Emily Brailey, Esq.**
    150 M Street NE
    Washington, D.C.  20503

    U.S. DEPARTMENT OF JUSTICE CIVIL RIGHT DIVISION VOTING
    SECTION - 950
    By:  **Richard Dellheim, Esq.**
        **Sejal Jhaveri, Esq.**
        **Margaret Turner, Esq.**
    950 Pennsylvania Avenue NW
    Washington, D.C.  20530

For Plaintiff Arizona Asian American Native Hawaiian and
Pacific Islander for Equity Coalition:

    LATHAM & WATKINS
    By:  **Amit Makker, Esq.**
        **Evan Omi, Esq.**
    505 Montgomery Street, Suite 2000
    San Francisco, California  94111

    ASIAN AMERICANS ADVANCING JUSTICE
    BY:  **Niyati Shah, Esq.**
    1620 L Street NW, Suite 1050
    Washington, D.C.  20036

    LATHAM & WATKINS, LLP - Avenue of the Americas
    By:  **Neethu Putta, Esq.**
    1271 Avenue of the Americas
    New York, NY 10020

For Plaintiff Arizona Democratic Party, Democratic National
Committee:

    WILMER CUTLER PICKERING HALE & DORR, LLP
    By:  **Kelsey Quigley, Esq.**
    2600 El Camino Real
    Suite 400
    Palo Alto  94306

1019

***A P P E A R A N C E S    C O N T ' D***

For Plaintiff Chicanos Por La Causa, Chicanos Por La Causa Action Fund, Poder Latinx:

    ARNOLD & PORTER KAYE SCHOLER, LLP
    By:  **John A. Freedman, Esq.**
        **Jeremy Karpatkin, Esq.**
        **Leah Motzkin, Esq.**
    601 Massachusetts Avenue NW, Suite 1000
    Washington, D.C.  20001

    FAIR ELECTIONS CENTER
    By:  **Michelle Kanter Cohen, Esq.**
        **Jonathan Sherman, Esq.**
    1825 K St. NW, Ste. 701
    Washington, DC 20006

For Plaintiff Voto Latino, Mi Familia Vota:

    HERRERA ARELLANO, LLP
    By:  **Daniel Abraham Arellano, Esq.**
    1001 N. Central Avenue, Suite 404
    Phoenix, Arizona  85004-1500

    ELIAS LAW GROUP, LLP
    By:  **Christopher Dodge, Esq.**
        **Elisabeth C. Frost, Esq.**
    250 Massachusetts Avenue NW, Suite 400
    Washington, D.C.  20001

For Plaintiff Promise Arizona, Southwest Voter Registration Education Project:

    MALDEF
    By:  **Ernest Israel Herrera, Esq.**
    634 Spring Street, 11th Floor
    Los Angeles, California  90014

For Defendant State of Arizona Kris Mayes, Jennifer Toth:

    Arizona Attorney General's Office - Phoenix
    By:  **Joshua Michael Whitaker, Esq.**
        **Kathryn E. Boughton, Esq.**
        **Timothy E. Horley, Esq**
    2005 N. Central Ave.
    Phoenix, AZ 85004

1020

***A P P E A R A N C E S   C O N T ' D***

For the Intervenor-Defendants State of Arizona, Kris Mayes, Ben Toma:

    GALLAGHER & KENNEDY, PA
    By:  **Hannah Hatch Porter, Esq.**
    2575 E. Camelback Road
    Suite 810
    Phoenix, Arizona  85016-9225

For Counter Plaintiff Republican National Committee:

    STATECRAFT, P.L.L.C.
    By:  **Kory A. Langhofer, Esq.**
    649 North 4th Avenue, Suite B
    Phoenix, Arizona  85003

UNITED STATES DISTRICT COURT

*I N D E X*

**PLAINTIFF WITNESS**:                                                            **PAGE**

MICHAEL P. McDONALD, Ph.D.
Direct Examination by Mr. Karpatkin.....................1058


*INDEX OF EXHIBITS*

**EXHIBIT**                                                            **ADMITTED**

NO.    DESCRIPTION

334     Table 1 from report                                1106

335     Table 2 from report                                1111

336     Table 3 from report                                1114

337     Table 4 from report                                1125

338     Table 5 from report                                1128

339     Table 6 from report                                1130

340     Table 7 from report                                1133

UNITED STATES DISTRICT COURT

***P R O C E E D I N G S***

*(Proceedings begin at 8:58 a.m.)*

COURTROOM DEPUTY:  All rise, court is now in session.

THE COURT:  Please sit down.  Before we begin with witness testimony this morning, there were a couple of matters that parties wish to address with the Court.

I believe there are at least three of them, and I wanted to first ask counsel for any or all of the defendants there was a Request for Judicial Notice that was filed on November 3rd.

To my knowledge, there has not been any opposition filed.  Is there any objection to the Court -- this is the request for Judicial Notice of Certain Census Records.

MR. LANGHOFER:  Good morning, Your Honor.  We have a draft.  There are two parts of it.  One part is about their proposal for judicial notice.  I think we're in principle okay with it, but maybe have some concerns around the margins; and the second part is saying since we're taking judicial notice of these public records, we have some as well.  I think it --

THE COURT:  Nobody's going to dispute that census records are the type of records that the Court can take judicial notice of.

MR. LANGHOFER:  Ms. -- Kathryn has drafted part of it so I don't want to speak for her, but our impression is

it's not going to be the subject of much dispute.

THE COURT:  Okay.  So we can worry about this later?

MR. LANGHOFER:  Yes, your Honor.

THE COURT:  Okay.  And let me just ask whichever plaintiffs' counsel wishes to address this, there were a total of 486 pages attached to this Request for Judicial Notice, none of which I have lacked at.

What I have looked at is your Request for Judicial Notice which contains -- and I didn't count them up -- several specific data items that the census records show, and then there's several of them that just refer to the census records.

Am I correct in concluding that -- for example, No. 3 says, "Data tabulated in the U.S. Census Bureau's  2021 1-Year American Community Survey B05003 series of tables," and then it goes on and on listing various tables.

Am I correct in my conclusion that what you want me to take judicial notice of are the specific facts shown by the census records as an example that there are 5,541,976 Arizonans at voting age population?

I ask that because I don't want to look at the 486 pages, and I want to be sure that I'm interpreting this correctly that the ones where you are specific about what the records show are the actual facts that you want me to take judicial notice of from the data from the Census Bureau.

MR. MAKKER:  Amit Makker for the Asian American --

Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition.

As I understand it, Your Honor, there are -- within the Request for Judicial Notice certain specific facts have been pulled out for some of the paragraphs, but in some instances the request is to take notice of sort of the set of numbers in a complete table.

THE COURT:  And how am I supposed to do that and how am I supposed to know what numbers you think are important?

MR. MAKKER:  Yeah, so at this point I think the exhibits should include the tables themselves.  That's what the pages that were attached include.  So those values are there.  Separately, what will actually be -- you know, what are you to then look at later, I think, would be cleared up by the proposed findings of fact, statements of law, as well as various expert testimony throughout the trial.

THE COURT:  So why is it structured this way?

I mean, I understand with the citation to various tables that the 2017 to 2021 ACS estimate of the voting age population of Arizona is 5,000,102.

Why aren't the other tables summarized in that way?

MR. MAKKER:  Because I think in the instances where it is not summarized that way, the whole of the table is either sort of part of an expert's opinion or is used by an expert; and so the idea was to not sort of exclude and instead

of trying to tabulate multiple sort of entries per table in the way that in some instances we were able to, like you said, some of them call out a specific value, the approach was then to attach the table as the exhibit and have the Court take judicial notice of the census' records in that table.

But as you said, there are certain instances where specific numbers, like the total population, or specific pieces of the table have been pulled out in specific paragraphs.  In other instances the ask is that the table be judicially noticed.

THE COURT:  I'm not sure that's going to work well. I would like the plaintiffs to try to do what they did for each table, what they did for the very specific statements as to what the records show, unless it somehow becomes obvious when you have your expert testify; but there's numerous, numerous exhibits that it isn't clear to the Court what -- what they are or what they mean, and I'm not sure I should be the one to decipher them if there's no dispute as to what they're attempting to show.

MR. MAKKER:  Understood, Your Honor.  We'll take a look at if it's feasible to do it that way or if there's a reason why it needs to be done specifically the way that it's already been done.

MR. LANGHOFER:  We may be able to help on that, Your Honor.  I believe that Kathryn has already identified the

facts that they're trying to prove that we think are not quite right, and so we may be able to resolve this by way of stipulation.

THE COURT:  I hope so.

MR. LANGHOFER:  We'll work with the plaintiffs.

THE COURT:  Okay, thank you very much.

I'm not sure what the status is of the motion filed on November 8th regarding resolution of exhibit objections, and then there's a motion to overrule the defendants' objections.

Is this still a work in progress, because I noticed, in particular, that there's references here to a witness who's actually testified, and my understanding -- or understanding's the wrong word.  My direction at the beginning of trial was that if the witness testified, you could only supplement that testimony from the deposition if it's deposition testimony to which there's no objection.

So I wasn't sure if this is really a current motion or it's one that is still being refined.

MR. MAKKER:  Amit Makker again, Your Honor.  So if this is for the deposition designations, I believe that the table that was attached to that would have taken out any of the objections to any of the hybrid witnesses.  I think the only instance where there may have been reference to that was to provide notice, essentially, where we understood that an

objection was withdrawn because the defendants had counter designated, basically, the same testimony and had told us in correspondence that that objection was withdrawn.

So I believe the only instance where a hybrid witnesses' testimony would have appeared in that table would have been where we were just saying we understand this objection's withdrawn to sort of provide them that notice; but, otherwise, we followed Your Honor's direction from the pretrial conference that for hybrid witnesses, specifically objected-to deposition testimony should have been handled live and then the unobjected-to testimony would have been coming in, but that shouldn't have been in those tables.  They were removed, from my recollection.

THE COURT:  Is it still the plaintiffs' intention to provide those specific portions of the deposition or is the entire deposition being provided?

MR. MAKKER:  You mean subsequent to trial like what would come in?  Yeah, so what we would do, as I understand it, is then for hybrid witnesses, for example, the designations that would come to Your Honor would be a combination of plaintiffs' designations, defendants' designations that just deal with what was not specifically objected to ahead of time.

THE COURT:  Do I have all the depositions?

MR. MAKKER:  I believe they were filed with the JPTO.  Someone correct me.  Yes, I'm seeing nods of "yes."

So currently they are with you.  I don't think those designations are, like, finalized in that sense, right?  Those designations were with the objections before we knew kind of what the trial list was, who the witnesses were.  So I believe the parties would endeavor to provide you, "Here are the final designations that are, you know, for hybrid witnesses, just the stuff that was unobjected to that sort of supplements the live testimony, both for plaintiffs and defendants," and then there would be, obviously, the non-hybrid witnesses.

THE COURT:  I -- I guess I'm still a little confused.  Are the original depositions, the books produced by the court reporter, have they been filed with the Court?

MR. MAKKER:  I believe they are exhibits to the JPTO filing.

THE COURT:  Okay, that's now how depositions usually work.  The depositions themselves are provided -- the original are provided to the Court.

MR. DODGE:  I've been told that the Court -- apologies.  Christopher D. Dodge on behalf of the MFV plaintiffs.

I've been told that there actually is a box labeled "depos" right up here --

THE COURT:  Okay.

MR. DODGE:  -- with hard copies of all the deposition transcripts.

THE COURT:  Okay.

MR. DODGE:  In addition to what was filed with the JPTO, and the parties are continuing to work on a final transcript of testimony that will come into evidence.  That's just an on-going process between the parties of understanding the scope of one another's objections so that only unobjected-to testimony is coming in for those witnesses who have appeared live.

THE COURT:  Okay.  And for these witnesses for whom there is a table of plaintiffs' responses to defendants' objections, your thought is that I'll rule on these before you submit proposed findings and conclusions?

MR. MAKKER:  So that -- that is part of the question, Your Honor.  I think part of this is we've tried to work a little bit with defendants to see, "Can we narrow these objections?"  We have not been able to do that with them yet.  For whatever reason, there hasn't been time to really try and narrow those.

I think where we're at right now is -- I don't know that you would do it before or that you could do it even after, but that is where we are right now.  I think --

THE COURT:  Because I can tell you right now --

MR. MAKKER:  Yeah.

THE COURT:  -- that I can't.  I mean, I -- I don't know when I would have the time to go through each of the

UNITED STATES DISTRICT COURT

depositions, the objections, and the response to the objections and make a specific ruling by the end of this trial -- well, I guarantee you I can't do it by the end of the trial or probably even next week, which is a very shortened week.

MR. MAKKER:  Understood, Your Honor.  That's part of the reason why, I think, when we filed the first motion, which sort of that table refers back to, was that there are certain objections that we think potentially could be overruled categorically, which would remove a number of those, which my colleague, Mr. Sherman, is also prepared to address today. Some of these are --

THE COURT:  Are you address -- are you talking about that general objection that -- as it relates to the County Recorders that they aren't adverse parties and, therefore, their depositions cannot be used for any purpose and, also, that some of them aren't more than a hundred miles away?

MR. MAKKER:  Relatedly.  So that is part of the motion that we filed.  Included in that motion were some other -- they're not phrased general, but they're more -- you know, similar objection is made throughout the various witnesses.

So they should be, for example, legal conclusion objections; and so we see those repeatedly throughout.  As I said, my colleague, Mr. Sherman can address this more directly; but, you know, what we're talking about here is

these witnesses, just like you heard from Ms. Petty or from Ms. Conner, yeah, they might talk about the statute; but we're not offering these for the Court to accept their legal conclusions.

It's to understand what are these County Recorders going to be doing under these laws, and so we think that that potentially could be handled categorically to certainly remove a number of objections throughout these tables and so that's -- you know, that's what we were trying to do is try and clear a lot of the objections perhaps categorically; but if that cannot be done, then I think that leaves us with one-by-one, and then maybe what that means is when we get to the end and we try and figure out what we're citing, that's how we do it.

But that was our attempt was first to see if we could narrow objections with defendants; and, if not, we thought there was some that could potentially categorically be overruled.

THE COURT:  From your perspective, is this a final table?

MR. MAKKER:  From your perspective, absent additional movement from the defendants, that's where the table is now.

Now, what I would say is ultimately we may not need to cite to every single thing there, and so that's where there

could be additional narrowing as well in terms of the objections lodged.

THE COURT: Let me just ask, Mr. Langhofer, if you want to speak, and then we'll see if anybody wants to add anything.

From your perspective, is this a final table since you've seen their responses to the defendants' objections?

MR. LANGHOFER: The table is overwhelming, Your Honor. It would take, you know, days with a team of lawyers going through it to digest it and explain it to the Court.

My concern with the table with the objections -- we had a meet and confer about this on Saturday. You know, of course, we didn't have a real three-day weekend, and the concern that I expressed was that so much -- we took fifteen -- we've took the same deposition fifteen times with fifteen counties.

So much of this is redundant and cumulative. We've already heard from Ms. Petty, who is extremely capable and I think, as I've already said, represents the State with some exceptions that we can get into.

I said, "Can the plaintiffs please identify which of these portions are not cumulative?" Like if you're getting to a real difference in a particular county, show us and we can review those, but reviewing -- re-reviewing all these transcripts and line-by-line objections are not productive or

necessary.  The plaintiffs so far have not been able to do that.  So there is a big cumulative concern here.

The second thing I'll say, which I think simplifies the hybrid situation significantly is none of the Government witness that you have heard from will have any portion of their transcripts that are unobjected to.

There, essentially, are no hybrid witnesses so far because the ones you've heard from, our position is, they're not adverse and they're all within a hundred-mile radius and, therefore, we have a global objection to their depositions. If they had somebody to present with them, they need to do it on the stand.  So I think the hybrid issue you don't need to reach.

THE COURT:  How many of these designations are County Recorders?

MR. MAKKER:  From that table?

THE COURT:  How many different County Recorders?

MR. MAKKER:  So we -- I mean, we deposed all fifteen, right, so --

THE COURT:  No, that's not my question.

How many of their depositions do you think have to be evidence in this case?

MR. MAKKER:  So currently they're all in that table, and I'll give the reason why, right, is there are claims that are still left in this case about how is this -- these laws

going to be implemented across the State, right?

There's equal protection claims that go to is it going to be done in an inconsistent manner?  The people that implement these laws are the County Recorders, right?  And so if they are telling us, "Over here in this county it's going to be done this way.  Over here in this county it's going to be done this way" --

THE COURT:  Are they telling you that?

MR. MAKKER:  Indeed, they are.  So that's what we're trying -- I mean, I'm not saying every single county is doing something different but there are --

THE COURT:  That's what I'm asking you, because I've discussed this issue with fifteen County Recorders.  We have seven stipulations of things that they would all say if called to testify.

MR. MAKKER:  Sure.

THE COURT:  But, for example, if seven County Recorders said, "We'll do it this way," and six said, "We'll do it this way," and two said, "I don't know how we're going to do it" --

MR. MAKKER:  Right.

THE COURT:  -- why would I want to read seven people saying the same thing and then six people saying the same thing?

MR. MAKKER:  As opposed to, for example, one

representative, one representative, one representative?

THE COURT: Exactly. If it would take the defense weeks to figure this out, how long is it going to take me?

And I am trying to be sensitive to all of the parties' desire that this case be resolved before the Primary Election in March of 2024; and when I'm given something like this or this census data for which I have to look at hundreds of pages and try to decipher it or read more than a dozen depositions and try to rule on objections and find that the information is largely cumulative and there's not a lot of differentiation between what the County Recorders had to say, I can guarantee you that it won't be decided before the March 2024 election.

The more you put into evidence, the more that you give me that I have to work through with my two law clerks -- and I'm looking out here at, you know, more than a dozen lawyers -- clearly, more than a dozen on the plaintiffs' side, a more camp packet group of only five to six or eight -- I don't know how many are not here that are working on this -- if their estimate is it would take them days and days and days to figure this out, how long is it going to take me?

And so ultimately, you can put into evidence whatever is admissible that you think is important; but the volume of what you put into evidence will be directly related to the time within which it takes the Court to make a

decision, and at the rate you're going I see the decision coming beyond March of 2024 with just the two examples that we've used today, and that doesn't even begin to have me thinking about an exhibit that I heard you call about that has like 80,000 pages so I -- that's some Excel spreadsheet.  I think I have a hint to what that is, but you see where I'm going.

I want to decide this case based on the things that I have to see, not based on everything that you've collected, much of which is not essential for the statistician.

MR. MAKKER:  I understand, Your Honor, and I would say this, right.  We have been trying in various ways to try and streamline the County Recorder piece.  We had a discussion the very first day of trial about, you know, County Recorder stipulations that came in.  That was objected to as well.

We're trying to figure out a way to streamline this with the County Recorders.  There hasn't been a lot of help from the other side in terms of being able to do that, right.

We had a list of numerous things that various County Recorders would have agreed to.  You've ended up with seven, I think, is all that we could -- we've moved with it.  So, yes, there's only seven things that, I guess, they agree that fifteen County Recorders would say.

As I mentioned, part of these claims are not what's everyone gonna say?  It's specifically, what is everyone not

saying?  And so is there opportunity to potentially get that down to sort of what other representatives?  Potentially.

There are still various issues to clear even to do that, right.  So one is the adverse party issue and the 100-mile issue, right.  I mean, I don't -- I don't think it's credible to say that these are --

THE COURT:  I'll just tell you --

MR. MAKKER:  Sorry.

THE COURT:  -- I think the 100 mile has to be driving distance, not as the crow flies, because the County Recorders can't fly like a crow.  Just so you know.

MR. MAKKER:  Fair enough, and I think that may affect just one of them and maybe not at all.  It just depends.

THE COURT:  Yavapai.

MR. MAKKER:  Yes, exactly.

THE COURT:  Under no circumstances, Pinal County a hundred miles away.

MR. MAKKER:  I don't think anyone is saying that they are, but the issue here is really, like you said, you directed the hybrid testimony at the pretrial conference.

We had four witness come up and testify to a slightly limited scope here with the understanding that the testimony that was not specifically objected to would be coming in under that hybrid approach.

As you just heard from Mr. Langhofer, his belief is there's no such thing because, "No, we've said they're not adverse" and what -- I mean, we have here is "yes" they're on the other side of the "V," but it's more than that.

We have sued these County Recorders because they are going to take actions under these laws that we don't want them to take. We're asking you to enjoin them from doing that, and in some instances these County Recorders are guilty of a felony, I believe, if they do what we want them to do.

There are clearly adverse interests here and that shows they're adverse; but, also, we identified the sort of catch-all unavailability rule that allows in the interest of justice for Your Honor to also allow this deposition testimony in.

We've tried numerous ways to keep these -- you know, to stop burdening these County Recorders from coming in and testifying live. We think that's also a completely reasonable application of that rule. As they said in their opposition, it's to accommodate the witnesses. That's exactly what this is for.

THE COURT: Okay, you're straying way beyond the issue of the volume of information that you're trying to get me to look at; and Mr. Langhofer talks about cumulativeness, which has been my concern as it relates to the County Recorders since we first discussed this at the final pretrial

conference.

I'm not sure that when I look at this table I see much of an attempt to limit cumulativeness.

MR. MAKKER: Understood, Your Honor. I think Mr. Sherman would like to address that specific point.

THE COURT: The cumulativeness?

MR. MAKKER: I believe so.

MR. SHERMAN: Yes, your Honor, if I may be heard on this. John Sherman for the Poder Latinx plaintiffs. Some of the volume here, not even 25 percent, but some of the volume is in -- we took deposition testimony that directly went to the Court's instruction or ruling in the order on the partial motions for partial summary judgment that said there were outstanding issues of fact with respect to, first, the NVRA Section 8(b) claim, *Bush v. Gore* equal protection claim, and the Civil Rights Act claim that we have in our case around differential practices, standards and procedures.

In anticipation that, we asked questions of all fifteen County Recorders about their varying understandings not for legal conclusions, but to understand how they'll be implementing the law; and that is the best evidence in the record, but hearing what Your Honor has said this morning --

THE COURT: And they all gave different answers?

MR. SHERMAN: There are different varying answers for -- across many of the questions that we asked, yes, Your

Honor; and for -- and for that reason, Your Honor -- I think what would be cumulative, as Your Honor has indicated, is to give you all seven who have responded "yes" to one question and then all five who have responded "no" and then, you know, give you all of the, you know, remaining that said it's a judgment call.

What we'll endeavor to do on our end, at least specifically with these arbitrariness claims, is to narrow down to the greatest hits, the best of, and give you only one the one or two examples for each category that establish that there's arbitrary inconsistent understandings of these laws that will lead to arbitrary and inconsistent implementation.

I think the defendants will still maintain their legal conclusions objections to those specific designations, but there will be fewer designations for the Court to consider; and we tried to tee up the legal conclusion dispute for Your Honor in this motion to overrule, but I think that might be a way forward in limiting what your -- the Court views as -- and the defendants see as cumulative.  It won't resolve, though, the dispute that we have --

THE COURT:  No, I don't mind that.  I'm happy to resolve the objection.  I just don't want to resolve the objection fifteen times -- well, fourteen 'cuz we had Ms. Petty testify and she, apparently, gave all the testimony -- well, I'm not sure if she did.  I don't know -- she was

mentioned again in this motion, and I don't think she should have been but...

MR. SHERMAN:  Understood, Your Honor.

You know, we can -- we can narrow it.  I do want to be clear, though, that, you know, all fifteen County Recorders' depositions will still be implicated because the questions that were asked for these different results for different, you know, combinations of County Recorders; but for each one of those questions that produced varying results that we think are material to the claims that I identified before, we will narrow it to only, you know, the one or two for each category of response that we think will establish the -- you know, resolve the issues of fact that the Court pointed to in the Motion for Summary Judgment order.

THE COURT:  I'll await an amended shortened table.

MR. SHERMAN:  Understood, Your Honor.

THE COURT:  Okay.

MR. SHERMAN:  For what it's worth, if I could just add one point, Your Honor.  I don't think this is a very substantial portion of that table.  So we will work again with defendants on the balance of questions.

Just to be clear, the arbitrariness-related designations are not an overwhelming portion of that -- of that table.

THE COURT:  Okay.  I want to move to --

MR. MAKKER:  Just one last piece on that, right.

So as to the adverse party 100-mile issue, that does leave, I guess, three County Recorders that under this sort of, hey, they're not adverse, there would be no opportunity, I guess, for their depositions to come in at all is how I understand the objection, and so we subpoenaed them to appear.

THE COURT: Which are those?

MR. MAKKER:  It is Pinal, Gila and Yavapai.

Well, I guess, yeah, Yavapai's right on that border there but, as I understand it, that's the position they have.

THE COURT:  So I did a Google maps of Courthouse Square in Prescott to 401 West Washington.  It came to a hundred miles.  Now, I don't know what side of Courthouse Square the Yavapai County Recorder's office is, but if it's close to Cortez Street, it's 100 miles -- it said on Google Maps 100.0 miles.

Presumably, if he or she parks on the other side of Cortez Street, it's over a hundred miles; and I just don't think I should have to resolve if it's a hundred miles and, you know, a hundred yards or --

MR. LANGHOFER:  Helpfully, your Honor, there -- there is a bright line of rule in this.  In the Federal Rules of Evidence it's 100 miles exactly, and we have attached to our response a route from the County Recorder's office -- it's a 30(b)(6) deposition -- to this courthouse that's 99.8 miles

if you take the most direct route.

THE COURT:  Oh, is the County Recorder not in -- their office is not right there --

MR. LANGHOFER:  I don't believe --

THE COURT:  I didn't know where their office was.

MR. LANGHOFER:  Yeah, I had to Google it myself; but I think it's attached to our motion.  It's 99.8 miles if you -- if you go up Grand Avenue.

THE COURT:  What if the County Recorder has to leave from his or her house?

MR. LANGHOFER:  Well, maybe they're closer then.

THE COURT:  Might be farther.

MR. MAKKER:  At any rate, Your Honor, you know, there is the separate provision 32(a)(4)(E) under availability that I think, you know, it's -- as they've said, it's to accommodate the witnesses.  I think that's another way to deal with the Yavapai issue.

Additionally, I don't think there's any disagreement, but the counsel for the Secretary of State, there's another witness here, Russell Smith, that was not called live.  Their counsel has said he's in Nevada.  So I believe he would be in that 100-mile --

THE COURT:  Who, I'm sorry?

MR. MAKKER:  Russell Smith was another 30(b)(6) deponent of the Secretary of State.

THE COURT:  Oh, is it somebody that used to work there and now lives in --

MR. MAKKER:  No, he just works remotely is my understanding.

THE COURT:  Oh.

MR. MAKKER:  And so he's in Nevada.  I believe that would put him in the 100-mile bucket as well.

MR. LANGHOFER:  I don't think it's worth spending time disputing this.

MR. MAKKER:  I'm just trying to resolve the different issues that we have on the various witness that they have under these global objections.

So I believe that deals with Russell Smith.  I believe that deals with Yavapai.  That leaves Pinal and Gila and then the hybrid witnesses and their unobjected-to testimony and whether that comes, which we would then, of course, try to narrow if possible to what we actually cite later on; but, as I said, our understanding was that the un -- specifically unobjected-to questions would be coming in and we dealt with what was specifically objected to in their live testimony.

THE COURT:  That's exactly how it's supposed to be.

MR. MAKKER:  Okay.  And so then the question, I guess, is for things that were not specifically objected to, would that be coming in as narrowed by whatever we cite to or

-- I guess how are we dealing with the objection of non-adversity for those witnesses?

THE COURT:  Well, my understanding with hybrid witnesses was that there was no -- if there was no objection to the designations that -- for purposes of streamlining the trial, that we weren't concerned about the issue of adversity or how far away they were.

MR. MAKKER:  That is what --

THE COURT:  I guess adversity's the only thing.

MR. MAKKER:  I think that's what we understood as well, but as you heard Mr. Langhofer say, he believes there is no hybrid deposition testimony because they're not adverse.

MR. LANGHOFER:  Yeah, I -- as I recall your instruction, Your Honor, it was only unobjected-to portions of transcript could come in --

THE COURT:  Correct.

MR. LANGHOFER:  -- and there are objections -- at least to the witness you've heard from so far there are objections to everything in their transcripts because they're not adverse and they're within a hundred miles.

THE COURT:  All right.  That is not how I understood our agreement with hybrid testimony.

My understanding was it was an evidentiary objection as opposed to an issue of adversity, which is not a rule of evidence objection.  It's a federal rule objection.

MR. LANGHOFER:  Your Honor is the leading expert in this courtroom on its orders so...

THE COURT:  That's my understanding, that that -- the objection had not been raised before me, that their depositions could not be used because they weren't adverse parties; but that their depositions -- but for a hybrid witness for purposes of trying to avoid prolonging the testimony that unobjected-to designations would be read -- I would be allowed to read those as opposed to having the witness testify to that and only rule of evidence objections would be handled with live testimony.

MR. LANGHOFER:  I think the case law gives Your Honor discretion in this matter.

THE COURT:  Okay, so that's -- that's the ruling.

MR. MAKKER:  Okay, and so I believe all that leaves is Pinal and Gila as, you know, they're not adverse.  We have designations that are also objected to and because they're inside the 100 miles and so just -- so that Your Honor is aware, we did subpoena these -- I guess we can take Yavapai out if that's where Your Honor lands on Yavapai being more than a hundred, but we did subpoena them to appear at trial. I don't know exactly how it will impact schedule yet, but I just wanted to make you aware of that --

THE COURT:  Okay.

MR. MAKKER:  -- to try and resolve that issue.

THE COURT:  Thank you.

MR. MAKKER:  Thank you, your Honor.

THE COURT:  Now I want to talk about the Motor Vehicle Department second disclosure.

MR. FREEDMAN:  Good morning, Your Honor, John Freedman for the Poder plaintiffs.

THE COURT:  And the first thing I want to have straight is the chronology.

MR. FREEDMAN:  Okay.

THE COURT:  My understanding -- and you can tell me if this is correct or only partially correct.

My understanding is that after plaintiffs made their request to produce to the Arizona Department of Transportation Motor Vehicle Division they got back a note there's a statute that says that you can't have what you asked for because of privacy concerns, and then a whole lot of work was done and eventually the Motor Vehicle Division produced a very large document with certain fields in it that included things that are not precluded by -- because of privacy.  Driver's license number, ID number -- I don't remember how many fields.

Then -- and everybody got that and everybody gave that to their experts and their experts gave opinions, and here's where I'm not sure of the chronology.

MR. FRIED MAN:  Okay.

THE COURT:  At some point the defendants' counsel

got in touch again with the Motor Vehicle Division, Mr. Jorgensen specifically, and said, "Can you add a couple more fields to this Excel spreadsheet?" specifically whether it's a real ID driver's license or not and that put -- and the plaintiffs were not involved in those discussions.

MR. FREEDMAN:  That's right, Your Honor.  That request came in on October --

THE COURT:  Can I finish?

MR. FREEDMAN:  Sorry, ma'am.

THE COURT:  And that data was provided to the defendants -- "yes" or "no" was it provided to you simultaneously?

MR. FREEDMAN:  Yes, Your Honor.

THE COURT:  And here's where I'm not positive:  Did you get it before you deposed Dr. Richman?

MR. FREEDMAN:  The first installment we got two days before Dr. Richman's --

THE COURT:  What installment?

MR. FREEDMAN:  There are two supplements at issue. So can I just take a step back and walk Your Honor through the chronology?

Everybody got -- in response to plaintiffs' RFPs there was data production, exactly as Your Honor described, August 29th.  Everybody got that.  Our expert prepared an analysis of that.  Their expert prepared an analysis of that.

Their expert made a supplemental request to Mr. Jorgensen on October 12th.

THE COURT:  Were you -- when I say "you," I mean the plaintiffs.  Were you aware of that?

MR. FREEDMAN:  Not until October 25th.

THE COURT:  So Dr. Richman through whoever, counsel, said, "Could we get something more?" and that request was made October 12th?

MR. FREEDMAN:  Yes, ma'am.

THE COURT:  So something more was produced when?

MR. FREEDMAN:  October 26th.

THE COURT:  And did you get it on October 26th.

MR. FREEDMAN:  We got it at the same time as defendants on October 26th.

THE COURT:  When did you depose Dr. Richman?

MR. FREEDMAN:  October 28th.

THE COURT:  October 28th.  And when was the second supplemental production made?

MR. FREEDMAN:  Second supplemental production was November 5th.

THE COURT:  November 5th?

MR. FREEDMAN:  Yes.

THE COURT:  And what did that add?

MR. FREEDMAN:  It's very confusing what it added. It was for approximately 50,000 records.  Mr. Jorgensen went

UNITED STATES DISTRICT COURT

back to the Legacy pre-max database to provide additional information on 50,000 individuals.

THE COURT: So when you -- and then when did you get the supplemental report from Dr. Richman?

MR. FREEDMAN: So the first supplemental we got at midnight October 26th, so just before his deposition.

THE COURT: Okay.

MR. FREEDMAN: And I did have a chance to depose him on -- on that.

THE COURT: All right.

MR. FREEDMAN: The second supplemental was served November 6th after the first day of trial.

THE COURT: Okay. Well -- and what are you asking? Obviously, you're asking that the second supplemental production and report not be considered by the Court --

MR. FREEDMAN: Yes.

THE COURT: -- or not allow any testimony on it.

What's your view on the first supplemental, the one that you had a chance, although with short notice, to depose Dr. Richman about?

MR. FREEDMAN: We also believe that should be out under Rule 32(e).

THE COURT: And when did he give you his original report?

MR. FREEDMAN: October 13th, the day after he made

his request for more data.

THE COURT:  Did his report reveal the deficiency that he thought there was in the data and the additional information that he wanted to get from the Motor Vehicle Division to make his analysis better?

MR. FREEDMAN:  There is a disclosure.  It's not particularly clear.  There's a footnote in the report indicating that he had requested more information from ADOT.

We promptly asked the defendants, "What's this about?"  We didn't hear back until October 25th.

THE COURT:  October 25th, the day before you got the new production?

MR. FREEDMAN:  That's right, ma'am.

THE COURT:  So you want to limit Dr. Richman to his October 13th report?

MR. FREEDMAN:  That's right, ma'am, and we believe that that's consistent with Rule 26(e)'s limitation on supplementing expert.

THE COURT:  Did you depose him about the supplemental report?

MR. FREEDMAN:  The first one was within scope of the deposition.  The second one was served after the deposition.

THE COURT:  So that's "yes"?

MR. FREEDMAN:  "Yes" as to the first supplement.

THE COURT:  Okay.  Mr. Langhofer.

MR. LANGHOFER:  So second one should be easier, Your Honor --

THE COURT:  Second one is out.

MR. LANGHOFER:  And we've -- we've never even said that we wanted to offer this --

THE COURT:  Okay.

MR. LANGHOFER:  -- in our testimony.

When we disclosed this up in our report, he's got a duty to update.  He updated it, and when I transmitted his second supplement I said, "We do not intend to introduce this in our case in chief."

Conceivably they could open the door and we can have a discussion about cross -- or redirect but that's -- that's a problem for another day, maybe never.

On the disclosures that they received, there's Footnote 3 in Paragraph 46 of Richman's report, talk about how there's an outstanding request -- he actually has several paragraphs where he talks about the interpretation of the original production and how there's some limits to it, and he reserves the right to update if his request for additional information is, you know, fulfilled.

Mr. Freedman said that he asked us for clarification as to what those meant.  I don't -- like, maybe I missed an e-mail, but I do not recall getting any requests for clarification.

Look, if I missed an e-mail, I apologize to everyone; but I just don't think I ever saw that.

THE COURT:  But you got -- you, the defendants, got the information from ADOT at the same exact time that it was provided to the plaintiffs?

MR. LANGHOFER:  That's right, and less than twelve hours later we disclosed Mr. Richman's analysis of that first supplement.

THE COURT:  Okay.  Have you provided the first supplement to your expert?

MR. FREEDMAN:  We have, Your Honor.

THE COURT:  And he's had a chance to see whether that affects his opinions in any way.

MR. FREEDMAN:  He has, Your Honor.

THE COURT:  Have you provided anything in writing?

MR. FREEDMAN:  We've not supplemented his report in part because the Rule 26(e) provides that you're not supposed to supplement after final pretrial disclosures are made.

THE COURT:  Right, all right.  Here's -- I'm not going to hear any more argument.  Here's what I'm going to allow:  I'm going to allow Dr. Richman to testify about his supplemental report, including the information that was received on October 26th, despite the lateness of it because this case did not proceed in the ordinary way that cases usually did, and I -- despite there being no written

supplement, I will allow plaintiffs' expert to orally testify, even though it will be the first time defendants ever hear it, to what, if anything, his opinions are with this additional information.  So that's my ruling.

MR. FREEDMAN:  Very good, Your Honor.

THE COURT:  With respect to the other aspect of this motion, by the way, that far exceeds -- I've felt like something I've done in the past but decided I wouldn't, which is like to -- oh, it actually is the perfect place for me to do this because page -- it's not the real Page 17, sorry --

MR. FREEDMAN:  It's okay.

THE COURT:   -- but it was an overlength brief without anybody asking permission to do that; but even so, the issues that really relate to the question of qualifications and admissibility of his opinions under *Daubert* can only be resolved through his testimony in any event, which because this is a bench trial the Court would not convene a separate hearing to have that.

So I can't discuss that yet.  We'll hear what Dr. Richman has to say, and the Court then will determine whether or not he -- if he is qualified, whether his opinions are admissible under *Daubert* and that's how it will go.

MR. FREEDMAN:  Understood, Your Honor.  If I could just point out one thing that's important for our experts' response, as well as Professor Richman's, which is that in the

RNC's option to the brief, ECF 637, Footnote 1 makes representations that Professor Richman will not be introducing in his testimony certain of the things that were -- certain of the items that were subject to the *Daubert* motion.

So I just want -- I want the record to be clear that they wrote defendant does not intend to offer during their direct examination Tables 3 through 8, Paragraphs 52 to 58, Paragraphs 102 to 107, 116 and 117 and 154 to 160 and we're planning to proceed with our expert on the relevant issues with that understanding.

THE COURT:  And that is still accurate, Mr. Langhofer?

MR. LANGHOFER:  Yes, ma'am.

THE COURT:  Thank you.

MR. FREEDMAN:  Thank you, ma'am.

MR. MAKKER:  One last bit of housekeeping, Amit Makker again.

Your Honor, we learned -- I think it was after court on Thursday -- that defendants are now also planning to call -- I believe it's four County Recorders, at least that's what we heard last.  These are Yuma, Pima, Apache and Coconino, all that, I believe, were on their unlikely to call list beforehand.

We've talked about the pretrial conference and the hybrid testimony.  We did have a point of clarification.  We

wanted to understand what would happen now that defendants are moving them up to being called because, right, we have objected to testimony that we've elicited from them in deposition and then, of course, whatever they elicited in deposition.

If they bring these witnesses to trial, our expectation would be that that doesn't require us to then question them about everything that we've already asked them about at deposition; but if that would be the understanding, that does change how those examinations would go when they're called.

THE COURT:  My hybrid ruling goes both ways.

MR. MAKKER:  Right.

THE COURT:  So if those individuals are called to testify and there are designations to which there's an evidentiary objection, I want it covered live in person so I can rule on it; and the only thing that will be left in the designations are the questions and answers to which no evidentiary objection has been made.

MR. MAKKER:  Okay, I think that is clear then. That's the point of clarification we wanted.

Defendants may ask this with respect to these County Recorders, and we discussed this on Thursday as well, the potential of maybe the County Recorders appearing by zoom or some other video conferencing.

I think the earliest that any one County Recorder may go would be tomorrow.  So I just wanted to put that on the record because I think you mentioned there's a certain amount of time to prepare for that that may be necessary.

THE COURT:  Well, we have to have some equipment brought in and we have to give them whatever the link is, none of which I'm in charge of.

Elaine -- I take it there's no objection to these witnesses appearing by zoom rather than coming all the way from wherever they are?  They're all -- those are mostly more than a hundred miles away.

MR. WHITAKER:  Josh Whitaker for the State and Attorney General.  No objection.  We think that would be great for everyone.

THE COURT:  Okay.  So if that is the case, then when they're scheduled to testify -- before they're scheduled to testify -- so if it's tomorrow, tell -- talk to Elaine so Elaine can talk to Systems and we can have the system set up so that we can take that testimony.

MR. MAKKER:  Thank you, your Honor.  We will figure that out.

THE COURT:  And plaintiffs next witness, please.

MR. KARPATKIN:  Your Honor, Jeremy Karpatkin for Poder Latinx plaintiffs.  Plaintiffs call Dr. Michael P. McDonald.

COURTROOM DEPUTY:  Raise your right hand.

*(Witness is sworn.)*

COURTROOM DEPUTY*:*  Thank you.  Could you just state your name and spell your name for the record.

THE WITNESS:  Michael McDonald, M-i-c-h-a-e-l, M-c-capital-D-o-n-a-l-d.

COURTROOM DEPUTY:  Thank you.  You can go ahead and have a seat up there.

THE WITNESS:  Good morning, Your Honor.

THE COURT:  Good morning.  Please proceed.

DIRECT EXAMINATION

BY MR. KARPATKIN:

Q.   Dr. McDonald, can you please state your full name for the record.

A.   Michael McDonald.

Q.   And, Dr. McDonald, did you prepare a slide to use as a demonstrative to assist in your testimony today?

A.   I did.

MR. KARPATKIN:  We will be referring to that demonstrative shortly; but, Stephen, can you put Dr. McDonald's CV up.

BY MR. KARPATKIN:

Q.   Dr. McDonald, is this your curriculum vitae?

A.   Yes, it is.

Q.   Was this submitted on September 14th with your expert

report?

A.   Yes, it was.

Q.   And was this CV up to date at the time you submitted it?

A.   Yes.

Q.   And have there been any changes or updates to this CV since then?

A.   No.

MR. KARPATKIN:  Your Honor, we move to admit Dr. McDonald's CV, which is Plaintiff's Exhibit 333.

THE COURT:  So this is one of those all or nothing's.  We've had other experts testify.  Their CVs weren't offered, and then they testified about it because it wasn't offered.

If you want to offer it, I'll admit it if there's no objection; and then I'll admit all the other ones if they're identified and offered, but if you offer it and admit it, I'm not going to have him tell me what it says.  Your choice.

MR. KARPATKIN:  Your Honor, we will then waive admission of the CV so that --

THE COURT:  Okay.  You're going to withdraw your offer and have him testify to his qualifications, thank you.

MR. KARPATKIN:  Yes, Your Honor.

THE COURT:  Go right ahead.

BY MR. KARPATKIN:

Q.   Dr. McDonald, what is your current position?

A.   I'm a Professor of Political Science at the University of Florida.

Q.   And for how long have you held that position?

A.   About ten years.

Q.   And what classes do you presently teach?

A.   I teach classes in elections, specifically election law, something we call election data science, political parties and campaigns.

Q.   Dr. McDonald, what are your main fields of academic expertise?

A.   Elections, voting, election administration, methodology, public opinion.  Those are some of the areas I cover.  I do more than that.

Q.   Have you also published in -- published articles in the area of voter registration?

A.   Yes, I have.

Q.   Does that include published articles on the accuracy and reliability on voter registration information?

A.   Yes, I have.

Q.   And did that include a publication related to match and voter registration data?

A.   Yes, I have.

Q.   Do you have expertise in election administration?

A.   Yes, I have.

Q.   And can you cite some of your relevant experience related

to voter registration?

A.    So I've been involved with consulting with election officials across the country on improving the accuracy of the information on the voter registration databases, and that springs from work that I did on -- some academic work that I did that developed a methodology of using geocoding to place correctly individuals within their districts.

And so I consulted with the Virginia Division of Elections, with the Colorado Secretary of State, worked with a national organization to help other state organizations to develop similar methodologies as proposed in that research.

Q.    Can you also summarize some of your relevant experience related to election administration?

A.    Yes, I've worked with the US Elections Assistance Commission on their biennial election administration survey early in the 2000s.

I've consulted with the Federal Voting Assistance Program.  They're the Department of Defense's organization that assists with overseas and military voters and looking at how localities manage that -- the data regarding military and overseas civilian voters' experiences.

Q.    And has your professional work included review and analysis of census data?

A.    Yes, it has.

Q.    Can you summarize some of that experience?

A.    Well, I've published on using census data; but I've also served as a -- on a liaison group that was appointed by the National Academy of Sciences to the Census Bureau over issues regarding the 2020 census.

Q.    And, Dr. McDonald, has your professional work included work with quantitative methodologies?

A.    Yes, it has.

Q.    Can you summarize some of that published work?

A.    Most noteworthy is a book that I published with co-authors, published by Wiley and Sons, which is the premier publishers of scientific and methods-type related work generally, not just within political science; and that work generally involves replication, particularly with attention to some of the issues that come up with computers when you're attempting to do replication.

I've done other derivative work from that among other things and developed methodologies that have been published in -- again, the top journal and political science for methodology to political analysis.

Q.    Dr. McDonald, do you serve as a peer reviewer on academic journals?

A.    Yes, I do.

Q.    Can you identify some of the journals which you provide peer review?

A.    Yes, the *American Political Science Review*, which is the

top overall journal in the field of political science.

Others that are very top level, *American Journal of Political Science*, *Journal of Politics*, *Political Analysis, Public Opinion Quarterly,* and the list goes on.

I've been a reviewer somewhere around 50 to 75 times. I've lost count.

Q.   Dr. McDonald, I think you might have mentioned this, but have you done consulting work for state governments related to voter registration?

A.   Yes, I did.  I mentioned that previously.

Q.   Are there any specific examples you failed to mention before?

A.   I think we covered the major ones, yes.

Q.   Dr. McDonald, have you previously testified as an expert in State or Federal Court?

A.   Yes, I have.

Q.   Can you list some of the more recent cases on which you've testified?

A.   Yeah, I've done this about fifteen times where I actually testified in court.  Most recently, I testified in Georgia regarding exact match procedures with the voter registration database to the -- their Department of Motor Vehicles database.

I testified in litigation in Maryland challenging the Maryland Congressional Districts as a Democratic gerrymander.

That went to the Supreme Court as a companion case to the *Benisek* case that the Supreme Court ruled on.

I testified as an expert witness in -- a lot of this is redirecting as well as election administration -- in a redistricting case in Virginia that also went to the US Supreme Court where the congressional districts are overturned on racial gerrymandering grounds.

Here in Arizona -- this is a little ways further back -- I did testify for the Arizona Independent Redistricting Commission in the 2000s as a consultant to the Commission, and I was working for the Commission as a defending claims from Democratic-aligned groups against the Commission.

Q.   Dr. McDonald, on each occasion when you testified as an expert witness, did the Court find you to be qualified?

A.   Yes.

Q.   Dr. McDonald, have you received any professional awards or recognition for your work?

A.   Yes, I've received several.  Most of them are related to redistricting and these are coming from professional organizations, some from media organizations.  Some are outside of political science, and then there's another class of awards that more recently I've been awarded from various organizations for freedom of speech issues that I'm -- I've been involved with at the University of Florida.

Q.   Dr. McDonald, did you prepare an expert report in this

UNITED STATES DISTRICT COURT

case?

A.   I did.

Q.   And did you later provide a revised report and declaration?

A.   I did.

MR. KARPATKIN:  And, Stephen, can we put up PX 332.

Next page, please.

BY MR. KARPATKIN:

Q.   Is this your revised report, Dr. McDonald?

A.   Looking at the first page, I believe it is.

MR. KARPATKIN:  And can we have PX 331, Stephen.

BY MR. KARPATKIN:

Q.   And is this the declaration you submitted with your revised report?

A.   Yes, it is.

Q.   Can you explain what revisions or additional information the revised report and declaration addressed?

A.   Yeah.  After I wrote my original report and after the Secretary of State's office was deposed, the Secretary of State's office referred to a technical document about -- that regarded matching procedures for the AVID database and we were provided a -- this technical document about, as I recall, three or four days after that deposition; and it did illuminate some of the issues that I raised in my report regarding matching.

So I thought it was prudent to write a supplemental -- or this declaration to evaluate that new criteria that was provided by the Secretary of State's office.

Q.   Were there any other changes made to your revised report?

A.   Those were just mainly to clean up citations and -- the deposition citations 'cuz we had the original raw ones and then we had the finalized ones.

So I don't think there was any other issue other than that that we revised in the revised report.

Q.   And, Dr. McDonald, does the revised report and declarations contain the opinions you intend to offer in this case?

A.   Yes, it does.

MR. KARPATKIN:  Your Honor, I'm aware that you are withholding ruling on the admission of expert reports, but I just want to go through the formality of offering the revised report and declaration for your consideration for such time as you rule on the global admissibility of reports.

THE COURT:  Thank you.  And I take it the revised report is a complete report, and so that's the only one that's being offered?

MR. KARPATKIN:  That, along with the declaration --

THE COURT:  Correct.

MR. KARPATKIN:  -- which has one additional issue that expands upon something in the report.

UNITED STATES DISTRICT COURT

THE COURT:  Thank you.

BY MR. KARPATKIN:

Q.   Dr. McDonald, can you briefly explain what you were asked to do in this case?

A.   I was asked to evaluate the effects of HB2243 and HB2492 on the burdens that they may place upon registrants and particular -- through the course of my work most of the focus is on naturalized citizens.

MR. KARPATKIN:  Your Honor, I move to admit Professor Michael McDonald as an export on political science, voter registration, election registration and quantitative methodologies.

THE COURT:  Unless there's any objection to proceeding with the testimony, you may proceed.

MR. KARPATKIN:  Thank you, Your Honor.

Stephen, can we please put up Slide 2.

BY MR. KARPATKIN:

Q.   Dr. McDonald, can you briefly describe the materials you reduced in preparing your report.

A.   Generally we're looking at data files and deposition testimony and documents that were provided, either through discovery or accessed publicly.

So there's the Arizona Active Voter Registration file. There are other lists that are similar to these that are adjacent to them on lists of individuals who have been

UNITED STATES DISTRICT COURT

cancelled, suspended; and from the Active Voter Registration file it's possible to get a subset of federal-only voters.

There are limited extracts, as you mentioned before, from the Arizona Department of Transportation that I've reviewed; deposition transcripts from various entities in the case; documents, again, that were produced in discovery from county, state and federal agencies; publicly-accessible reports and some of these -- beyond these reports about the effectiveness of the databases.

Also information specifically on naturalizations within the State of Arizona from the Department of Homeland Security and information about the character of naturalized citizens from the American Community Survey.  That's a survey that's from the Census Bureau.  I think you were probably looking at a very long document on that.

And then just for the final opinions that I draw in my report, those are scholarly articles on the cost of voting and the impacts of obstacles to voting.

Q.    Dr. McDonald, did you also review the rebuttal reports provided by defendants?

A.    I did.

Q.    Let's now turn to Slide 3.  I want to turn to the substance of your opinions.

Can you please briefly summarize your principle opinions in this case?

A.    Yes, sir.  Highlighted in this slide -- and there are six of them listed.  The first is there are multiple failure points in database matching, and we'll go into detail about what these failure points are and that these -- these failures or these difficulties for matching and the timeliness of the information found in databases is disproportionately going to impact naturalized citizens, that there are non-uniform documentary proof of citizenship or DPOC requirements or implementation now currently that I can observe; and then through deposition testimony there's indications that this discretion that will be afforded by these new laws will exacerbate the existing trends that we see right now in non-uniform implementation of DPOC requirements.

Examining the people who are likely to be impacted by these laws are mostly federal-only voters, although that's not the only group of individuals, and these federal-only voters tend to be younger, more diverse and less partisan than active registered voters in the State of Arizona.

These -- the burdens that are going to be placed upon individuals will have, of course, immediate impacts on burdens, but they will also have long-term impacts on their voting behavior.

Q.    Dr. McDonald, we're going to dive into each of these in more detail.  Let's start with your first opinion about database matching.

MR. KARPATKIN:  Can we go to Slide 5.

BY MR. KARPATKIN:

Q.    Dr. McDonald, you reviewed several databases.  Can you briefly describe what these databases are?

A.    So there's the statewide voter registration system that's contained with the AVID system, which is a larger election management system thirteen of the fifteen counties use directly; and then Pima and Maricopa have their own systems which interface with the AVID system as well.

Then there's the Arizona Department of Transportation database for licensed credential holders.  There's the Social Security Administration database, which is used for something that we'll call the HAVA check or Help America Vote Act check.

There's the SAVE database, which is a database that's maintained by the US Citizenship and Immigration Services that is -- allows groups, agencies, to look up information on citizenship status for use of potential benefits.

There's a database -- and I cannot remember the name of the organization fully -- but it's a National Association of Public Health and Statistics and Information Systems, I believe, is that NAPHSIS and this is a database of birth certificates.

And then there's -- those are the ones that I could evaluate.  I'd also make note that the new laws have another category of unspecified databases, and so some of the issues

that we're going to be talking about -- or I will be talking about with respect to these other databases will also apply to these unspecified databases and the law.

Q.   Dr. McDonald, why did you choose these databases to analyze?

A.   Well, as I said, these are the ones that are specified in HB2243 and HB2492.

Q.   And can -- we're going to turn to the individual databases, and let's start with the Arizona Department of Transportation database.

        MR. KARPATKIN:   Can we have Slide 6, please, Stephen.

BY MR. KARPATKIN:

Q.   Can you briefly summarize the issues you identified in your evaluation of the ADOT database?

A.   Yeah.  We're going to go into more detail about this, but there's -- something that's going to be consistent across all the databases and deposition testimony documents that I reviewed is the timeliness of the citizenship information that's contained with those databases.

    This is going to be true for ADOT's databases.  It's going to be true for other databases.  Citizenship information does not get automatically updated.

    There's also -- because of that phenomenon, that the information does not get updated, there's a particular

situation that's going to occur where if individuals do not provide updated citizenship information to ADOT, even though they have provided documentary proof of citizenship to County Recorders, they're going to find themselves a monthly loop where they're constantly being requested to have DPOC. There are data entry errors that are going to plague all of these databases.  It's going to lead to matching issues.

And then, finally, just because -- there's going to be the situation where in some cases that County Recorders are faced with indeterminate matches, and there are going to be multiple matches that they're going to have to review and decide which of these records in these other databases is the individual that they're looking at.

There's going to have to be some resolution and some discretion that the County Recorders are implementing to resolve those indeterminate matches.

Q.   Dr. McDonald, let's address each of these individually in a little bit more detail.

MR. KARPATKIN:  Slide 7, Stephen.

BY MR. KARPATKIN:

Q.   What did you conclude with the respect to the timeliness of citizenship status in the ADOT database?

A.   Well, individuals are only required to provide citizenship when they're issued an original credential or if they're issued a renewal credential.

UNITED STATES DISTRICT COURT

Those renewals can take up to ten years between those two time periods.  So if you're changing your address, for example, you don't need to renew and provide this citizenship information.

This is something that it's incumbent upon the individual to update that information with ADOT.  It's not required by the law, and even when someone dutifully does this task, a new naturalized citizen provides their new citizenship information, that information has to go through a SAVE -- what's called a SAVE check through the federal government, and there can be delays in that process up to weeks; and this has to be done in person by the individual.

So as a consequence of that, the citizenship record that exists in ADOT is at a point in time -- this, again, is discussed not in just ADOT, but in other databases as well -- and, thus, the accuracy of that citizenship information that's contained within the ADOT database can be out of date.

Q.    Dr. McDonald, why is this timing issue of particular significance with respect to the Challenge Laws?

A.    So there's really two scenarios that we have to consider here.  Currently, if a new registrant is a naturalized citizen, they've exited the naturalization ceremony -- County Recorders have provided deposition testimony about how they attend these ceremonies and they register individuals to vote.

They know that these people are citizens and they're very

UNITED STATES DISTRICT COURT

happen.  It's a -- I've been to these naturalization ceremonies myself to register individuals, and it's a joyous occasion.  People are very excited.  They want to be good citizens, and one of the first things they want to do is register to vote.

Currently, election officials understand that there's some timeliness issues with the information when they need to do citizenship verification under current policies and procedures within Arizona.

The law will change, though, and for these new registrants, if there's conflicting citizenship information -- if there's any information, actually, that says that individual is not a citizen, even though we know there are issues of timeliness with that information being updated within databases, or any other factor that may not allow a County Recorder to find the correct record, then that person's registration is immediately cancelled.

So there's no opportunity for them to receive a notice letter, which is what currently happens under the law. Instead, their registration will be immediately cancelled. They will be mailed notice that they've been cancelled, and they will be referred for criminal investigation.

So here is a process that is known to have flaws, that County Recorders know this, it's in the Elections Procedures Manual about the timeliness of the citizenship information;

UNITED STATES DISTRICT COURT

and, yet, it's going to penalize individuals and penalize their rights.

There's also this issue, as I discussed and we'll discuss in more detail, about this loop where current registrants will -- who have not updated their ADOT record will find themselves repeatedly requesting -- County Recorders requesting county -- citizenship information from them until they can resolve the citizenship information status that's found in the ADOT database.

Q.   Dr. McDonald, let's dive a little bit deeper into that loop you just mentioned with respect to currently-registered voters.

MR. KARPATKIN:  Can we have Slide 8, please.

BY MR. KARPATKIN:

Q.   You referred to this earlier with the DPOC loop.

Can you explain what this chart demonstrates?

A.   Yes.  So HB2243 applies to current registrants, and for somebody who's a full-ballot voter, who has provided DPOC to County Recorders in accordance to Arizona law, if there's a record of them not being a citizen in the ADOT database, on a monthly basis the law requires the Secretary of State's office to look up their information in the ADOT database; and if they see that there's a non-citizen flag, they're supposed to report that to the County Recorders.

County Recorders are then to issue a notice to the voter

that they are not -- they have not provided acceptable -- or there's a question of their citizenship status.  So they're required to provide DPOC.

If they respond affirmatively with the DPOC, then they retain their full ballot status, but this is gonna happen on a monthly basis until they -- this is the arrow that goes off to the left and down to the lower left -- until they go to MVD and update their citizenship status.

In the event that for some reason they don't respond to that notice -- and there could be a number of reasons why an individual may not respond.  It may have to do with problems with the mail, delivery.  I myself experienced this during the pandemic where I did not receive mail for more than a month and -- but that's not uncommon to happen to individuals.

There may be individuals who are traveling for some reason and don't receive that information within the allotted 35 days that are permitted under the law, or there could be other reasons why individuals are not responsive to that mailer; but if they do not respond within the 35 days, their registration is cancelled.

Q.   Dr. McDonald, I want to zero in on one element of the loop in the center of this graphic where it shows that there's notice to the voter.  The voter responds and provides DPOC.

To whom do they provide that DPOC?

A.   County Recorders.

Q.    And so the County Recorder is then able to register the voter as a full-ballot voter?

A.    Yes, they are.

Q.    Is the County Recorder able to change the information in the Arizona Department of Transportation database?

A.    No, they are not.

Q.    And is that why the voter could be subject to the monthly check again?

A.    Yes.

Q.    I want to turn to the next issue that you identified.

        MR. KARPATKIN:  Can we have Slide 9, please.

BY MR. KARPATKIN:

Q.    What did you find with respect to data entry errors with the ADOT database?

A.    I first want to make clear that there's a certain class of voters, these naturalized citizens, who are most likely going to be affected by these laws but there is just --
because of random chance and other elements that just happens with very large databases, that there's going to be an element of chance to individuals being incorrectly identified as non-citizens or their information be in indeterminate status because you cannot find the right record through database matching.

    And so one of the barriers that will exist and currently exists for any large-scale database is simply database entry

UNITED STATES DISTRICT COURT

errors.  Individual at the -- say at the County Recorder's office or ADOT -- since we're talking about ADOT at this point -- they have to do ingest procedures when they're entering people's identification.

So there's a clerk there who's entering information, and we all make typos; and so just those typographical errors and data entry errors can lead to incorrect position.

That information is important to have correct because we're talking about doing matching, and computers need to have the exact information as presented to them in order to do a successful match.

And so in deposition Mr. Jorgensen discussed that there are inaccuracies in their auditing procedures that they do about data entry.  They find that 10 to 15 percent of the time that there are inaccuracies in some portion of the ADOT record.

Q.   And, Dr. McDonald, to clarify, is that 10 to 15 percent inaccuracy rate related specifically to the citizenship information in the ADOT database?

A.   It is not.

Q.   So what does that refer to?

A.   It refers to all of the potential errors for any of the data elements that are entered into the ADOT database.

Q.   Dr. McDonald, is this level of inaccuracy generally consistent with your understanding of inaccuracies in large

administrative databases?

A.   Yes, there are other documents that are provided with respect to the Social Security Administration, for example, where they have a six percent error rate.

So it seems relatively similar in auditing procedures at other large organizations who manage these very large databases.  This sort of error rate that they typically find.

Q.   I want to now turn to the process where county official -- election officials have to try to match registrants to the ADOT database.

MR. KARPATKIN:  Can we have Slide 10, Stephen.

BY MR. KARPATKIN:

Q.   As an initial matter, can you explain the different types of matches that can be made between a registrant and an ADOT record?

A.   Yeah, so this is part of this HAVA match procedure.  So when a County Recorder enters information into AVID, that information is transmitted to ADOT, and then ADOT transmits information to the Social Security Administration database for limited verification of some of the information on names and birthdates and last four digits of Social Security number.

That information from the Social Security Administration is then transmitted back to ADOT.  ADOT appends some information to those records, and that information is then transmitted back to the County Recorders through the AVID

UNITED STATES DISTRICT COURT

system, all right.

So what we're discussing here is the stage in which information has been returned by the Social Security Administration and that they're gonna -- in some cases, as described by Mr. Jorgensen in deposition, they're not gonna find the exact record that they're -- they're hoping to find, and the exact record would be a hard match.

This is where we have a good identification.  We've done additional matching.  There's a high level of confidence.  It's always possible that you found the wrong record, but there's a very remote chance that you found the wrong record when you're doing this database matching.

So if you have a hard match, the ADOT system is gonna send back a single record and you would hope that it's the correct record; and in most cases it will be, but if there's an indeterminate match, if the AVID -- or the ADOT system can't automatically find this hard match record that its looking for, it's going to revert to a soft match.

And these soft matches are ones where there's not enough information to identify uniquely the record.  In deposition, Mr. Jorgensen described one of the soft matches that ADOT does, which is simply last name and birth date and that's it, and that's going to have a large number of matches because there's Smiths in the world and millions of people, you're gonna find that there are going to be upwards to fifty or more

UNITED STATES DISTRICT COURT

people who have exactly the last name and same birthdate. This is a phenomenon called the birthdate problem that I've published research on.

So Mr. Jorgensen says that they know that this is gonna be a problem so they actually truncate the number of returned records through the ADOT system to 50 records.  So we know there are going to be at times up to 50 records that are going to be transmitted back to the AVID system for adjudication.

Q.   Dr. McDonald, did you have an opportunity to analyze the specific criteria that AVID uses to evaluate matches?

A.   Yes, this was that technical document that came in after the Secretary of State's tran -- deposition.

MR. KARPATKIN:  Stephen, can we put on DX 935.

And, Your Honor, this has already been an admitted exhibit.  It is defendants' Exhibit 935.

BY MR. KARPATKIN:

Q.   Dr. McDonald, is this the document that you're talking about?

A.   Yes, but it's not the page where the soft matches for MVD is found.

MR. KARPATKIN:  Stephen, can we go to Page 2.

BY MR. KARPATKIN:

Q.   Is this the basis for your analysis?

A.   Yes, it's the -- at the bottom of that page -- it's cut in half.  These are the MVD verification soft matches.  So

these are the four types of soft matches that MVD -- that AVID

uses to winnow down that information that's being transmitted

back from ADOT to AVID.

MR. KARPATKIN:  Can we go to Slide 11, Stephen.

BY MR. KARPATKIN:

Q.   Does this slide reflect the information that was on the

document we just reviewed?

A.   Yes.

Q.   And can you briefly explain what the different soft match

types are here?

A.   Yes, so we have a Soft Match Type 1.  It's -- to take it

out of the technical document, it's related to exact match on

the last name, the first three characters of the first name,

and the last four digits of the Social Security number.

Soft Match 2 and Soft Match Type 3 are similar.  They're

varying some of the information, maybe birthdate, but

generally the information is generally the same about

birthday, names or Social Security numbers.

The last one is a different character, which I found

interesting, and it's not something that I contemplated in my

original report.  It's that the Arizona driver's license

number is considered to be a soft match, and under reflection

from this document and from some of the expert report that was

produced by Mr. Richman, which discusses duplicates, I

realized that AVID does not treat driver's license number as a

unique number.

And in some of the hard matches, additional criteria such as names, birthdates or Social Security numbers are used to help identify records that would be under the hard match. It's not -- but a driver's license number itself is not a hard match, which means that the AVID system recognizes that you can have duplicates and that you may not be matching the correct record when you are doing record matching with driver's license numbers alone.

Q.   Dr. McDonald, the right column of this table identifies the number of duplicate pairs.

Did you calculate those duplicate pairs?

A.   Yeah, I applied these criteria to the AVID database, so the database of active registered voters.  Understand that that's roughly four million records.  The ADOT database is roughly seven million records.  So these are the numbers that we can see within the AVID system.

I didn't have the personal identifying information that I could do a similar sort of check on the ADOT system.  So I'm trying to approximate what's going to happen here.  I would guess that there's gonna be more matches when we're talking about a roughly two-thirds size more size of a database with millions of records talking about ADOT.

But these number of duplicate pairs are -- for example, with Soft Match Type 1, there are 3,428.  So there's -- it

means that there are 3,000 -- excuse me, 3,428 instances where there are two records that satisfy this soft match criteria.

Q.   And, Dr. McDonald, how many duplicate pairs are there for Soft Match Type 2?

A.   2412.

Q.   And that's 2412 duplicates?

A.   Duplicates of this character, yes.

Q.   And how many duplicates are there for Soft Match Type 3?

A.   438.

Q.   And how many duplicates are there for Soft Match Type 4?

A.   480.

Q.   Dr. McDonald, on this table you prepare a total.  Can you explain what that total represents?

A.   Yeah.  So as I was doing this analysis, I realized that it's possible that one record could be matched under Soft Type Match 1 with another record, but in Soft Match Type 2 it could be matched with yet a different record, and so it wouldn't be right, really, just to tally these up and come up to a total number of duplicates.

So instead, I changed the unit of analysis to the individuals that were not uniquely identified by any of these four soft match types, and that total number is 12,051.

Q.   And just to be clear, what does that 12,051 number represent?

A.   That represents -- as far as we can see within the AVID

system -- but, again, ADOT's gonna have a greater number of records that are transmitting to it.  The number of instances where using the soft match criteria there's gonna be an indeterminate match that the County Recorder's going to have to exercise some form of discretion to determine whether or not the -- which record is the correct individual to match information to and with the new AVID record that they're entering into the system.

Q.   Professor McDonald, I would like to give you a chance to walk us through an illustrative example of this soft match process.

MR. KARPATKIN:  Can we have Slide 12, please.

BY MR. KARPATKIN:

Q.   What does this example show?

A.   So this is replicating, essentially, the Soft Match Type 1 and showing an issue where it can fail.  So now we're -- here's where we would have two records, but they're actually not the same person.

So recall that the Soft Match Type 1 involves last name, first three characters of first name and the last four digits of the Social Security number, and the real blocker here is with first name.

If an individual is named Mari, for example, and there's another individual who's named Maria, the soft match will fail because it only looks at the first three characters of the

first name.

Q.   So this is an instance where two individuals who were potentially the same individual failed to match?

A.   Yeah, and I -- sorry.  I don't really mean to say fail. I mean that there will be an indeterminate match and there will have to be some adjudication by the County Recorder as to which of these two is the correct record.

Q.   I want to now move to an illustration of a different kind, of a match failure.

        MR. KARPATKIN:  Can we go dough to the next slide, please.

BY MR. KARPATKIN:

Q.   Dr. McDonald, what does the -- this slide provides two examples of match failure.  Can you explain the example on the left?

A.   Yeah.  So here again, these are just illustrative examples to be somewhat repetitive so I apologize for that; but, again, we've got the first name issue not matching correctly on the left-hand side and what's more frequent -- and this comes up in deposition and it comes up in documents that are reviewed for this case repeatedly across multiple databases is what happens when a woman takes a hyphenated last name for the husband through a marriage or a child is adopted and they take the last name as a hyphenated name with their parents, and so this happens quite frequently.

UNITED STATES DISTRICT COURT

It's described in documents from various sources. I've also seen instances when I've been working with voter registration databases around the country that people will take those dual first names, like a Lopez Garcia that has a space between them and they'll put the Lopez into the middle name and not put the Lopez and Garcia on the same line as well.

So there are various things that can go wrong here when it comes to these -- you know, particularly with these last names and given life events that people have and that can alter that last name. That can challenge how that information's entered into a database.

On the right-hand side is an example where we have an individual who maybe at one stage in their life they went by Joseph, but over time they decided to start calling themself Joe. So they adopted a nickname and that's become their legal name, and that's the name that they're using for their forms.

So this really speaks to the point in time that this information's entered into the database and whether or not those life event changes or those discretionary changes that people may have are accurately reflected in the names that are contained within the databases.

At the bottom is more of a typical sort of matching -- a transcription error that can occur. So we have a Social Security number of 1234 on the left-hand side and a Social

Security number last four of 1239 -- and, again, this is pretty common that people have -- will write onto a paper form a number, like a "4," and it may be hard to distinguish from a "9" whoever's doing the data entry; and so here would be a good example of that of sort of phenomenon.

Q.   Dr. McDonald, what is the consequence to the voter if they find themselves in a situation like described here where there isn't a match between their AVID registration and their ADOT record?

A.   In terms of their ADOT record is that they may be denied some benefit of being able to cast a full ballot.  As contemplated currently under the laws, if there's an indeterminate match, you just simply can't look up the record, that person would be given a limited federal ballot status in the AVID database.

Q.   Dr. McDonald, were you able to estimate the total number of individuals with ADOT records that may inaccurately identify them as non-citizens?

A.   Yes.

          MR. KARPATKIN:  Can we have Slide 14.

BY MR. KARPATKIN:

Q.   What did you conclude about that number?

A.   So I took the driver's license number as it was found within the AVID system, and I matched that exactly with the driver's license number in the ADOT system in that extract

that was provided by ADOT; and there's a citizenship flag in there as well, and I found 6,084 cases where there were full-ballot voters who had provided DPOC satisfactory to County Recorders and were registered as full-ballot voters, but the ADOT system had a record of them being a non-citizen.

Q.    Dr. McDonald, so summing up your analysis of the use of the ADOT database, what, in your opinion, will be the result if the new laws expand the use of ADOT matches to confirm citizenship?

A.    As I mentioned in the very beginning, there are two real problems here; but globally, what we're looking at, is naturalized citizens are gonna have some difficulties here.

The information is not going to be current necessarily within the ADOT database, and there are going to be certain things that are going to happen to them as a consequence to that.

The other major thing that's going to happen here is registering to vote is going to become like a lottery and, you know, very few people win the jackpot; but in this case the jackpot's going to be that you may be found to be a non-citizen through -- just simply through database entry errors or matching issues.

And anyone, it could be a full naturally-born citizen within the United States, they could be erroneously matched with an ADOT record, and if they're a new registrant, they're

going to find themselves -- their registration cancelled and they'll be referred for criminal investigation.

THE COURT:  So would this 6,084 be the number of people that would be in what you described as the loop?

THE WITNESS:  That's correct.  It's a -- I'm not including any other registrants like the full -- the federal-only voters that could also be caught in this loop as well.

MR. KARPATKIN:  Dr. McDonald, I want to now turn to the next database of the Social Security Administration.

Can we have Slide 15.

BY MR. KARPATKIN:

Q.   What did you conclude about the usefulness of this database for verification of citizenship?

A.   Well, the Social Security Administration under the Help America Vote Act of 2002 makes an application available to election officials across the country to permit look-ups of information found in the Social Security Administration database.  It's called the HAVV system or Help America Vote Verification system.

That system only returns certain information.  It returns names and last four of the Social Security number and birthdates.  So it only verifies that.  Although the Social Security Administration does have citizenship information for some of their credential holders, that information is not

externally available outside the federal government through this HAVV system.

So it cannot be used, currently configured, to verify citizenship and the State of Arizona would not have access to the citizenship information found within the Social Security Administration database.

If somehow there was a change of law at the federal level that would permit this access or policy, then there's other challenges, just like we were discussing with ADOT.  There's gonna be latency issues with the citizenship, and there's going to be another global issue that, according to the Social Security Administration, about a quarter of their records don't even have citizenship information.

Q.   Dr. McDonald, you referenced "latency issues."  Can you elaborate a little bit?  What do you mean by a "latency issue"?

A.   Well, it's the same thing we were discussing earlier with ADOT where that citizenship information is only good at the point in time in which it was acquired by the organization, be it the Arizona Department of Transportation, be it the Social Security Administration, and so unless individuals have contact in which there was an opportunity to update that citizenship status, naturalized citizens will have inaccurate and old citizenship information contained with any of these databases.

UNITED STATES DISTRICT COURT

MR. KARPATKIN:  Stephen, can we go to Slide 16, please.

BY MR. KARPATKIN:

Q.    Did you also review the accuracy and reliability of the SSA database?

A.    Yes, so I -- I didn't have the data in the same way as we have with AVID and with the ADOT records.  So there are some reports that have been produced by the Social Security Administration, the Office Inspector General.  These were reports back in the 2000s so they are a little dated, but I don't think that there's anything that would have changed the circumstances within the Social Security Administration since then because these are issues that are pernicious and they're present in all large databases, and there really would not have been fixes to these over time to any large degree.

So what that -- those Inspector General reports describe is that the Social Security database really does not necessarily provide reliable matching.  Part of it's because the ID number that you're looking up is just the last four digits.

It's not the full Social Security number, and so what's happening here with the Social Security Administration database is they're doing soft matching, too, and they're going to have multiple records; and there's possibility described in the documentation that you're going -- if you put

the same information in twice into this HAVV system that they have, you can actually get two different records back when you're doing this; and for this reason the Inspector General warns against using the HAVV system as a means to verify eligibility for voting.

Q.   Dr. McDonald, did the reports you reviewed estimate what the error rate might be in the SSA database?

A.   Yeah, I referenced that earlier.  It's about six percent.

Q.   And, Dr. McDonald, you referenced Inspector General reports from SSA.  Did you also review record requests from SSA?

A.   Yes, there was a record request as well that was made.

Q.   And was that in a piece of correspondence provided from the SSA addressing these issues?

A.   Yes.

Q.   And is that the kind of information generally relied upon by scholars in your field in assessing databases?

A.   Yes, I do it all the time.  We do data collection on precinct boundaries and election results that have been used, for example, the most recent case out of Alabama that went to the Supreme Court, the data that was produced by the team that I lead at the University of Florida.

So we're constantly doing records requests of local election officials across the country to obtain information that we use in courtroom.

MR. KARPATKIN:  Dr. McDonald, I want to now turn to the SAVE system.  Can we have Slide 17.

BY MR. KARPATKIN:

Q.    This Court has already heard some about the SAVE system, but can you briefly describe the key features of this system that are most critical to your analysis?

A.    Yeah, so SAVE is gonna have some of the same issues that we've just been discussing with other databases; but there's also some issues that are really endemic to the SAVE system as well.

One of those is that it's a system.  It's actually not a single database, and there's a system of other databases within the federal government that the SAVE system is accessing to get information about citizenship status of individuals; and the information is only for non-native born citizens and you have to have some identification number in order to conduct the query into the system.

MR. KARPATKIN:  Dr. McDonald, I now want to turn to the specific issues you identify with respect to the SAVE system.  Can we have Slide 18, Stephen.

BY MR. KARPATKIN:

Q.    Can you explain your findings from your review of the SAVE system?

A.    Yeah, again, this is very common; but in some respects the data issues are magnified in SAVE because it's got

UNITED STATES DISTRICT COURT

multiple databases that it's accessing, and so there's a description in the documentation about how the different databases that the SAVE system's accessing can have variations on last name, like we were describing earlier with respect to the ADOT system; and there they're gonna be indeterminate matches as to whether or not this individual is the correct individual that you're supposed to be finding and providing verification that that individual should receive a benefit.

It's known from -- from the side of Arizona within the County Recorder depositions and within the Secretary of State's deposition and within the Elections Procedures Manual that there's a lag time of how SAVE gets updated.

So if someone naturalizes, the SAVE system, that doesn't immediately propagate through the bureaucracy that's the federal government; and so some of these databases could have conflicting information with citizenship status because it's not being updated at the same time and it may be points of contact updates, but at the very least you're gonna have flags of how that information gets updated.

The Elections Procedures Manual describes that lag time to be -- some caution is to be exercised if a person -- a naturalized person registers within two weeks of an election date.

I think that that -- there's no documentation why the two weeks should be the cutoff point.  It's just what the

Elections Procedures Manual says.  In my review of the documentation from SAVE, there are reasons why we might suspect that the time might be longer in some cases.

For example, there was a discussion that there could be a database down for days or -- hours or days and that the information would not be able to be accessed within the SAVE database, and so this whole system is known to have issues with it.  It's known to have inability to find the correct record; and in that situation where the SAVE does not provide a record back, the USCIS requests that the user, the agency that's using the SAVE database -- could be County Recorders, could be Secretary of State's office, could be ADOT 'cuz they also use the SAVE database -- they're requested to send some information back to SAVE so that they can do a manual search and find the information and see if they can find it within their database so they can provide the benefit to the individual who's seeking it.

Q.    Dr. McDonald, were you able to review information about how this manual verification is actually implemented in Arizona?

A.    Yes.

MR. KARPATKIN:  Can we put up PX 266.

Your Honor, I believe this is an admitted exhibit -- I'm sorry, that was the wrong exhibit.  Let's take that down. My apologies.  Can we have Slide 19, please.

BY MR. KARPATKIN:

Q.   Dr. McDonald, does this slide include the information you reviewed with respect to the implementation of the manual verification?

A.   Yes.

Q.   Can you please explain what this slide represents?

A.   It's a spreadsheet.  Fortunately, it's only one page, and it has dates going from 2016 to 2023 on the left-hand side year.  There's agency ID and agency name.  The agencies that are being described within each of these years are County Recorders and the Secretary of State's office -- County Recorders that have access to the SAVE system.

     Of note are these two columns that are highlighted in yellow.  The first column represents the number of times that SAVE requested information from Arizona -- additional information to perform one of these manual checks.

     The column next to it is the number of instances where Arizona affirmatively responded with that additional information.  I've totaled these up.  Just simple.  That was not in the document, but I just did a simple sum; and there were 2,892 instances where SAVE requested a manual verification check and the State agencies, either the County Recorders or the Secretary of State's office, responded 162 times from that request.

              THE COURT:  So would this potentially be the

UNITED STATES DISTRICT COURT

situation where someone walked out of the naturalization ceremony, went and registered to vote at the table outside the ceremony, run through SAVE, SAVE hadn't updated their records and they say, "Well, can you send us more information?"

Theoretically, the Voter Registration Office, the County Recorder, could send an image or the number of the naturalization certificate?

THE WITNESS:  Yeah, but it's the scenario where it's not that the information hasn't updated in SAVE yet.  It's the scenario where whatever information was entered into the system is not matching with a record within the SAVE system.

THE COURT:  So this isn't an update situation?  This is just a failure to match?

THE WITNESS:  It could be an update situation because these HAVA checks are happening whenever anyone updates their voter registration, and it could be that there's a non-citizenship information coming back from ADOT through the update that's happening within the HAVA check; and that might trigger a SAVE check, a request for documentary proof of citizenship that would then result in a SAVE check.

MR. KARPATKIN:  And I just want to note for the record that the data on this table is derived from Plaintiffs' Exhibit 269-2, which has been admitted.

BY MR. KARPATKIN:

Q.    Dr. McDonald, can you just sum up on this issue.  Why is

UNITED STATES DISTRICT COURT

this -- the totals that you derived here, the 2,892 requests and the 162 responses significant in your overall evaluation of the SAVE system?

A.    Yeah, this is a scenario where under this Memorandum of Agreement that if there is a failure to find information because there's just no record match, there's a duty to the County Recorders and the Secretary of State's office to request this manual information.

You can envision a scenario like we just discussed where someone had previously provided information to the ADOT that they are not a citizen, they've naturalized, but that new information's not being matched within the SAVE system; and so they will still be considered to be a non-citizen even though they provided DPOC, but SAVE just can't verify that because they can't find the record.

MR. KARPATKIN:  Dr. McDonald, I want to now turn to the NAPHSIS Electronic Verification Vital Events database.

Slide 20, please.

BY MR. KARPATKIN:

Q.    As an initial matter, can you summarize what this database is?

A.    So this is a -- as I understand it -- and there's not as much documentation on this system as other systems, but it's a -- as I understand it to be, a database of a collection of birth certificates across the country.

Q.   And what issues did you identify in --

THE COURT:  Could I interrupt?  Is this the database that the County Recorders said they had no access to?

MR. KARPATKIN:  Yes, your Honor.

THE COURT:  Okay.  So why do we need to talk about it if they can't even -- I mean, they have plenty of errors, but they're not using it 'cuz they have no access.

Is the idea maybe they'll have access and it will still be bad?

MR. KARPATKIN:  That contention has been made by some of defendants' experts.

THE COURT:  What, that access might be granted to this?

MR. KARPATKIN:  At some point in the future.

THE COURT:  "Yes"?

MR. KARPATKIN:  Yes.  Yes, your Honor.

THE COURT:  Okay.

MR. KARPATKIN:  We will not spend much time on this, Your Honor.  We'll be very brief.

THE COURT:  I don't know what EVVE is.

THE WITNESS:  It's Electronic Verification of Vital Events.  That's the database system that they provide the product they provide.  This is not a government entity.  This is a nonprofit organization that collects this information, and so they have this product EVVE that allows people to look

UNITED STATES DISTRICT COURT

up information within their system.

THE COURT:  Who are the people it allows to look up?

THE WITNESS:  Anyone who has a contract with them that they've granted access to their system.

THE COURT:  Thank you.

BY MR. KARPATKIN:

Q.    Let's move on, Dr. McDonald.  Is it possible for two databases to provide inconsistent information?

A.    Yes, it is.

Q.    And what happens if there's an inconsistency?

A.    So we have a situation where we know that there's latency in how citizenship gets updated within the databases, and so County Recorders are going to be confronted at times with conflicting citizenship information.

One database will say that they're a citizen, another database will say that they are not.  In that scenario, the County Recorder needs to exercise their discretion as to which information they're going to accept as being the definitive proof of citizenship.

Now, there's conflicting information of how this is being implemented right now in the deposition testimony, and I think we'll cover that so -- but it will also be, though, the situation where County Recorders are under threat of committing a felony if they knowingly register an individual who is not a citizen.

And so a risk adverse person, I think is reasonable to assume, would look at the conflicting information of citizenship status and they would not want to be committing a felony so they're gonna go with the citizenship -- the information that says that person is not a citizen so that they are guaranteed that they're not committing a felony in that case.

THE COURT:  Can we take our morning break, Ladies and Gentlemen.  We'll reconvene at five minutes after 11:00.

Court is in recess.

COURTROOM DEPUTY:  All rise.

(Recess taken at 10:48 a.m.)

(Back on the record at 11:05 a.m.)

THE COURT:  Thank you, please sit down.

Please continue with your questions.

BY MR. KARPATKIN:

Q.   Dr. McDonald, I want to ask one last question about your databases analysis.  We've been discussing your analysis of these databases for purposes of citizenship verification.

Is it your opinion that these databases are not reliable generally?

A.   No.

Q.   So for what particular purposes are these databases not reliable?

A.   They're unreliable for the purposes of determining

citizenship verification.

Q.   Dr. McDonald, thank you.  I want to now focus on your second opinion, which is the disproportionate impacts on naturalized citizens.

Did you have an opportunity to evaluate which groups in the population are most likely to be impacted by the further application of these databases for citizenship verification?

A.   Yes, it's been discussed throughout that naturalized citizens are going to be the ones mostly impacted by these new laws.

MR. KARPATKIN:  Can we have Slide 23, Stephen.

BY MR. KARPATKIN:

Q.   Did you have an opportunity to analyze the demographic composition of naturalized citizens of voting age in Arizona?

A.   Yes, I did.

Q.   And what did you conclude?

A.   So from the Department of Homeland Security, there are statistics on the number of individuals who have naturalized within Arizona since 2015; and they report that there are 111,513 individuals of voting age who have naturalized.

In addition, the American Community Survey, it's a large-scale survey that the Census Bureau runs every year, it finds some information on the demographic characteristics of these individuals who have been naturalized compared with the voting age population within Arizona.

Q.   And can you explain in a little bit more detail how you use the American Community Survey data to identify the numbers in this table?

A.   Yes.   So, for example, on the first two columns there, the blue is the voting age population, and 66.0 percent of the voting age population within the State of Arizona is non-Hispanic white.  Among naturalized citizens, 32.6 percent are non-Hispanic white.  So they're more diverse.  Naturalized citizens are more diverse, as we might expect.

     Predominantly they're going to be more diverse because of the Hispanics and Asian American Pacific Islanders.  So for the Hispanic, 34.0 percent of Arizona's voting age population is Hispanic, while 67.4 percent of naturalized citizens are Hispanic; and, again, going to the most prevalent group, 4.8 percent of the voting age population is Asian or Pacific Islander, while among naturalized citizens 35.8 percent are Asian or Pacific Islander.

     The numbers aren't so big for the smaller groups within the State of Arizona.  So 61. -- 6.1, excuse me, percent are African-American among the voting age population and 7.9 percent among the naturalized citizens and 4.8 percent among Native Americans of voting age statewide compared with 2.4 percent naturalized.

Q.   So, Dr. McDonald, what conclusion do you draw from the data in this table?

A.   That the naturalized population's more diverse than the voting age population of Arizona.

Q.   I want to now turn to your next opinion, Dr. McDonald.

MR. KARPATKIN:  Can we go to Slide 24.

BY MR. KARPATKIN:

Q.   I'm sorry, one -- one last question on the last slide.

Dr. McDonald, do you know the number of voting age citizens in Arizona since 2015?

A.   Yes, that's the first graphic in the top there.

Q.   I'm sorry.  Thank you very much, Dr. McDonald.

MR. KARPATKIN:  Let's go to the next slide, please.

BY MR. KARPATKIN:

Q.   Dr. McDonald, what is the third opinion that's highlighted here?

A.   Non-uniform documentary proof of citizenship implementation current.

Q.   And what analyses did you conduct in coming to this opinion?

A.   I analyzed the -- some of the databases that I described earlier with respect to suspended voters, cancelled voters and federal-only voters, and I also looked at deposition testimony and also considered the rebuttal experts' reports.

MR. KARPATKIN:  And I want to review the data one category at a time.  Let's go to Slide 25, cancelled voters.

BY MR. KARPATKIN:

UNITED STATES DISTRICT COURT

Q.   Dr. McDonald, what is this table?

A.   This is Table 1 from my report, and it's the active registered voters by county.  So we've got the counties identified on the left --

        MR. KARPATKIN:  Dr. McDonald, let me just pause you for a moment there.

        Your Honor, this is Table 1 from Dr. McDonald's expert report.  In this table and several other tables that Dr. McDonald will discuss are separately-identified as exhibits.

        Since the Court has not yet determined whether the report in its entirety will come in and since this exhibit will assist in Dr. McDonald's testimony, we would like to move to enter this table as a separate exhibit.

        It's Plaintiffs' Exhibit 334.

        THE COURT:  334?

        MR. KARPATKIN:  Correct.

        THE COURT:  Is there any objection to 334?

        MR. LANGHOFER:  Subject to cross-exam on accuracy, of course, Your Honor, no objection.

        THE COURT:  With that objection, Exhibit 334 is admitted.

        *(Exhibit No. 334 admitted into Evidence.)*

BY MR. KARPATKIN:

Q.   I'm sorry, Dr. McDonald, can you briefly explain what is

a "cancelled voter"?

A.   A cancelled voter is an individual whose registration has been cancelled effectively so that they are no longer active or in a suspense status.

Q.   And how did you determine invalid citizenship proof on this table?

A.   There is a status reason field within the database, and among the status reasons indicated there's "Invalid Citizenship Proof."  So that's in the quotations there.

     So these are all of the individuals by county that have a flag of invalid citizenship proof.

Q.   Dr. McDonald, looking at the individual counties, what pattern do you observe from this table?

A.   There's some anomalies here.  I draw your attention to Pima, in particular.  There are zero invalid citizenship proof in Pima.  It's the second largest county in Arizona, at least in terms of active registered voters, and I believe that's also total population and, yet, it has zero.

     Maricopa has 232, Pinal has 825.  It seems reasonable that Pima should have some more and it's -- it's suggestive, then, that there's uneven implementation of current DPOC procedures among County Recorders in Arizona.

Q.   Dr. McDonald, did you consider any explanations for that pattern that you observed?

A.   Yes, and the defendants' experts questioned whether or

not there could be some other explanation for this zero number in Pima; and this goes, also, with the next slide that we're going to see with suspended voters, because we will find in the next slide as well that Pima has zero suspended voters for invalid citizenship proof as well.

So it looks to be an anomaly and when I -- one of the suggestions by Dr. Hoekstra was that there's some other code here that's identifying the invalid citizenship proof.

Well, if there was a different code, that would also speak to different policies and procedures that are being implemented across the counties; but I did look with respect to the suspended voters and there were, if I recall correctly, 114 records of suspended voters in Pima County, and all but one of them was for not of voting age.  So it doesn't seem reasonable that that's some other code for invalid citizenship proof.

There was one record with missing code.  So if I were to be most generous, there could be one; but even if there was one, as we'll se in the next slide, it would be very unusual for Pima, being the second largest county, to have only one individual in a suspended status for invalid citizenship proof.  So I looked a little further.

I looked at -- I took recommendations from the defendants' experts, looked at the data further, but then I also looked back at the Pima deposition; and Pima says in

UNITED STATES DISTRICT COURT

their deposition that they don't put people into a suspended status or cancelled status if they do not provide DPOC.  They simply register them as federal-only voters.

So, clearly, it's a matter of record in the deposition testimony that Pima is definitely doing something different from the other counties.

Q.   Dr. McDonald, did you consider whether the numbers reflected in this table could reflect the possibility that non-citizens are distributed in a manner consistent with the invalid citizen paragraph?

A.   That was something that Richman did in his report.

Non-citizens tend to be located in larger counties and they tend to be in most populous counties across the country. I look at this data all the time for purposes of calculating turnout rate for those who are eligible to vote, and so when I calculate those things I know that the patterns are gonna be that the larger counties are going to have concentrations of non-citizens.

So, again, if it was an explanation somehow that there were zero non-citizens in Pima and that's why Pima has zero non-citizens who are registered for insufficient -- or in suspended or cancelled status for invalid citizenship proof, that just doesn't bear any reasonable explanation from what I know about how the data work.

Q.   Dr. McDonald, you've already talked a little bit about

UNITED STATES DISTRICT COURT

suspended voters, but let's turn to the table in your report that addresses suspended voters.

MR. KARPATKIN:  Can we have Slide 26, please.

BY MR. KARPATKIN:

Q.   Is this Table 2 from your report, Dr. McDonald?

THE COURT:  I'm not sure that I know what a "suspended voter" is.  I've heard about inactive list.

THE WITNESS:  Yeah, so -- so there's a process that happens here, and this just generally discusses the process not with respect to citizenship.

So if a County Recorder receives an application and for whatever reason they don't think that that application is valid and they need to go out and gather more information from the registrant, could be like the address doesn't seem correct, it's not in their records as an example this sort of thing that could be just mundanely that they're worried about, it could also be for citizenship, DPOC, they will put those voters in a suspended status while they do further investigation.

At the point in time when that investigation ends, and under Arizona law this is supposed to -- you can only keep a person in suspended status up to the next general federal -- General Election -- Arizona Regular General Election, I believe is the correct wording in the law.  Then they're supposed to be moved into a cancelled status and so,

basically, time is up.  You're not going to get registered to vote.

There are scenarios, also, where you could immediately cancel a registrant, skip the suspended status and go directly to a cancelled status.

MR. KARPATKIN:  Your Honor, similar to Table 1, this is Table 2 from Dr. McDonald's expert report.

We would like to admit it as plaintiffs' Exhibit 335.

THE COURT:  Is there any objection?

MR. LANGHOFER:  The same reservation of rights on cross-examination.  Otherwise, no, Your Honor.

THE COURT:  Without objection, Exhibit 335 is admitted.

(Exhibit No. 335 admitted into Evidence.)

BY MR. KARPATKIN:

Q.  Dr. McDonald, in developing this table did you use the same methodology that you used for Table 1?

A.  Almost.  I mean, I looked at suspended voters, which is a separate list from cancelled voters; but besides that, same methodology.

Q.  Did you see a similar pattern in this data?

A.  Yes, Pima stands out as an anomaly.  Maricopa appears to stand out as well as an anomaly.  This was an issue that was brought up by defendants' experts, and although they were not

able to find additional data file for Maricopa suspended voters, I was able to locate one.  It just wasn't provided in the overall data dump that I got for all of the voter registration data.

I missed it.  It was may fault, but I did review that one and there were fifteen records that had some indication of invalid citizenship proof.  It wasn't the same exact wording for the Maricopa system.  Recall that Maricopa has a separate system from AVID.  So it's slightly different wording, but it had citizenship as part of the reason why individuals were in suspended status.

So even if I were to look at these fifteen, it doesn't really change my opinion that there's something different going on in Maricopa where they would only have fifteen suspended voters; and you compare that with counties that have, you know, significantly smaller populations having over a thousand.

So we know something's going on in Pima that's different, and it looks like as well in Maricopa that something is having differently there as well.

THE COURT:  My understanding from prior testimony is that both Maricopa County and Pima County have their own registration system and don't -- and all of the other thirteen counties use the State system?

THE WITNESS:  Yes.

UNITED STATES DISTRICT COURT

THE COURT:  Would that be an explanation for why the data doesn't work for them?

THE WITNESS:  These are data that were compiled by the Secretary of State's office that included suspended registrations and cancelled registrations for Pima, and for Maricopa there were cancelled registration but there were no suspended; and so I looked for that additional suspended data and that was in a separate database.

So for whatever reason, it wasn't compiled into that statewide file that was provided in discovery for suspended voters, and the data file itself that was provided by the Secretary of State's office misleadingly says all counties.

Again, it was my fault for not looking further; but I did find the records and I would amend this table to say there should be fifteen there for Maricopa.

BY MR. KARPATKIN:

Q.   So, Dr. McDonald, just to give you a chance to say it explicitly, what pattern do you observe looking at this table of suspended voters?

A.   There's just some anomalies, and these anomalies suggest that there's some uneven implementation of current DPOC requirements in Arizona; and this is most certainly true, it's not just the data table when we look at Pima, that there's additional deposition testimony that confirms that Pima's doing something different from the other counties.

MR. KARPATKIN:  I want to now turn to federal-only registrants.  Can we have Slide 27.

BY MR. KARPATKIN:

Q.   Dr. McDonald, is this Table 3 from your expert report?

A.   Yes, it is.

MR. KARPATKIN:  Your Honor, similar to the other exhibits, I move admission of this table that is plaintiffs' Exhibit 336.

THE COURT:  Any objection?

MR. LANGHOFER:  Same reservation; but otherwise no, Your Honor.

THE COURT:  Exhibit 336 is admitted.

*(Exhibit No. 336 admitted into Evidence.)*

BY MR. KARPATKIN:

Q.   Dr. McDonald, why did you evaluate federal-only registrants?

A.   Well, these are individuals who have not provided DPOC and have been registered to vote for only federal-only elections pursuant to prior court action here in the State of Arizona.

Q.   And what methodology did you use to develop this table?

A.   Similar as before, except instead of looking at the status reason, there are two codes within the Arizona Voter Registration File that indicate what sort of federal ID that you have to provide; and those two codes together, looking at

the documentation, is -- they're indicative of individuals who are federal-only voters.

Q.   And, Dr. McDonald, do you find a pattern in this data similar to what you found in Tables 1 and 2?

A.   No.  I mean, we don't see zeros here.  So the patterns are not as stark in Maricopa as the largest county and it has the most federal-only voters.

So some of these patterns make sense, although, I mean, there's still some peculiarities.  Coconino appears to be somewhat of an outlier with 636 federal-only voters; but you; look at a similar-sized county, say like right next to it above in the alphabetical list, Cochise, there's only 118 (sic).

So, again, not as stark difference as we saw with suspended and cancelled voters.  There's still some suggestion there that there's uneven implementation of these policies on DPOC policies.

Q.   And Dr. McDonald, for these three tables, did you calculate the degree of statistical significance?

A.   No, I did not.

Q.   And why did you not do that?

A.   Well, statistical significance is only used when you're sampling from a population.  So if I were randomly selecting people from all of the registered voters within the State of Arizona, that would be a survey like -- and there would be a

margin of error associated with that survey, and that might be what we would use to do statistical significance.

We don't apply -- and I've never applied it in any other prior court case or work that I've done when I'm working with the universe of all individuals who are in these different statuses. There is no margin of error. That's the number, and so it's inappropriate to calculate margins of errors for numbers when they're just the absolute number that's known as truth.

Q.   So Dr. McDonald, to sum up the discussion of the data in these tables, what conclusions do you draw from your analyses in Tables 1, 2 and 3?

A.   It appears that County Recorders are unevenly implementing current DPOC procedures within the State of Arizona.

Q.   I want to now turn to the next opinion, your opinion for County Recorder discretion.

MR. KARPATKIN:  Give me Slide 28.

BY MR. KARPATKIN:

Q.   And before we dive into the details, can you explain why you think county discretion is particularly important to implementation of the Challenge Laws.

MR. KARPATKIN:  Give me Slide 29, please.

THE WITNESS:  Well, there's deposition testimony currently that there are counties are interpreting current

policies differently and implementing current policies differently.  The new laws will create more opportunities for discretion from local election -- among local County Recorders, and so likely they're just going to continue doing what they're doing now and they're going to have that discretion.

They might have some guidance, but none is going to be coming from the Secretary of State's office.  The new 2023 Elections Procedures Manual does not address any of the discretion that is present in the law, at least as I understand that's being challenged in this case; and so the Secretary of State themselves, I believe, at least in deposition testimony that I reviewed, 'cuz I don't know what they testified to in the Court, said that it's really up to the County Recorders to decide what they will do.

BY MR. KARPATKIN:

Q.   Dr. McDonald, what information did you rely on in conducting your evaluation for this opinion?

A.   Primarily -- well, I actually think exclusively I was looking at deposition testimony.

Q.   And is that the kind of information experts in your field generally use to analyze issues in election administration?

A.   Yes, I've used it in prior cases.

Q.   In your opinion as an expert in election administration, is it similar to relying on interviews with local election

officials?

A.   Yes, I've done that sort of activity where I've interviewed election officials about their election practices, yes.

Q.   And, in your opinion, are statements by local officials useful in understanding how voter registration will be implemented?

A.   Yes.

Q.   Okay.  You evaluated several areas where you saw evidence of diverse practices by County Recorders with respect to these laws.  Let's take them one at a time.

MR. KARPATKIN:  Can we have slide 30, please.

BY MR. KARPATKIN:

Q.   What provision of the Challenged Laws does this slide represent?

A.   There's a provision "reason to believe," and in deposition County Recorders were confronted with various scenarios of what may constitute reason to believe; and we've taken some excerpts here of the various responses that County Recorders are providing to these reasons to believe.

Q.   And can you walk us through what -- well, let me first ask you, Dr. McDonald, can you explain in a little more detail what the reason to believe provision is and how it works?

A.   Yes.  So for a current registrant, if the county recorder obtains some reason to believe that the individual is not a

citizen, then they can institute a SAVE check.

Q.   And on the left-side column there's some information that could be a reason to believe.  Is that how I am to interpret this slide?

A.   Yes.

Q.   And can you explain what you found with respect to how counties construe that information?

A.   Yes.

MR. LANGHOFER:  Your Honor --

THE COURT:  I'm sorry, I couldn't understand what you said.

MR. LANGHOFER:  We have pending objections to all of the testimony that he's about to rely upon.

THE COURT:  Oh, overruled.  You may answer.

I have to allow the answer because I can't rule on the objections that I haven't had an opportunity to read yet.

So we'll go ahead with this.

THE WITNESS:  Okay.  So to proceed, on the left-hand side the County Recorders were confronted with the scenario if they received information from a neighbor, anonymous call or by mail, it was posed in different ways in different forms in deposition, but that's summarizing the scenario that was posted; and, for example, Santa Cruz County Recorder said it's something they would have to act upon.

Maricopa elicits that they would need guidance on

UNITED STATES DISTRICT COURT

what it makes credible to make them believe the information, and Cochise County Recorder says it's not a reason to believe.

So there's varying interpretation of this information.  The quality of that information determines citizenship status to reason to believe that they need to conduct a SAVE check.

BY MR. KARPATKIN:

Q.   And can you explain what the right column of this table shows?

A.   So this would be with lists of non-citizens provided by third parties.  This is currently happening, by the way, in places like Virginia, where I used to live, among others.

So there are organizations that are compiling lists of non-citizens and providing them to -- suspected non-citizens and providing them to election officials.

It's also happened with respect to Texas and Florida where state officials did a similar sort of HAVA check against voter registration database versus a driver's license database finding hundreds of thousands of individuals who were not citizens, but later turned out to be just this latency issue with citizenship information.

So this is a reality.  It's happening right now.  It's not so much of a hypothetical, though I don't think that it's -- to my knowledge, it's not actually occurred within Arizona to date.

But Santa Cruz says in this situation they would need to consult their legal counsel.  Cochise says, no, they would not accept that information.  La Paz said they would need to look into or need to research, but would not change a registration based solely on that information.

MR. KARPATKIN:  Dr. McDonald, I want to move on to another issue.  Can you pull Slide 31.

BY MR. KARPATKIN:

Q.   What issue does this slide represent?

A.   So this -- for example, in that loop that we were talking about earlier, a person was registered as a full-ballot voter. They provided DPOC.  They've been flagged as having to provide DPOC because there's this record in the ADOT database, but they really are a citizen and they provide the okay; and so what would happen in that case if this was close to an election deadline, would that voter's rights be restored so they can participate in election?

So that's basically the scenario that's being posed here. So we get differing responses again from County Recorders. One from Cochise saying the voter could not be added back to the rolls if the registration deadline has passed.  Pinal says so it might vary from circumstance to circumstances the questions posed to Pinal and the County Recorder says that is correct; and in Coconino if it's their mistake they would restore that voter so they can participate in the election.

MR. KARPATKIN:  Can we have Slide 32.

BY MR. KARPATKIN:

Q.   Dr. McDonald, what is this slide?  What issue does this slide represent?

A.   So County Recorders were posed the question how reliable did they view the HAVA check information that's coming back.

So if they're getting citizenship information through that HAVA check that's being appended by ADOT, whether they determine -- like how reliable is that information; and a number of County Recorders, the five that are on the left-hand side, they're expressing the view that that HAVA check information may be inaccurate.

Some of them were describing, again, actually going to naturalization ceremonies as part of the response to this question; and so they know that these individuals' information is gonna be inaccurate and out of date until everything can be worked through the system.

The two on the right-hand side, Navajo and Graham, believe that the -- whatever they get back from the HAVA check is the accurate, definitive citizenship status for that individual.  So there's uneven County Recorder understanding of the limitations of the HAVA check right now in Arizona.

MR. LANGHOFER:  We'd note the same situation with pending objections, Your Honor.

THE COURT:  Understood.  Please continue.

UNITED STATES DISTRICT COURT

BY MR. KARPATKIN:

Q.   Dr. McDonald, why is the difference in the two columns in this slide particularly important?

A.   Well, under the new law we can think about this loop.

Whenever anyone is a new registrant or they're updating information, like their address or something of that, a HAVA check is performed.  So anyone who is having a HAVA check performed can have their citizenship questioned; and particularly for the new registrants, we're going to be in a situation where the new laws say that if that HAVA check comes back as a negative on citizenship, they will -- their registration will be cancelled immediately and that their registration -- they will be referred to law enforcement for a criminal investigation.

Q.   So, Dr. McDonald, looking at the evidence you reviewed with respect to County discretion, what do you conclude?

A.   There's uneven implementation right now in the State of Arizona of current DPOC procedures.

Q.   And what do you conclude from the statements of the County Recorders?

A.   That when the new laws are put into effect, that the current discretion is present in the system will only continue to exist in the new system.

Q.   Dr. McDonald, I want to turn to your next opinion regarding current federal-only voters and their composition.

What analysis did you perform related to this opinion?

A.    Well, I -- I looked at this federal-only list, and the reason why I thought that would be important to look at is that these are people who have not provided DPOC and there's going to be investigations.  There are going to be database matching -- not really investigations, but there's going to be database matching that's going on with respect to these particular class of voters, and I wanted to understand who they are.

MR. KARPATKIN:  And can we have Slide 34.

BY MR. KARPATKIN:

Q.    Dr. McDonald, is this slide based on Table 4 from your report?

A.    Yes, it is.

MR. KARPATKIN:  Your Honor, this slide is not identical to Table 4 from Dr. McDonald's report.  It is derived from data from that report.  We would like to move for the admission of Table 4 from Dr. McDonald's report as Plaintiffs' Exhibit 337.

MR. LANGHOFER:  So this implicates a problem because Exhibit 337 is not what we're seeing on screen, and as we're sitting here I've discovered that the last three exhibits we've admitted also were not what we saw on the screen because they included a lot of narrative from the witness, not just the chart.

So we've got no objection to just the table portions of those four exhibits coming in, but I think we should work with opposing counsel to strike the narrative portions.

THE COURT:  Okay, thank you.

What was this number again?

MR. KARPATKIN:  337.

THE COURT:  With the limitations that, I believe, the parties agree with, 337 is admitted; and my understanding when the other documents were admitted, that all we were admitting were the tables and if the exhibit that's been admitted in evidence has more than that on it, it needs to be removed.

MR. KARPATKIN:  Your Honor, we have prepared versions of those exhibits that remove anything other than the data itself.  We'll work with the clerk to make sure that is what is admitted as evidence of those exhibits.

THE COURT:  Thank you.

(Exhibit No. 337 admitted in to Evidence.)

BY MR. KARPATKIN:

Q.    Dr. McDonald, can you explain how you calculated race and ethnicity in this table?

A.    Yes.  So this is actually race and ethnicity of the community in which the registered voters live in.  So it's -- it's not actually the race or ethnicity of the -- the Spanish ethnicity, I should say, of the registrant.  It's the nature

and character of the community that they live in, and how I determined that was I took the resident address of the individual and geocoded it just like you would look up on a map, like an app map, and you get a point as to where a location a restaurant or something else that you're trying to find.

It's the same methodology, and so putting those dots down on a map I can overlay census data and from the census data it has aggregate statistics on the nature of the community in which the individuals live in.

And so from that I can look at the average of the different characteristics that we're looking at here on this screen on race and ethnicity and average across all of the registrants who are in the different classifications of voters across the entire state.

Q.   Dr. McDonald --

THE COURT:  This one isn't where you knew exactly what the race and ethnicity was.  You made certain assumptions based on all of the different data that you had?

THE WITNESS:  That is absolutely, correct.

BY MR. KARPATKIN:

Q.   Dr. McDonald, what conclusion do you draw from this table?

A.   So in terms of the communities in which these individuals live in, according to the Census Bureau -- this is the 2022

Census -- they -- among all active registered voters 62 -- the average community that they reside in is 62.9 percent non-Hispanic white.  Among federal-only voters, their communities are 47.3 percent Hispanic white, and from that we can deduce that those communities among federal-only voters are more diverse than all active registered voters.

Q.    Dr. McDonald, did you conduct any analyses to try to confirm or verify the aggregate patterns you've shown here?

A.    Yeah, so this is where you're absolutely right, Your Honor, to worry about trying to infer individual behavior from aggregate data.  It's something that's called the Ecological Inference Problem, and so in order to take that possibility into account that the patterns that we're seeing here really do not apply to the individuals, I did a procedure called "surname matching."

Surname matching -- the Census Bureau when it conducts its census, it takes all of the last names that individuals have provided to the census and it comes up with frequency counts of the different race and Hispanic ethnicities of that particular surname, and so from that you could look at the surname and what may be that individual's race or ethnicity from the surname.

But you can do a little better.  You can take the geocodes and you know something about the community that the individual lives in and you can deduce from that something

about the characteristic of the individual.

For example, I know a Martinez who's a Latino and I know a Martinez who's a Hispanic male -- I mean, excuse me, a white male; and so the Latino lives in a dense Hispanic neighborhood and so we can deduce from the fact that she lives in that neighborhood and has the last name Martinez that she's more likely to be a Hispanic; but for Martinez he lives in a predominantly white neighborhood, and so we would say he's more likely to be a white even though he has that last name of Martinez.

MR. KARPATKIN:  Can we have Slide 35, Stephen.

BY MR. KARPATKIN:

Q.   Dr. McDonald, does this table depict the information that you developed from surname matching --

A.   Yes, it does.

Q.   -- from Table 5 of your report?

MR. KARPATKIN:  Your Honor, similar to the other tables, I'd like to admit Table 5 from Dr. McDonald's report, plaintiffs' Exhibit 338.

MR. LANGHOFER:  Same situation, Your Honor.  We'll need to clean up the exhibit that's been deposited with the clerk.

THE COURT:  338 is admitted.

(Exhibit No. 338 admitted in to Evidence.)

BY MR. KARPATKIN:

Q.   Dr. McDonald, what conclusions do you draw from this table?

A.   This largely confirms the patterns that we just saw with respect to the communities in which the individuals live in. This would be expected.  In order for the ecological fallacy to really have had an effect, it would have had to have been, for example, that whites in dense Hispanic neighborhoods were more likely to be federal-only voters and that doesn't -- there's no real theory or explanation I could come up with that would explain something like that, especially given what we know about the other potential characteristics of these individuals.

So this is just confirming information.  We had the ecological inference fallacy that may be at play.  This surname information seems to be confirming that.  It's not the end all.  I mean, there's lots of sources of error and, unfortunately, a lot of these errors can't be even quantified. There's errors with surname matching.  There's errors with the surname matching process.  So they're -- they're just suggestive that the federal-only voters tend to be more diverse, but there's going to be other evidence to suggest that they're more diverse as well, as we're about to see.

MR. KARPATKIN:  Can we have Slide 36.

BY MR. KARPATKIN:

Q.   Dr. McDonald, did you also consider age differences among

these categories of voters?

A.    Yes, I did.

Q.    And does this slide show your analysis of age differences from Table 6 of your report?

A.    Yes, it does.

        MR. KARPATKIN:    Your Honor, we move to admit Dr. McDonald's Table 6, Plaintiff's Exhibit 339.

        MR. LANGHOFER:    Same response, Your Honor.

        THE COURT:    339 is admitted.

        (Exhibit No. 339 admitted into Evidence.)

BY MR. KARPATKIN:

Q.    Dr. McDonald, why did you analyze these age differences?

A.    Well, this is really gonna come in play for the last section of my report, and we're going to get to at the end of my testimony about my report, which is younger people are going to be disproportionately impacted by these laws and they're most at risk of having burdens placed upon them and their voting behavior not only immediately but over their lifetimes.

Q.    And what did you find with respect to age differences among federal-only voters and all active registered voters?

A.    Yeah, so here I don't have to rely on any inference or estimation procedures.  We can go directly to the voter registration file.  There is a birthdate on that file as we well know through what we've been discussing.

So here it's just taken directly there and there's no problem with the ecological inference or anything of that nature, and the federal-only voters are remarkably younger than all active registered voters.

You know, for example, in the 18 to 29 classification -- I just chose these because they're commonly used with surveys, these age ranges.  49.9 percent of them are -- of federal-only voters are between the age range of 18 and 29 with only 16.4 percent of all active registered voters, and this pattern, you can see, increasingly through the ranges as you get over 60 plus, 38.0 percent of active registered voters are over age 60 and only 14.8 percent of federal-only voters are over age 60.

This makes sense because these laws only went into effect about ten years ago, and so the people who are being impacted by these laws or at least are being put on to the federal-only status would only be people who are recently registering and those are most likely -- you know, predominantly they're going to be younger people.

So the patterns here are what one would expect if you were thinking about who are these federal-only voters and who may be registering through these procedures and the timing of those procedures.

We also know that younger voters tend to be more diverse. There's just greater diversity.  We know that the younger population is much more diverse than the older population in

the United States.

So this, again, is just building up a body of evidence to say these are who these people are and what may be the potential impacts for these individuals.

Q.   Dr. McDonald, for this table and for the last two tables, you compared federal-only voters to active registered voters.

Why did you choose not to compare federal-only voters to the total Arizona population?

A.   Well, we know that people who register to vote and participate in elections are markedly different from people of the general population, and so for whatever federal-only voters for active registered voters, we know that they're going to be different in some fundamental ways from just the general population because they wanted to participate. They're interested in politics, and so I thought that the proper comparison point -- it's what I've done in previous litigation as well.

I think it's firmly in academic, scholarly work on voter turnout, which I'm one of the leading experts in the country on.  I thought that this was the appropriate way to go about doing this is to compare active registered voters to -- as the comparison point rather than just the general population.

MR. KARPATKIN:  Stephen, can we have Slide 37.

BY MR. KARPATKIN:

Q.   Dr. McDonald, did you also consider party registration

among active registered voters and federal-only voters?

A.   Yes, I did.

Q.   And is this slide derived from Table 7 of your report?

A.   Yes, it is.

MR. KARPATKIN:   Your Honor, similar to the other tables, we move to admit Dr. McDonald's Table 7.  It would be plaintiffs' Exhibit 340.

MR. LANGHOFER:   Same response, Your Honor.

THE COURT:   Exhibit 340 is admitted.

(Exhibit No. 340 admitted into Evidence.)

BY MR. KARPATKIN:

Q.   Dr. McDonald, why did you analyze registration by party?

A.   One, it was just available and I wanted to be complete, but it also -- again, it's confirming evidence of what I've been telling you about the characteristics of these individuals; and of most note, if you look at the third classification of non or no party affiliation is provided by the voters.

We know that younger people tend to not affiliate with a political party or less frequently than older people.  So it would not be surprising at all then to see that among all registered voters, active registered voters 28.7 percent of them are -- have no party affiliation -- or no party registration, I should say, but among all those who are federal-only voters who are younger, more diverse, 52.5

percent have no party affiliation.

So, again, that's very consistent with the other information that we've been seeing here, yeah.

Q.   So, Dr. McDonald, what is your overall conclusion from these tables about the characteristics of federal-only voters?

A.   Yeah, these are individuals who are younger, they're more diverse, they're less tied to a political party.

Q.   Dr. McDonald, I want to turn to your sixth opinion with respect to long-term impacts.

Can we -- let's start with the immediate effects.

MR. KARPATKIN:  Can we have Slide 39, please.

BY MR. KARPATKIN:

Q.   Can you briefly describe your opinion on the short-term effects on impacted voters from the Challenge Laws?

A.   Yes.  For the sake of brevity and discussing this all along in the deposition, so just to say that an individual may be barred or delayed from registering to vote because they're having to provide additional DPOC.

Those DPOC burdens are going to be unique to these individuals on their -- you know, particularly with naturalized citizens, they're -- they have to go through a different process and procedure of providing a DPOC and repeatedly in some cases providing it; and, lastly, that in certain circumstances they may be referred for criminal investigation.

Q.   And, Dr. McDonald, when you describe impacts, are you talking about impacts to voters generally?

A.   No, I'm not.

Q.   So who were the group whose impacts you're particularly focused on?

A.   Yeah, it's -- it's primarily naturalized citizens, and then there's this sort of unlucky lottery that's going to be happening where people are going to be randomly picked out of the population and matched and have to provide additional DPOC or be at risk for referral for criminal investigation through just bad luck of database matching.

Q.   Do the impacts that you are describing include an overall impact on voter turnout among the electorate?

A.   No, I'm not.

Q.   Okay.  Now, let's turn to long-term effects.

          MR. KARPATKIN:  Can we have Slide 40, please.

BY MR. KARPATKIN:

Q.   Dr. McDonald, can you briefly describe what you believe to be the long-term effects of these laws on the impacted voters?

A.   Well, obviously, they have immediate effects; but then the question is if those individuals are not able to participate or if there's additional barriers in the way of participating, will that reduce their voting propensities?

     And there's a large body of literature, some of it I've

written myself, that says you add registration cost to individuals and they're going to be less likely to vote or, conversely, you make registration easier for individuals and you're going to have higher turnout.

So on these increasing costs are going to -- for the individuals who are at risk are going to decrease their vote propensity.

Voters with the negative interactions with the legal system, in the last decade or so there's been research on what the effect of low level interactions with police have on turnout, and so just a traffic stop can result in an individual having a lower turnout rate than those people who aren't stopped for traffic stops; and that's trying to control for lots of other factors about who those individuals are.

And so here we could be in a situation where people are having negative interactions with government.  It's not a police officer, but in some cases they could be put under criminal investigation; and that interaction could have a negative effect then on people's willingness to participate in the system, and it could harm their long-term propensities to vote because once you vote you're more likely to vote again.

The literature talks about this in terms of habit forming, and you empower yourself by voting and you are -- it's more easier for you to navigate the system once you voted once; and so what could happen here are individuals who are

seeking to register but they're deterred through whatever reasons, but they do -- they don't vote in the first election, but they do manage to vote in a subsequent election.

It's just that that habit forming will happen at a later point -- stage in they're life.  So they're likely going to have lower voting propensities over the entire life span, and we know that these impacts are going to disproportionately affect low propensity voters.

I mean, we're looking at younger voters who are going to be more at risk of these sorts of burdens that are going to be placed upon them.

Q.   Dr. McDonald, is your analysis of long-term effects based on a body of political science literature?

A.   Yes, it is.

Q.   And does that literature generally reflect the accepted consensus among political scientists?

A.   Yes.

Q.   And is this literature published in peer review journals?

A.   Yes.

MR. KARPATKIN:  Could we go to Slide 41.

BY MR. KARPATKIN:

Q.   I want to give you a chance to walk through in a little more detail the basis for the conclusions you describe in the last paragraph -- in the last slide.

So let's start with burdens on voting.  What are some of

the principal sources you've relied on?

A.   Well, I cite myself.  I can I can self cite in a courtroom and -- but, really, this is building on a large body of literature.  The two pieces that I cite to regarding a phenomenon called "portable registration" where some states allow people to re-register if they've moved and -- they're currently registered voters and they move to a new locality they can register on election day.  So that was investigation of that.

I was also investigating a phenomenon called "same day registration."  Again, there's widespread consensus within academia that -- and scholarship that election day registration increases turnout, that lowering those barriers of cost of registering increases turnout.

The other one I'm citing here is a policy that certain states have of allowing 16-year-olds to register so that they'll be available to vote and already registered when they turn eighteen.  Florida is one of these states.  Hawaii is another.  Since I've produced this report, other states have adopted these laws and, you know, I publish on this.

There is another publication on this in the *American Journal of Political Science* that confirms what I find here, which is, that you're gonna end up -- there's a boost on turnout for people who have already been registered through this pre-registration system.

In terms of interactions with the law enforcement, the first one I cite is the most recent piece.  It's in the *American Political Science Review*.  That's the top journal in political science, and this particular piece is as close to what Hoekstra mentions in his expert report is the gold standard for randomized controlled experiments.

It's a very clever study.  You know, I reviewed it.  It looks at traffic stops, matches this with the voter file in Hillsborough County where Tampa's located in Florida and is able to deduce, like, the effect of traffic stops because they look not just at one point in time at the traffic stop, but they also look at an earlier traffic stop; and they're matching people not only on whether or not they were stopped, but also in the character of the stop that had happened to them.

So it's a pretty clever study and gets as close as we can to get to randomized controlled experiments, in my opinion. The earlier one is based -- you know, is cited in that one, too, and it's in the *American Political Science Review* and --

THE COURT:  I don't know what that word means, the "carceral" state.

THE WITNESS:  Prison, being in the judicial system as, you know, a felon or something of that nature.

In terms of long-term harms, this goes back to this consuetude or habit forming.  It's in the first title and

that's coming from the *British Journal of Political Science*. It's a well-respected journal.  It's like the Top 10 journal in the profession.

It's an early study.  It's doing randomized control experiments to a degree and looking at other survey data, and they find that voting is habit forming.

Another study by Eric Plutzer in the *American Political Science Review*, again, top journal, is -- really focuses on this efficacy, this empowering way in which people once they vote they feel empowered and they feel like they can effect change in the future.

So -- and the last one as well is in the *American Journal of Political Science* building upon the prior research here, and that's like the No. 2 or No. 3 journal in political science, depending on who you ask; and so it's in a well-respected journal and it's, again, doing a randomized controlled experiment and finding in a field experiment that voting can be habit forming.

BY MR. KARPATKIN:

Q.   Dr. McDonald, is there a particular or specific study that you relied on related to your conclusion about the voting habits of younger people?

A.   Yes, there is an additional one that's not on this list, although all of these long-term harms are talking about when people establish their voting behavior when they're young.

So in one respect we're looking at young people here in this last group of scholarly work.  There's also another piece that I referred to.  It has to do with -- it's from Brady and McNulty.  It appears in the *American Political Science Review,* and it looks at the effect of moving polling places and how that's going to have a disproportionate effect on younger voters.

Q.    Dr. McDonald, I now want to turn to the defendants' expert reports.  You mentioned earlier that you had an opportunity to review them?

A.    Yes, I did.

THE COURT:  I think it might actually be a good time for to us break for lunch.  We'll reconvene at 1:00 o'clock.

MR. KARPATKIN:  Yes, your Honor.

THE COURT:  Court is in recess.

COURTROOM DEPUTY:  All rise.

*(Whereupon the proceedings adjourned at 11:57 a.m.)*

UNITED STATES DISTRICT COURT

***REPORTER'S CERTIFICATION***


I, TERI VERES, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 14th of November, 2023.


_____s/Teri Veres_____
TERI VERES, RMR, CRR

UNITED STATES DISTRICT COURT