UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Mi Familia Vota, et al.,          )
                                  )
              Plaintiffs,         )   No. 2:22-cv-00509-SRB
v.                                )
                                  )   Phoenix, Arizona
Adrian Fontes, et al.,            )   November 14, 2023
                                  )   8:59 a.m.
              Defendants.         )
_____)

*BEFORE:   THE HONORABLE SUSAN R. BOLTON, JUDGE*

*REPORTER'S TRANSCRIPT OF PROCEEDINGS*

*BENCH TRIAL DAY 6 - AM SESSION*
(Page 1294-1405)

Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

1295

*A P P E A R A N C E S*

For Plaintiff United States of America:

    U.S. DEPARTMENT OF JUSTICE - VOTING - M STREET
    By:  **Emily Brailey, Esq.**
    150 M Street NE
    Washington, D.C.   20503

    U.S. DEPARTMENT OF JUSTICE CIVIL RIGHT DIVISION VOTING
    SECTION - 950
    By:  **Richard Dellheim, Esq.**
        **Sejal Jhaveri, Esq.**
        **Margaret Turner, Esq.**
    950 Pennsylvania Avenue NW
    Washington, D.C.   20530

For Plaintiff ADRD Action, Arizona Students' Association, League of United Latin American Citizens Arizona, Living United for Change in Arizona:

    CAMPAIGN LEGAL CENTER
    By:  **Danielle Marie Lang, Esq.**
        **Robert Brent Ferguson, Esq.**
        **Hayden Johnson, Esq.**
        **Jonathan Diaz, Esq.**
    1101 14th Street NW, Suite 400
    Washington, D.C.   20005

For Plaintiff Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition:

    LATHAM & WATKINS
    By:  **Amit Makker, Esq.**
        **Evan Omi, Esq.**
    505 Montgomery Street, Suite 2000
    San Francisco, California   94111

    ASIAN AMERICANS ADVANCING JUSTICE
    BY:  **Niyati Shah, Esq.**
    1620 L Street NW, Suite 1050
    Washington, D.C.   20036

    LATHAM & WATKINS, LLP - Avenue of the Americas
    By:  **Neethu Putta, Esq.**
    1271 Avenue of the Americas
    New York, NY 10020

1296

*A P P E A R A N C E S   C O N T ' D*

For Plaintiff Arizona Democratic Party, Democratic National Committee:

        WILMER CUTLER PICKERING HALE & DORR LLP
        By:  **Daniel S. Volchok, Esq.**
        2100 Pennsylvania Ave. NW
        Washington, DC 20037

        WILMER CUTLER PICKERING HALE & DORR, LLP
        By:  **Kelsey Quigley, Esq.**
        2600 El Camino Real
        Suite 400
        Palo Alto  94306

For Plaintiff Chicanos Por La Causa, Chicanos Por La Causa Action Fund, Poder Latinx:

        ARNOLD & PORTER KAYE SCHOLER, LLP
        By:  **John A. Freedman, Esq.**
             **Leah Motzkin, Esq.**
             **Erica Elaine McCabe, Esq.**
        601 Massachusetts Avenue NW, Suite 1000
        Washington, D.C.  20001

        FAIR ELECTIONS CENTER
        By:  **Michelle Kanter Cohen, Esq.**
             **Jonathan Sherman, Esq.**
        1825 K St. NW, Ste. 701
        Washington, DC 20006

For Plaintiff Voto Latino, Mi Familia Vota:

        HERRERA ARELLANO, LLP
        By:  **Daniel Abraham Arellano, Esq.**
        1001 N. Central Avenue, Suite 404
        Phoenix, Arizona  85004-1500

        ELIAS LAW GROUP, LLP
        By:  **Christopher Dodge, Esq.**
             **Elisabeth C. Frost, Esq.**
        250 Massachusetts Avenue NW, Suite 400
        Washington, D.C.  20001

UNITED STATES DISTRICT COURT

*A P P E A R A N C E S   C O N T ' D*

For Plaintiff Promise Arizona, Southwest Voter Registration Education Project:

        MALDEF
        By:  **Ernest Israel Herrera, Esq.**
             **Erika Cervantes, Esq.**
        634 Spring Street, 11th Floor
        Los Angeles, California  90014

        ORTEGA LAW FIRM, PC
        By:  **Daniel R. Ortega, Jr., Esq.**
        361 E. Coronado Road, Suite 101
        Phoenix, Arizona  85004-1525

For Defendant State of Arizona Kris Mayes, Jennifer Toth:

        ARIZONA ATTORNEY GENERAL'S OFFICE - PHOENIX
        By:  **Joshua Michael Whitaker, Esq.**
             **Kathryn E. Boughton, Esq.**
             **Timothy E. Horley, Esq**
        2005 N. Central Ave.
        Phoenix, AZ 85004

For the Intervenor-Defendants State of Arizona, Kris Mayes, Ben Toma, Warren Peterson:

        GALLAGHER & KENNEDY, PA
        By:  **Hannah Hatch Porter, Esq.**
        2575 E. Camelback Road
        Suite 810
        Phoenix, Arizona  85016-9225

For Counter Plaintiff Republican National Committee:

        STATECRAFT, P.L.L.C.
        By:  **Kory A. Langhofer, Esq.**
        649 North 4th Avenue, Suite B
        Phoenix, Arizona  85003

UNITED STATES DISTRICT COURT

1298

**I N D E X**

| PLAINTIFF WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| NANCY HERRERA (CONT'D) | | | | |
| By Ms. Motzkin | 1299 | | | |
| By Ms. Porter | | 1303 | | |
| By Mr. Langhofer | | 1305 | | |
| PETRA FALCON | | | | |
| By Mr. Herrera | 1306 | | | |
| By Mr. Whitaker | | 1323 | | |
| By Mr. Langhofer | | 1330 | | |
| DEREK CHANG, Ph.D. | | | | |
| By Mr. Makker | 1332 | | | 1389 |
| By Mr. Horley | | 1360 | | |
| By Mr. Langhofer | | 1364 | | |
| ORVILLE VERNON BURTON | | | | |
| By Mr. Johnson | 1330 | | | |

UNITED STATES DISTRICT COURT

*P R O C E E D I N G S*

*(Proceedings begin at 8:58 a.m.)*

COURTROOM DEPUTY:  All rise, court is in session.

THE COURT:  Please sit down, and let's continue with the examination of Ms. Herrera.

MS. MOTZKIN:  Thank you, Your Honor.

I'm Leah Motzkin for Poder plaintiffs.

CONTINUED DIRECT EXAMINATION

BY MS. MOTZKIN:

Q.   Nancy, when we ended yesterday, we were discussing Poder Latinx's anticipated programmatic changes.  So we're going to jump in there.

What resources do you anticipate, if the laws are implemented, that Poder Latinx will have to put into its voter engagement efforts?

A.   If this law goes into place, we're going to have to do strategic planning around our program, change most of the components that are now in the program itself to meet the new law.  In addition to that, adding additional funding.

So as I stated before, it's around fifty dollars to register a new applicant now.  We're looking to add anywhere from ten to twenty additional dollars to that to be able to meet what we want to do out with the community, which is adding additional cancer -- canvassers on the ground to maximize our outreach.

UNITED STATES DISTRICT COURT

We want to be able to do language accessibility materials, meaning translation, and being able again to somehow locate individuals that have been removed from the rolls itself to reregister them again, which is allocating time and money to our efforts.

Q.   Do you have -- so you mentioned an estimate of the cost per registrant going up.  Why do you expect that amount to go up?

A.   Well, it's gonna go up because we have to do all these additional steps that I just mentioned with having to do maximum outreach, so additional outreach into our community to be able to find folks that have been removed from the polling rolls, also folks that have been denied and that's gonna take a lot of time and activity out in the ground.

So if we -- we have a team of four.  We're gonna have to maximize to eight because now we're going to be knocking on additional doors and again doing additional outreach.

Also, with that we're gonna have large campaigns -- I foresee having large campaigns with digital, social media, television and radio, which all of that encompasses funding.

Q.   Are these new campaigns?

A.   They're definitely gonna have to be new campaigns.

Q.   Will the implementation of these laws affect your relationship with the community you serve?

A.   Absolutely.  It's gonna cause reputational harm on the

work that we do 'cuz it's going to undermine our mission overall, right?  We're here to be able to bring out the Latinx community to be civically engaged through their vote and now we're -- now somehow having to reregister them because they are being pulled off the rolls.  They might not even know that themselves.  So we are going to have to relay that information to them.

Or when they go to the polls themselves and find out that they have been removed, they're going to question as to why, if I was registered through Poder Latinx at this healthcare activity, you know, I should be a full registered participant.

Q.    And will the harm you discussed on the reputation -- to the reputation -- scratch that.

Will the harm you discussed to Poder Latinx's reputation have an affect on your work?

MR. LANGHOFER:  Speculation.

THE COURT:  Overruled, you may answer.

THE WITNESS:  It absolutely will because the community looks up to Poder Latinx and the organization like ours that do this kind of work for resource information, for language accessibility.  So they trust in us, and they have got to know who we are.

So if we're breaking that trust, folks are not gonna want to participate with us.  They're not gonna believe in the work that we're doing.  They are going to feel, you know,

like, yeah, we've been disenfranchised from, you know, moving one step forward and actively being participants of the democracy and now we're being taken away from that one more time.

Q.    And what would Poder Latinx have to do to overcome this reputational harm?

A.    Maximum outreach again.  You know, all we can do is go out there, inform our community, keep providing the resources, not stopping, you know.  Not giving up and try to persuade our folks once again to entrust in us, to be a part of civic engagement, how to be participants once more and how to move forward from the law if they would go into place.

Q.    And what will that take?

A.    A lot of time, resources and manpower for sure.

Q.    You testified that Poder Latinx will have to spend additional resources if HB2492 and HB2243 are implemented.

How will you do that?

A.    At this time we don't know.  We don't have a budget in place.  We have spoken about it, potentially having to move resources from our issue-based campaigns that we have now to then allocate that to our voter engagement campaign.  That's the only way we foresee moving the campaign forward, if anything.

Q.    Thank you.

        MS. MOTZKIN:  May I have one moment.

UNITED STATES DISTRICT COURT

(Counsel confer.)

MS. MOTZKIN:  No more questions on direct, thank you.

THE WITNESS:  Thank you.

THE COURT:  Any additional questions on direct?

Cross, Ms. Porter.

CROSS-EXAMINATION

BY MS. PORTER:

Q.  Good morning, Ms. Herrera.  I am Hannah Porter.  I represent the intervenor-defendant Speaker Toma and President Peterson.  I just have a few questions, I think, for you this morning.

Is Poder Latinx a membership organization?

A.  No, we're not.

Q.  And just to be clear, has -- aside from this litigation has Poder Latinx spent any money as a result of the Challenged Laws as of today?

A.  Not that I'm aware of.

Q.  Has Poder Latinx hired any new staff in response to the bills?

A.  We haven't hired new staff directly to implementation of this potential bill.

Q.  And I believe you testified that you're still working on the budget for the next year; is that correct?

A.  Correct.

UNITED STATES DISTRICT COURT

Q.    So do you have any written internal document that outlines how Poder Latinx will expend resources if the laws go into effect?

A.    Not at this time we don't have anything written down.  We just had discussions about what options that we have, and right now it would be moving funding from our issue-based campaign into our electoral campaign.

Q.    Thank you.  Do you know anyone as of today that has been injured by the loss?

A.    No.

Q.    Can you identify any specific person who would be removed from the voter rolls as a result of the loss?

A.    Naturalized US citizens who have not gone to the DMV to update their information as they should, and in most cases they're unaware because we've encountered these folks in the field.

Q.    So generally your concern is for naturalized citizens, but you don't know anyone specifically; is that correct?

A.    I don't know anyone specifically at this time, no.

        MS. PORTER:  I don't have any further questions, thank you.

        THE WITNESS:  Thank you.

        THE COURT:  Mr. Langhofer.

        MR. LANGHOFER:  Good morning, Your Honor, thank you.

CROSS-EXAMINATION

BY LANGHOFER:

Q.   Ma'am, I have just one question for you.  Can you identify anyone who is an adult citizen who resides in Arizona but does not have a US birth certificate, a US passport, an Arizona driver's license issued after 1996, a tribal identity card or a naturalization number?

A.   No.

Q.   Thank you.

MR. LANGHOFER:  No more questions.

MR. WHITAKER:  Mr. Whitaker for the State and Attorney General.  No questions for --

THE COURT:  If you would stand when you address the Court, please.

MR. WHITAKER:  I apologize, Your Honor.  Josh Whitaker for the State and Attorney General.

We have no further questions for the witness.

THE COURT:  Ms. Motzkin, anything on redirect?

MS. MOTZKIN:  No redirect, thank you.

THE COURT:  May this witness be excused?

MS. MOTZKIN:  Yes.

THE COURT:  Ms. Herrera, thank you very much.  You may step down and you are excused as a witness.

Plaintiffs may call their next witness.

MR. FREEDMAN:  Plaintiffs will be calling Petra

Falcon, but we'll give counsel a minute to bring her in.

COURTROOM DEPUTY:  Please stand right there and raise your right hand for me.

*(Witness is sworn.)*

COURTROOM DEPUTY:  Thank you.

And can you state your name and spell your last name for the record, if you want to come up here to this microphone.

THE WITNESS:  My name is Petra Falcon, P-e-t-r-a, F-a-l-c-o-n.

COURTROOM DEPUTY:  Okay, thank you.  You can go ahead and have a seat.

THE WITNESS:  Thank you.

MR. HERRERA:  Good morning, my name is Ernest Herrera, and I represent the Promise Arizona plaintiffs.

DIRECT EXAMINATION

BY MR. HERRERA:

Q.   Good morning, Ms. Falcon.

A.   Good morning, Ernest.

Q.   Please state your name for the record.

A.   Petra Falcon.

Q.   And what do you do for a living?

A.   I am the founding executive director of Promise Arizona.

Q.   And what is -- can you please give a brief description of Promise Arizona.

A.      Promise Arizona grew as the work here in the State of Arizona against SB1070 and 2010.

Q.      And is Promise Arizona a nonprofit?

A.      Promise Arizona is a community nonprofit organization that serves primarily the population in Maricopa County, but we have work in other counties of the State of Arizona.

Q.      And what year was Promise Arizona founded?

A.      2018.

Q.      Okay.  And were you involved in the founding of Promise Arizona?

A.      Yes.

Q.      And you mentioned SB1070.  What work did Promise Arizona do around SB1070?

A.      Well, we worked with the community in terms of doing a lot of education about what the SB1070 was going to do in the State of Arizona and especially for people here who were immigrants; and so we worked to identify people who were interested in learning more and also got involved with the organization, and what it looked like on the ground is that we did a lot of work actually at the State Capital continually to meet with members of the Legislature; and we'd work in community settings, at schools, churches, high schools and any community events.

Q.      And is Promise Arizona -- well, what is the mission of Promise Arizona today?

A.    The mission of Promise Arizona today is to involve as many people as possible in community engagement or in the life of their community, meaning -- there was a bond election last week.  So we participated in the bond election because that bond election brought a lot of community resources, like larger parks or more parks, lighting in the streets.

Q.    And what are -- is part of -- does electoral participation in voter registration, are those things a part of Promise Arizona's mission?

A.    Yes, our -- our mission from the beginning has been to involve as many Latinos in the electoral process or anybody in the community; and that work entails, obviously, knocking on doors and, again, educating people how they need to get registered and we've registered many, many people.

Q.    Is Promise Arizona a membership organization?

A.    Yes.

Q.    And about how many members does Promise Arizona have today?

A.    Checked on our data and we have 1,043 members currently enrolled in the organization, and at any given time that could be higher or lower.

Q.    And do members pay dues?

A.    Yes, they do.

Q.    And what are some of the benefits that members of Promise Arizona get from membership?

UNITED STATES DISTRICT COURT

A.    They get -- they get access to any of the services we provide and the two big ones are adult education, meaning they can learn English, and second thing is that we can help them with their application process for naturalization.

Q.    And how many staff work at Promise Arizona?

A.    Approximately eight people and some of those are full time and some of those are part time.

Q.    And for the part-time and full-time staff, are those paid staff?

A.    Yes.

Q.    And what is Promise Arizona's average budget from year to year?

A.    That budget will vary from year to year depending on the project that we have or perhaps the engagement that we're doing.  It will be anywhere from 500,000 to over a million dollars.

Q.    And where does your funding come from?

      Please take a moment to get some water.

A.    The funding comes from national grants.  It will come from foundations, Arizona foundations.  It will come from individual donors or it will come from entities like the City of Phoenix.  We did some work with doing light rail planning, and so we received money from the City of Phoenix.

Q.    And you mentioned a little bit about the electoral piece of Promise Arizona's work, and you also mentioned certain

classes.  So what are the other main categories of Promise Arizona's work?

A.   Well, I mentioned adult education and we provide four levels of language access from basic to advanced English classes.  We provide citizenship classes that we help people prepare for the citizenship tests that they have to take with the federal government before they become a citizen; and we're also doing a lot of work right now with helping families become -- have light -- broadband in their homes because many people in the community we serve do not have access to broadband; and everybody learned during COVID that families that did not have wifi in their homes, their children struggled because a lot of their schooling needed to have a tablet and wifi.  So we help the community make sure that they have access to those resources.

Q.   And where do most of your members reside?

A.   The majority of them reside in Maricopa County.

Q.   And tell me about -- tell me a little bit about Promise Arizona's citizenship classes.

A.   The citizenship classes are held every Thursday, and anybody can come at any point because usually when a person decides they want to become a citizen, the biggest obstacle for them is the fear of taking the test.

     So we've had this test -- this class going on for about six or seven years now.  It's at a local Methodist church near

our office, but I have two -- I have two volunteer teachers that have been doing this for all that time and the teacher -- the main teacher happens to be a retired police officer.

Q.    That's great.  And so -- are the teachers, are they volunteers --

A.    Yes.

Q.    -- or staff?

A.    We have about eight instructors right now, and they're retired businessmen and they come to us and they just want to help.

Q.    And tell me a little bit about Promise Arizona's naturalization work.

A.    Our naturalization work, usually it's people that know that we have that service and they'll call us and they'll make an appointment and they'll come and see one of our specialists; and they determine if that person is eligible at that time, and then we give them a screening and we tell them, "These are the items that you need to bring back at your next visit so that we can start your process," and the process usually takes about two or three visits.

     And then once their application is complete, it is submitted to USCIS so that it could be further reviewed for approval, and that process can take anywhere from three months to six months.

Q.    And who at Promise Arizona works on doing those

applications?

A.    It's mostly or paid staff.  However, we do have volunteers that also do that work.

Q.    And of your paid staff, are any of them lawyers?

A.    No, we have one -- we have one legal -- legal assistant that perhaps works in some of the more difficult applications, but we do also have volunteer attorneys that we turn to so that we can work with some of the families.

Q.    And do the staff who work on naturalization at Promise Arizona have any kind of certification?

A.    Yes, they received certification from our association at the national level with clinic, and clinic is a national organization that provides that training.

Q.    And is it a BIA certification?

A.    Yes.

Q.    Okay.  Now, you mentioned community engagement, I believe.  What is the purpose of Promise Arizona's community engagement program?

A.    I think I mentioned it a little bit.  It's about making sure that our community is aware of what is going on in their neighborhoods and their community and how decisions are made. Again, whether it was light rail or it was this broadband project; but we're constantly connecting our families to what's important to them and their families.

        And we've done a lot of work around census.  We've done a

lot of work obviously around COVID education, we've done a lot of work supporting small businesses not to get -- obviously, to go out of business during the COVID pandemic and even during construction of the light rail.  We wanted to make sure they had access to services that the City provides.

Q.   And does the community engagement program register people to vote?

A.   Yes.

Q.   Okay.

A.   That is always a given, wherever we go.  Whether we go to a church event, whether we go to -- we just were at an event on Saturday and handed out a thousand turkeys.  So we were doing voter registration there, but we were also doing all the other services.

Q.   And when Promise Arizona -- well, first of all, who are the staff at Promise Arizona who do voter registration?

A.   We all essentially do it.  That's just a given.  People can walk right into our office, and we have a table that's full of things that people can have access to.

     Our adult education students that come in, if they're eligible to register to vote, they can register to vote; and, again, some of our families have mixed -- are mixed, right?  Some is gonna be a citizen and some isn't gonna be a citizen, so they all can support one another.

Q.   And those who are -- the students who are not US citizens

at Promise Arizona, they are aware that they are not eligible to vote?

A.    Absolutely, yes.

I just want to say this, Ernest.  I've been doing voter registration since I was 21, and at the time I was in Yuma County.  So I've been doing this work for a long, long time.

Q.    Well, I wanted to ask, how many people has Promise Arizona registered in its history?

A.    In this last history in the last ten years, 63,000 -- 63,434 or something like that.

Q.    And does Promise Arizona do Get Out The Vote-type work?

A.    Yes, we do because it's -- again, we want to make sure that as many people participate as possible in the electoral process and we do -- we'll either phone bank them, we'll go door-to-door.  We work with lots of high schools that come and volunteer with us, yes.

Q.    And who are the paid staff?  Not by name, but what is their title at Promise Arizona who work on Get Out The Vote?

A.    Well, we train our staff to be community organizers.  So it will be a community organizer; and, again, all of us will go out and do door-to-door.  Our instructors will go out and do door-to-door.  Our students are asked to volunteer, and they'll do a few hours that they have.

Q.    And of those, how many paid community organizers does Promise Arizona have?

A.   I think we have four right now.

Q.   Now, when Promise Arizona helps people register to vote, what -- what form do you usually use?

A.   We use a form that's provided by the Maricopa County Recorder's Office.

Q.   And in terms of -- does that form require some kind of proof of citizenship?

A.   Yes, it will ask you if you're a citizen.  I mean, if -- what we need to make sure that we qualify that form, you need to show an ID and normally that ID is the Arizona State driver's license; but if that person's been naturalized, it will ask that question.  So we have to add that number from their certificate.  It's called an A-number.

Q.   Okay.  And so --

A.   It's called an A-number.

Q.   So what is the number that is put on the -- what do you do with that number in terms of --

A.   There's a -- there's a -- there's a slot in the voter card that has, "Please include the number of their certification for naturalization."

Q.   Does it ask for the -- you said the A-number?

A.   Yes, it's an alien number.  I don't like using that word, but it is.  It's an alien number.

Q.   Well, let's -- we can refer to it as the A-number?

A.   It's an A-number, yes.

Q.   And do people who use -- who put the A-number on their voter registration form because they are naturalized citizens, do they also provide their -- any other proof of citizenship besides that?

A.   Well, that's all they provide, but they also should provide their driver's license.

Q.   Okay.  And -- okay.  Did Promise Arizona do Get Out The Vote work in -- for the 2022 elections?

A.   Yes.

Q.   Okay.  And you also mentioned there was a bond election. When was that bond election?

A.   November 7th this year.

Q.   So last week?

A.   Yes, last week.

Q.   And so does Promise Arizona sometimes do Get Out The Vote work on odd-year elections?

A.   Yes.

Q.   Does Promise Arizona plan to do any Get Out The Vote work for next year's elections?

A.   Yes, that's in the plan.

Q.   Okay.

A.   We don't actually have a plan at the moment; but, yes, we are hopefully going to do that.

Q.   And will -- will Promise Arizona do Get Out The Vote work around the primary election or the general election?

A.    Most likely both.

Q.    Okay.  Now, as you're aware, this is a lawsuit over a certain law.  Have you -- what is your awareness of House Bill 2243 passed last year?

A.    My awareness is that this will require the Department of Transportation to share its database every month to the County Recorder's office, I believe, so that it will be compared and determine whether there's anybody in that list for that month that might potentially be an undocumented person.

Q.    Okay.  And what happens in terms of -- well, let me just ask.  What was your reaction to the law when you learned about it?

A.    My reaction to the law was, "Here we go again," because SB1070 did very much the same thing.  SB1070 allowed somebody to point a finger at somebody that said, "That person probably is undocumented and that person should be picked up and sent across the border," and so 2243 is going to point the finger at somebody that says they're not -- they should not be a registered voter, and we need to address that.

Q.    As far as you know, are election officials enforcing HB2243 yet?

A.    I don't think it's been implemented yet --

Q.    Okay.

A.    -- so no.

Q.    Now, as far as you know, as part of the law, would

someone get some kind of a notice before their voter registration is cancelled?

MR. LANGHOFER:  Legal conclusion, speaks for itself, Your Honor.

THE COURT:  Overruled.  Just your understanding.

THE WITNESS:  My understanding is that the Recorder's office will send a letter to that applicant, to that voter, and they're required within 35 days to submit actual proof that they are a citizen; and if they don't, their registration will be cancelled.

BY MR. HERRERA:

Q.   Now, what would happen if people who Promise Arizona helped registered to vote received a notice from the County Recorder under HB2243 saying that they needed to provide proof of citizenship in 35 days?

MR. LANGHOFER:  Legal conclusion.

THE WITNESS:  I'm sorry, will you repeat that.

MR. HERRERA:  I can -- I can ask a different way, maybe.

THE COURT:  On the basis of legal conclusion, the objection is overruled.

MR. HERRERA:  Okay.  Well, I'll ask -- I'll ask again.

BY MR. HERRERA:

Q.   What would happen if people who Promise Arizona helped

registered to vote received a notice from the County Recorder under the new law saying that they needed to provide proof of citizenship in 35 days?

MR. LANGHOFER:  Speculation.

THE COURT:  Let me ask it this way:  Based on your experience working within your community, what do you think the reaction will be?

THE WITNESS:  Well, if that registered voter that got that letter was indeed a citizen, I can -- I can feel that that person would be angry because they are a citizen.

I mean, I could get that letter, right, potentially, and I'm a sixth generation American; but if it was a person that we had supported to get through the naturalization process, I think it would be hurtful because they went through the process of naturalization and the moment to become a citizen, they were probably very, very, very, very proud at that moment; and getting a letter that said it wasn't any good, I think it would -- it would just be hurtful to that person, and so we would have to work with that person in terms of what do we do next?

Because what I don't know is if that law does get implemented, what is the process of how that person has -- yes, you have to turn in the letter that says you're a citizen, but what happens -- how -- I just don't know what will happen.  I don't know what -- I just don't know the

follow-up to that.

BY MR. HERRERA:

Q.   What steps would Promise Arizona take if a registered voter came in and said that they got a notice from the County Recorder saying that they need to provide proof of citizenship in 35 days?

A.   I -- I don't know, but I think what I would want to do is go back to the County Recorder and say, "Okay, what -- what's the deal here?  How do we solve this problem?"  And if there is a process, that I need to go ahead and make sure that our staff knows what to do so that we can help, because we'd get phone calls.  We would get e-mails.  We'd get people knocking on our door.  So I just think we're going to have to take some kind of -- take our steps to make sure that we are going to deal with this because I'm sure if we're going to get one letter, we're going to get another letter.

So I think we just need to get prepared to do that.  I mean, it's just going to mean that whatever we're doing, let's go do this.  Let's go make sure we can handle this at this point.

Q.   Will Promise Arizona's paid staff have to help out in those efforts that you just mentioned?

A.   Yes.

Q.   If field organizers -- and among those paid staff would have to help out with those steps, would those include Promise

Arizona's field organizers?

A.    Field organizers and volunteers.  I mean, we're going to have to really make sure that we can all be a part of this process.  Everybody's going to have to be trained because we don't know who's going to be calling in at what point, who's going to be arriving at what point with their letter, and everybody needs to be able to respond at that moment.

Q.    Now, earlier you mentioned that part of Promise Arizona's mission has to do with increasing Latino participation in elections.

        If this bill is enforced, what would that do to that part of Promise Arizona's mission?

A.    We like challenges but -- but I do think that -- I think one of the things that we exist is because we want to increase the participation of Latino voters and this bill -- if we have to take all this time to go and train people and help people correct the problem, it's going to really hurt that process.

        I mean, it's going to take us back instead of forward. It's gonna undo a lot of the work that we've been doing for over a decade.

Q.    Now, I have a couple of questions about some of the -- about membership -- or the members of Promise Arizona.

        Are some of the members of Promise Arizona people who naturalized as citizens?

A.    Yes.

Q.    Okay.  And are some of them who are naturalized who are members of Promise Arizona also registered to vote?

A.    Yes.

Q.    Okay.  Now, how would -- if this law were to be enforced, how would Promise Arizona's members be affected?

A.    I think all of us would feel the pain of having to think that we did something wrong, because that's how I would feel.  I would feel we didn't do anything wrong; but, you know, I think we're getting penalized because we're doing community work.

I've been doing community work for a long, long, long time and I like to do it the best that I can; but if there is a law that says we're doing something wrong, we're going to really feel penalized.

Q.    Now, what would happen if one of Promise Arizona's members had their voter registration cancelled under this new law?

            MR. LANGHOFER:  Speculation.

            THE COURT:  Sustained.  Rephrase it a different way.

BY MR. HERRERA:

Q.    Let's say this law is enforced and a member of Promise Arizona somehow misses the cancellation notice under HB2243 and has their voter registration cancelled.  What would that do to that member?

A.    The worst thing that would happen is that that person

would not have trust in the system and then, you know, how did we let that happen?  But I just -- I just think we're going to have to work at trying to solve the problem.

This is a problem.  This is going to be a problem not only for Latino voters, but it's going to be a problem for any voter that may think they may be questioned for the legality as a voter.  I mean, I've been voting since I was eighteen so I -- I've never stopped voting.  If we're going to start stopping voters to vote because of this law, then I think we have a problem.

MR. HERRERA:  Your Honor, we pass the witness.

THE COURT:  Who would like to go first?

Mr. Whitaker?

MR. WHITAKER:  Yes, your Honor.

CROSS-EXAMINATION

BY MR. WHITAKER:

Q.   Good morning, Ms. Falcon.

A.   Good morning.

Q.   I'm Josh Whitaker.  I represent the State and Attorney General in this case.

A.   Can you -- can you speak a little louder, please?

Q.   Oh, I'm sorry, yeah, I'll pull it closer to my mouth.

A.   Thank you.

Q.   I understand that you have a concern that if HB2243 is implemented, folks who are naturalized citizens may be removed

-- may be sent this letter -- this notice letter requiring them to submit proof of citizenship; is that right?

A.   Yes.

Q.   Okay.   And is that -- is that based on your reading of the law?

A.   Yes.

Q.   Okay.   Do you know -- do you know whether a County Recorder in implementing this law upon receiving information from MVD would say, "Well, MVD says this person wasn't a citizen the last time we transacted with them, but this person did provide proof of citizenship at the time they registered. So we're not gonna provide a notice"?

     Do you know whether the County Recorder would say something like that?

A.   No, I'm not following you at all.

Q.   Let me -- let me ask it this way:  Do you think the law requires County Recorders to send these notices to folks who have already provided proof of citizenship?

A.   No.  Why would somebody who's not applying for voter registration be sending naturalization information to the County Recorder?

Q.   Sorry, say that that again.

A.   You're telling me that somebody prior -- prior to this HB2243 had sent the County Recorder proof that they were a citizen, and if HB2243 didn't exist why were they doing that?

Because a registered voter -- I mean, I'm a registered voter -- I'm not following the question.

Q.   Let me -- let me ask it this way:  I believe you testified on direct exam that when Promise Arizona does these registration activities, that they encourage applicants to submit a driver's license number or a naturalization number, something along those lines?

THE COURT:  I think she said both.

MR. WHITAKER:  Or both, right.

THE COURT:  They want both.

MR. WHITAKER:  Right.

BY MR. WHITAKER:

Q.   So is it -- is it your understanding that currently folks who register do provide some sort of proof of citizenship in order get registered?

A.   They provide their driver's license, and that driver's license -- only a citizen can get a driver's license.

Q.   All right.  Do you know whether HB2243 requires Recorders to confirm information that someone isn't a citizen before sending the notice letter that you're talking about?

A.   I don't know that.  I don't think so because a voter registration card asks for your driver's license and you have -- if your -- the person that is naturalized is the person -- they ask you specifically, "Are you a naturalized person?  If so, please give us your A-number."

Q.    Do you know whether HB2243 has a confirmation requirement before a notice is sent out to -- before a notice is sent out?

A.    My question would be how does the County Recorder determine that a person needs that letter and especially if they've already submitted that A-number and they've already submitted the driver's license?

Q.    And do you know how County Recorders will answer that question when they go implement this law?

A.    I don't know.

Q.    All right.  Do you know of any voter in Arizona who has been affected by HB2243?

A.    No, I don't think so because my understanding is that 2243 has not been implemented yet.

Q.    Do you know of any voter in Arizona who will be affected by HB2243?

A.    Not that I know of, no.  You're asking me -- no, it's a "no."

Q.    You mentioned that Promise Arizona is a membership organization; is that right?

A.    Yes, uh-huh.

Q.    And I believe you mentioned that some of the benefits offered to members include English-speaking classes and classes on how to become a citizen; is that right?

A.    Yes.

Q.    Now, you also mentioned that Promise Arizona does what

I'll call voter registration and community engagement activities; is that right?

A.    Yes.

Q.    Okay.  I wasn't clear in your testimony.  Are the voter registration and community engagement activities uniquely offered to members or are those offered to members of the public more generally?

A.    It's not a requirement for a person to be a member to participate in Promise Arizona.  It's all -- it's just -- it's just if people want to become a member, you're a member.  However -- and we don't deny anybody a service because they're not a member but our -- we started registering people in 2010 and we've continued to do that, yes.

Q.    I take it -- I take it you're saying that you don't need to be a member of Promise Arizona to have the benefit of the voter registration activities --

A.    Yes.

Q.    -- that Promise Arizona has?

A.    Right.

Q.    Okay.  I believe you mentioned on direct that Promise Arizona has some plans to do registration and community engagement efforts in 2024; is that right?

A.    Yes.

Q.    Okay.

A.    And let me explain that.  We do this every -- we do voter

registration every day.  I mentioned this event we were at this last Saturday at Lowell School.  At our table as a vendor we always have our information about what we offer, services we offer, and then we also always have voter registration cards with us.  So, yes, we continually do that; but, yes, in 2024 we'll continue to do that work.

Q.    And as part of registration efforts, I understand that Promise Arizona trains the people who are doing the registration efforts on what the laws require; is that fair?

A.    Yes.

Q.    How often does that training occur?

A.    As -- as often as we need to.  Normally with new volunteers, because we have volunteers that have been around for a long time and don't need that training, but as soon as we get some new people -- and mostly it will be young people because we work with a lot of youth; but, yes, it will be as needed and, quite frankly, sometimes it's one-on-one and sometimes its, "Hey, we're gonna go do a walk.  Come with us," and we're training as we go along.

But I understand if there is something that needs to be addressed as HB2243, yes, we're going to have to train people about what is 2243 and what does that mean.

Q.    And will that happen as part of Promise Arizona's normal training process for training people what to do?

A.    Yes -- well, let me add this:  Because we deal with a

Spanish-speaking community, we'll have to -- we'll have to do -- yeah, we'll have to do -- yeah, we'll have to do a lot of training.  We'll have to train all -- everybody.  Everybody will have to be trained all over again.

Q.   Oh, all over, okay.  So --

A.   If you implement 2243, a lot of people don't know about it yet.  So we are going to have to take that time to do that.

Q.   Understood.  There was a discussion in your testimony about Promise Arizona's budget and a little bit of testimony about spending.

Apart from any money that's been spent on this lawsuit, has Promise Arizona spent money in response to HB2243?

A.   Not yet, but I anticipate that we will.

Q.   And --

A.   If it's implemented.

Q.   And by that are you referring to --

A.   We have a lot of literature.  So our literature all needs to be changed, okay.  Our website will have to be changed. Our staff will have to be trained.  So, yes, we'll have to -- we'll have to -- we'll have to take some steps.

Q.   And is that something that Promise Arizona does every time there's a new substantive change to registration laws in Arizona?

A.   I don't remember when was the last time that there was and if there is -- if there was, we did that, yes.  We've been

training people from day one.  We train, we train.  That's part of our work.  To get people engaged, you have to train people to become leaders in their communities, and yes.

MR. WHITAKER:  I think that's all the questions I have for you.  Thank you very much.

THE WITNESS:  Thank you.

THE COURT:  Mr. Langhofer?

MR. LANGHOFER:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. LANGHOFER:

Q.  Good morning, ma'am.  Has -- in the year or so that Promise Arizona has been involved in this case, have you been able to identify anyone who's an adult citizen and resides in Arizona, but doesn't have a US birth certificate, a US passport, an Arizona driver's license issued after 1996, a tribal identity card or a naturalization number?

MR. HERRERA:  Objection, cumulative.

THE COURT:  Overruled, you may answer.

THE WITNESS:  What's the question?  Could you repeat that 'cuz I didn't --

MR. LANGHOFER:  It's long.

THE WITNESS:  That was a long question.

MR. LANGHOFER:  Yes, ma'am.

BY MR. LANGHOFER:

Q.  In the year that you've been involved in this case, have

you been able to identify anyone who's an adult citizen and resides in Arizona but does not have any of the following five things:  A US birth certificate, a US passport, an Arizona driver's license issued after 1996, a tribal identity card or a naturalization number?

MR. HERRERA:  Same objection even though I know Your Honor's ruling.

THE COURT:  You may answer.

THE WITNESS:  I may answer?

THE COURT:  Yes.

THE WITNESS:  I would say I have not, but I would have to go back and ask, you know, our team.

MR. LANGHOFER:  Okay. Thank you, your Honor.

THE COURT:  Any questions, Ms. Porter?

MS. PORTER:  No, Your Honor, thank you.

THE COURT:  Redirect, Mr. Herrera?

MR. HERRERA:  No, Your Honor.  No further questions for this witness.  She may be excused.

THE COURT:  Thank you.

Thank you very much, Ms. Falcon.  You may step down and you are excused as a witness, and plaintiffs may call their next witness.

MR. HERRERA:  Your Honor, plaintiffs call Derek Chang to the stand.

COURTROOM DEPUTY:  Please raise your right hand.

(*Witness is sworn.*)

COURTROOM DEPUTY:  Thank you.  Could you please state your name for the record and spell your last name.

THE WITNESS:  My name is Derek Chang, C-h-a-n-g.

THE COURT:  Thank you very much.

You can go ahead and take a seat.

MR. MAKKER:  Amit Makker on behalf of the Arizona Asian American Native Hawaiian Pacific Islander for Equity Coalition plaintiff.

DIRECT EXAMINATION

BY MR. MAKKER:

Q.   Professor Chang, if you could please introduce yourself to the Court.

A.   My name is Derek Chang.  I'm an Associate Professor of History and Asian American Studies at Cornell University.

Q.   And did you provide an expert report in this case?

A.   Yes, I did.

Q.   Okay.  And just to identify it for the record, if we could bring up Plaintiffs' Exhibit 326.  And is what's been marked as Plaintiffs' Exhibit 326 on the screen a copy of your expert report in this case?

A.   Yes, it is.

MR. MAKKER:  And, Your Honor, I understand you're reserving ruling on whether those will come in.

THE COURT:  Funny you should mention that.  I've

already made my decision after yesterday, learning that there are opinions in Dr. McDonald's report that he wasn't asked to speak about and knowing that when Dr. Richman testifies, there are numerous opinions expressed in his report that he won't be able to test -- that he will not be testifying about.

The Court will not be admitting any of the expert reports.  It would simply be too confusing to have expert reports that contain opinions that are not part of the evidence, and by admitting them they would then be part of the evidence.

MR. MAKKER:  Okay.  Thank you for the clarification, Your Honor.

We can take that down.

BY MR. MAKKER:

Q.   And Professor Chang, you mentioned you are at Cornell. Can you just state what your current position and how long you've held it?

A.   So I am currently an Associate Professor of Asian American -- or Asian American Studies and History.  I've been an Associate Professor at Cornell since 2008.

Q.   And can you describe your research interest, please?

A.   My research broadly is on the American and Asian American past.  Currently I'm looking at Asian immigration and Asian settlement in the American South.

Q.   And does your research interest also touch on Asian

Case 2:22-cv-00509-KML   Document 656   Filed 11/15/23   Page 41 of 112

Derek Chang, Ph.D. - Direct Exam by Mr. Makker        1334

Americans and race?

A.   Yes.

Q.   And can you describe your educational training for those research interests in your professorship?

A.   Yes.  I hold a Ph.D. in American History from Duke University, which I earned in 2002; and as part of that training I prepared a field in Asian American history.

Q.   And can you let us know what classes you teach at Cornell?

A.   Sure.  I teach fairly broadly in US history, but I primarily focus, as I've said, on Asian American history and the history of American race relations.

So every fall I teach a course on the introduction to Asian American history.  I teach a course in race and modern US history, and I teach broadly in immigration history and Asian American studies, which is about more contemporary issues.

Q.   Beyond your teaching roles, do you have any other positions at Cornell?

A.   So currently I am the Director of Undergraduate Studies in the Department of History.  I'm also serving as the interim Director of Public History through the Department of History, and I've served for a cumulative total of about ten years as the Director of Asian American Studies at Cornell, although I no longer hold that position.

UNITED STATES DISTRICT COURT

Q.    And have you published in the area of Asian American history?

A.    Yes.  I've published a few articles, but primarily I've published a book which looks, in large part, at Chinese immigration to the US.

Q.    And are you a member of any professional associations in this area?

A.    Yes.  So I am currently a member or/and have been a member of a number of professional organizations, including the Association for Asian American Studies, which many years ago I was an officer of; the Organization of American Historians; the American Historical Association; the American Studies Association.

Q.    Okay.  And I want to move forward a little bit toward the report and your opinions here.  Can you just explain what you were asked to do for this case?

A.    Sure.  Broadly speaking, I was asked to provide a kind of synthesis of Asian American history and to -- to place the Challenged Laws within the context of Asian American history.

One of the defining features of the Asian American past is a long and deep history of anti-Asian American discrimination, and I was asked to see whether the Challenged Laws fit within that longer history and whether they hold to a kind of pattern.

Q.    Okay.  And just briefly on terminology, in your report

there's -- often you use the acronym AAPI, and I just wanted to let the Court know what -- what that definition means, especially if we end up using it during your testimony.

A.    Sure.  So -- so in the report I generally use Asian American and the acronym AAPI, which stands for Asian American Pacific Islanders fairly interchangeably.

The term "Asian American" really comes about in the 1970s and 1980s and shifts to be a little more encompassing through the 1980s into the 1990s.  The federal government adopts the AAPI, or Asian American Pacific Islander, designation, I believe, with the 1990 census.

Roughly speaking, "Asian American" is descriptive in some ways to refer to people who trace their ancestry to the continent of Asia.  Asian American Pacific Islander broadened that -- broadened that group of people to include people from the Pacific Islands, including the Philippines, Guam, American Samoa and places like that.

I use that -- use both of those interchangeably, in part, because it captures most of the relevant scholarship.  In fact, to my -- to my knowledge, almost all of the relevant scholarship in history and related fields.

Q.    And so just to put a finer point on that, the use of the term, is that consistent -- the way you use it, is that consistent with scholarship in the area?

A.    Yes.

Q.    And you mention at the top sort of -- you were asked to contextualize the Challenged Laws within the AAPI history.

Can you explain why we should look to history?

A.    So broadly speaking, you know, we look to history to try to understand what occurred, how an event occurred, the broad social, cultural, economic, political dynamics that shaped events in the past; but by looking at past events and identifying those broad forces and -- and aspects, we can also begin to understand our contemporary moment better.

We can look for patterns and similarities to understand our contemporary moment.

Q.    And then, if you could, could you describe the methodology you used in your analysis for your report?

A.    So, in general, I began by synthesizing the standard scholarship in Asian American history by looking at secondary sources, the major textbooks, the major scholarship in Asian American history to identify things like the major periods of the Asian American past and to identify the significant events of the Asian American past.

But then I also looked to other kinds of secondary literature, things like scholarship in, say, legal studies or in sociology.  I also looked at primary sources.  Those are -- those are documents generated in a given historical period.

Q.    Okay.  And you mentioned the standard historical scholarship, and we're going to go a little bit forward into

that; but before we do, can you just describe sort of how that standard scholarship breaks up the time period of AAPI history?

A.   Yes.  So traditionally speaking, we look at -- in Asian American history or AAPI history we look at -- we have three broad historical periods, the period of immigration, which lasts really from the mid 19th Century when we see the first large-scale migration or immigration from people from Asia to the United States and ending roughly in 1882 with the passage of the first Chinese Exclusion Act.

After that period of immigration we often look at the period of exclusion, right, and that period of exclusion lasts, really, from 1882 until the mid 20th Century when restrictions and exclusions on immigration from Asia begin to be lifted.

And then after that we look at the post-exclusion period, which really lasts from the mid 20th Century to our present time and really sort of is marked at the beginning by the passage of the 1965 Immigration Act.

Q.   And just to road map a little bit for the Court where we will be going, can you just briefly describe any historical patterns that you see emerging from these periods?

A.   Yeah.  So at the sort of very, very broad contours a pattern that holds through all three periods of Asian American history is a dynamic in which we see the immigration and

arrival and settlement of people from Asia coming to the US and settling in various parts, and then that is often followed -- usually followed by a kind of reaction to -- to their presence and motivated by concerns and sometimes outright fears about real or perceived notions that their larger numbers might influence adversely social, cultural, and often political life in America.

Q.   And in addition to these historical patterns, are there any constructs or concepts that come out of that standard AAPI history review?

A.   Yes, the central concept -- I mean, at the center of Asian American history and Asian American studies more broadly is the notion of Asians represented as the perpetual foreigner, right, and that there's a related concept of the alien citizen; but the perpetual foreigner is really grounded in a kind of political and legal fact at the beginning in that first period -- the first two periods, really, of AAPI history in which immigrants from Asia were barred from becoming naturalized citizens, right.

And that political and legal fact is compounded by broader social and cultural ideas that people from Asia aren't really from America or don't really belong in America or aren't really organically of America, and those two ideas would play off of each other.  Even after the lifting of barriers on naturalization and even as people who are

native-born American citizens of Asian descent, they can be influenced, right, or they can be shaped by that representation as Asians, as non-Americans, or as perpetual foreigners, and that plays out with this notion of the alien citizen.

Q.   So sticking with those constructs for a moment, can you give us an historical example where we can maybe see what you mean by that?

A.   Right.  So the most -- the most sort of significant in some ways, or the one that comes to mind at least, example is of Japanese Americans and their treatment during the Second World War where their association with Japan, right, even though 70 percent, roughly, of the people who were incarcerated during the Second World War of Japanese descent were American citizens by birth, their association with Japan resulted in their incarceration as enemy aliens.

The notion that even these native-born citizens were thought of as aliens is at the center of what occurred during the Second World War.

Q.   If I recall my history, the internment of the Japanese Americans was done by executive order?

A.   Yes, and what's -- what's really interesting about -- there are lots of interesting things about that, I suppose, but one of the most significant aspects of that Executive Order 9066, which was issued by Franklin Roosevelt, is that

Roosevelt did not at all refer to Japanese Americans in that original -- in that original executive order.

Q.   And then sticking with this concept of perpetual foreigner or alien citizen, can you give us a more recent example where we may see that?

A.   So the more recent -- the more recent example that really jumps immediately to mind is in the past three years or so with the COVID-19 crisis and the association of people who are of Chinese descent or who are thought of being of Chinese descent or related to China as being somehow connected to -- to this virus, right, and the virus was connected that way through political discourse and understandings, right, the association of the China virus, the notion that the -- the notion that COVID-19, in the words of President Trump at the time, constituted an invasion, like the worst kind of invasion since Pearl Harbor or the worst attack on the US since Pearl Harbor; and we see that resulting in a marked increase in anti-Asian biased incidents and discrimination, and violence in particular.

Q.   I want to switch gears a little bit.  You discussed in your methodology that the source is reviewed.  Can you just give us again some -- some more pointed examples of primary and secondary sources reviewed?

A.   Right.  So I'll start with the secondary sources, and those are basically the main textbooks that I've cited in the

reports on Asian American history that are really, as I said, kind of at the center of the field and represent kind of the standard.  Both sort of ideas around chronology, but also the standard identification of significant or important events.

In terms of primary sources, I looked at things like newspaper articles, census data.  I looked at, you know, commentary by politicians, things like Executive Order 9066.

Q.    Did you review the legislative record underlying the Challenged Laws?

A.    I did not.  I -- I was asked to look at the historical -- the historical context of the Challenge Laws, and so I focused my attention on looking at the past.

Q.    And so using that historical context, are you nonetheless able to opine on your view of the legislative intent and effect of the Challenged Laws?

A.    Yes, I believe I am, yes.

Q.    And can you explain how?

A.    So, again, in the broadest strokes, by placing the Challenged Laws within this historical past, right, within the Asian American history and looking at the patterns of anti-AAPI or anti-Asian American discrimination, I opined or I found that the Challenged Laws reflect an intent to discriminate; but, also, by looking --

MR. HORLEY:  Excuse me.  Tim Horley for the State and Attorney General.

I object to this on it being improper expert opinion.

THE COURT:  I actually think that his answer is not responsive to the question.

You asked whether he was able to opine, and I thought I was going to get an explanation as why he was able to give an opinion as opposed to his opinion.

MR. MAKKER:  Sure.  May I ask that question?

THE COURT:  Yes.

BY MR. MAKKER:

Q.   Let me reask, Professor Chang.  So using the analysis that you provide in your report, can you explain how you are able to provide the opinions you do, and then we'll get to what those opinions are?

A.   Yes, happy to.  So -- so by looking at past events, looking at the kind of significant events of the Asian American past and trying to understand the broad social, political and cultural, and in some cases legal dynamics around those events, I was able to identify patterns of the historical past and see similarities in some of those patterns around passage of the Challenged Laws.

And so being able to connect the past 170 years or so of the Asian American past to our contemporary moment through the identification of those patterns.

Q.   Okay.  And then before we jump into that historical past,

can you just provide an overview of the opinions that you reached as to intent and effect?

A.   Right --

MR. HORLEY:  Same objection, Your Honor.

THE COURT:  Okay.  I -- I look at intent and effect as two separate issues.  I'm concerned about how anyone could have -- I mean, you can have an opinion, but I question how someone could have a reliable opinion about intent.  I don't question how they could have a reliable opinion about effect.

So if you want to ask him about the intent, we need -- I need more information as to how he can offer an opinion that the intent was to discriminate.

MR. MAKKER:  Right.  So why don't we do it this way, with Your Honor's permission, to go through the bases for those opinions before he offers those opinions?

THE COURT:  I think that would be helpful and possibly necessary before he can offer that opinion, which is usually the opposite of how we do it with an expert, but this is an unusual opinion.

MR. MAKKER:  Fair enough, Your Honor.  So we'll dive in then.

BY MR. MAKKER:

Q.   So let's start with -- you mentioned the three periods. Can you just remind us what those three periods are for the standard AAPI History?

UNITED STATES DISTRICT COURT

THE COURT:  Immigration, exclusion, post-exclusion.

MR. MAKKER:  Correct, then we will move on.

BY MR. MAKKER:

Q.   So understanding that there's more context and description in your report, can you briefly summarize the key events and characteristics of the period of immigration?

A.   Right.  So the period of immigration is really marked by, as I said earlier, the first large-scale migration or immigration of people from Asia to the US.

It's important to note that even as people from Asia, primarily China and then Japan become -- begin to come to the US almost immediately, right, almost immediately, there are responses to that presence.

So in California, as early as 1850, the State Legislature passes a Foreign Miners' Tax; and, again, it's a law that doesn't necessarily identify people of Chinese descent as the targets of the law, but the way in which it is implemented tells us that, in fact, people from China are, in fact, the targets of that law, all right.

And then in 1875 right before the Chinese Exclusion Act is passed Congress passes the Page Act, which is -- again, doesn't mention Chinese people by -- by name.  It is -- one of the provisions of that law is to prevent the immigration of people who are coming to the US for the purposes -- for lewd purposes, I think is the language of the law, and that law

effectively, right -- historians have established that that law is both intended to and effectively stops the migration or the immigration of Chinese women into the US.

Q.    In this time frame of the period of immigration, were Asian immigrants able to participate in politics?

A.    No, they were not.  They were barred from naturalization, Asian immigrants.  The original Naturalization Act of 1790 in the US restricted naturalization to free white people.  It was expanded again in 1870 to include people of African descent, but was not expanded to include people from Asia, and that doesn't begin to open up until the mid 20th Century.

Q.    And we'll get there.  This concept where APIs or especially the Chinese in this time frame were unable to naturalize, does that speak to the broader construct that we mentioned before?

A.    Yes, so that is a fundamental piece of the notion of Asians as perpetual foreigners in the way in which they are treated and understood.

Q.    And then focusing in on Arizona in this time period, can you summarize the key events and characteristics in Arizona during the period of immigration?

A.    Yeah, so it broadly reflects the same patterns and the same ideas and the same dynamics that we see in the rest of the nation.

There is an immigration of people leaving California on

the West Coast to enter Arizona to help build railroads in the 1870s, Japanese farmers coming to Arizona in the beginning part of the 20th Century; but, again, as with the other parts of the country, there is a reaction to -- a negative reaction, an adverse action to their coming.

Q.   Let me ask the question then.  So can you provide some examples of how Arizona responded to that influx of Chinese and other AAPI?

A.   So as early as 1865, there's a law barring the intermarriage between Asians and white people, and that's understood to discourage the family formation, right, and to discourage settlement.

There are -- there are laws restricting -- or there are attempts restrict residential settlement of Asians in places like Phoenix as well.

Q.   And was -- did you look at anything that showed sort of reaction to the numbers that were coming in at the time?

A.   Yes.  So even what seemed to us to be relatively small numbers engendered a kind of adverse reaction.

So there's a -- there's a newspaper article, for instance, from Prescott, Arizona, in which the increase of the Chinese population of Prescott from three to four causes a kind of outcry and the author of this article says, you know, "This is too many Chinese now."  We've reached the tipping point, essentially, is what that article suggests.

Q.    Okay.  And let's move to the next period, the period of exclusion.  Can you summarize key events and characteristics of this period?

A.    In general.

Q.    Yes.

A.    So even with the federal restriction on immigration, which begins eventually to slow the influx of Chinese immigrants that are briefly replaced by Japanese immigrants -- but that's sort of curtailed by the first decade of the 20th Century and by 1924 with the Immigration Act of 1924 all Asian immigration to the US is effectively -- is effectively stopped, right.

So there are key characteristics, at least in terms of immigration; but even despite those kind of limits on the entrance of people from Asia to the US, the period is still marked by anti-Asian violence.  There are race riots and things like that through the 1880s to 1990s.

Q.    So the Chinese Exclusion Act, does that feed into that overall construct you were describing before?

A.    Right, it does.  The idea that, again, people from Asia don't belong in the US and are, therefore, perpetual foreigners, are not of America and don't really constitute American citizens.

Q.    Are there any legal decisions during this period that further fortified that?

A.    Yeah, there are a handful of legal decisions.  The first one that comes to mind is the *Ozawa* case, which is decided in the 1920s by the Supreme Court in which a Japanese immigrant who, I believe, was a veteran of the First World War, tried to demonstrate to the Court that he had for all intents and purposes become an American.

He dissimulated.  He spoke English in the household.  He'd became a Christian because in his mind this was important to be an American.  He'd gone to college in California.  He'd done some of his high school in California, was raising his children as Americans.

He tried to make the argument that he should be able to be naturalized based on all of these things; and the Supreme Court, in fact, ruled that based on his country of origin, he could not become a US citizen.

Q.    Okay, and then let's focus in on Arizona.  Can you summarize key events and characteristics in this period of exclusion in Arizona specifically?

A.    Yeah.  So, again, it reflects the national trend; and one of the things that sort of comes to mind especially is that Arizona, along with California and Oregon and Washington State, in 1921 it passes an alien land law, right?

And, again, this is a law that doesn't specify any particular ethnicity or country of origin, but bars aliens ineligible to become citizens from owning land, right; and

that designation over time, and by the 1920s certainly, is only applied to people of Asian descent, right.

And so we understand in Asian American history and Asian American studies that aliens eligible for citizenship becomes a kind of code for people from Asia.

Q.   And then let's move to the post-exclusion period.

Can you give us key events and characteristics of that period?

A.   So that -- the antecedents for that post-exclusion era really begin in the 1940s with the loosening of restrictions on Chinese immigration.  In 1943 there's a small quota of about 100 or 105, I forget the exact number, of Chinese who are allowed to immigrate to the US and it begin -- and that law, also, does away with the prohibition on naturalization for Chinese immigrants.

It's altered a little bit in 1952 to expand to other Asian nations but also with that small -- relatively small quota of 105 people allowed in, and finally culminates with the 1965 Immigration Act which -- which opens up in many ways immigration to the US with preferences for things like family reunification, refugees and labor and skill -- people with labor and skills that the US deems necessary or good.

Also in that post '65 period, not necessarily related to the 1965 Act is a kind of influx of refugee migration primarily from Southeast Asia due to the wars in Vietnam and

the military, the military presence in Cambodia and Laos.  And so beginning in the 1970s, especially, and into the 1980s we see an increase in southeast Asian immigrant populations in the US.

Q.   Okay.  You mentioned that the complete bands on naturalization were coming down and sort of culminating in 1965, but how does this history around naturalization affect AAPIs moving forward in this period?

A.   Yeah, so -- and this is really related not just to the perpetual foreigner idea, right, but to the idea that Asian Americans, AAPIs, generally speaking, constitute what once scholars referred to as alien citizens.

So this deep and long, 100-year history or so, right, more than a hundred-year history of the idea that people from Asia aren't actually Americans extends through that post '65 period and can be mobilized either in everyday life, right, culturally, socially, but also sometimes by the State, right, to affect people of Asian descent, to treat them as though even if you are a citizen, you are not a citizen.

Q.   And I want to talk a little about the Arizona AAPI population in this period of exclusion.  I think we have some demonstratives for that.  If we could have the first slide.

And can you just describe what we see here, what these numbers are?

A.   So just roughly speaking, we just see an increase since

1960 of the Asian population in Arizona, right.  1965, of course, is -- or 1960 is, of course, before the 1965 Immigration Act.  That act begins to really -- the effects -- the demographic effects really begin to take hold in the 1980s and in the 1990s, especially in traditional centers of Asian immigration, places like New York City or San Francisco or LA; but certainly by the end of the 20th Century and into the 21st Century it accelerates in places like Arizona.

Q.   And which Asian ethnic populations are immigrating to Arizona in this post-exclusion period?

A.   So it's -- often we focus on people who trace their ancestry to China, to Taiwan, to Korea, to South Asia, right, India or Pakistan, and to some extent to Japan, and that's all true; but, also, in that post '65 era we see, especially in Arizona, a Vietnamese refugee population, which is more socioeconomically diverse perhaps, less well advantaged than the folks entering the US under the '65 Act.

Q.   And so just focusing on that a little bit, how would you describe the ethnic -- sorry, economic diversity of the population in Arizona?

A.   So they're generally poor, right, working class or poor refugee populations.

Q.   Okay.  And then before we move forward, can we just summarize, now that we've gone through the three periods, the pattern that you spoke about earlier?

Derek Chang, Ph.D. - Direct Exam by Mr. Makker          1353

A.   So again, the pattern is, in really broad terms, one in which we see the entrance and attempted settlement in some cases of people of Asian descent and then a reaction to it, right.

So in Arizona we see a few Chinese coming into Arizona in the mid 19th Century and people reacting against it, right, circumscribing residential spaces right, commenting on the perceived notion that there are too many of them, right.

During the exclusion period we see that happening again despite federal legislation limiting the number of people who can come into the county, the people who are there are subjected to this idea that there are too many; and that happens, of course, in the post-exclusion period as well.

Q.   Okay.  So now what I want to do is focus a little bit more recently.  So I want to move from this slide to the second slide, and can you describe what this slide shows?

A.   So this really demonstrates a kind of more recent increase in the Asian -- Asian American population in the state across counties.

Some of the counties, Greenlee County, there aren't a huge number of people of Asian descent in 2010, and so the increase in 2020 isn't a lot of people, whereas in Maricopa County, which is a much larger county, we see even there, right, well over 50 percent increase.

And, again, right, the important thing to note is that

the reaction to Asian immigration, Asian American settlement

doesn't necessarily have to be engendered by the real increase

in numbers.  It can be engendered by a kind of perception that

there are -- there's an increase in the AAPI population.

In this case, what we see is that, broadly speaking,

there is, in fact, a real increase.

Q.   And then I believe this demonstrative shows the specific

Asian-alone population.  Is it similar, your understanding,

for the Native Hawaiian Pacific Islander population, I

believe, the census tracks separately?

A.   Yes.  I'm working here from memory, but my

understanding -- or my memory is that the NHPI, right,

population increases by almost 50 percent.  So it's in the

same ballpark.

Q.   And so with this recent population influx, what percent

of Arizona's electorate does the AAPI population make up?

A.   Again, I'm working from memory.  I believe the number I

cite in my report is 4.6 percent.

Q.   And so thinking about that population, what's your

understanding of sort of the foreign born and naturalized

portion of that?

A.   Right.  So my -- my sense is from at a high -- looking at

sort of broad census data, that the majority of that 4.6

percent -- so of the Asian population in Arizona, most of the

people tend to be natural -- foreign born, excuse me, yeah.

Q.   And then of the eligible voting population, what's your understanding of the naturalized percent?

A.   My understanding that it is well over half, closer to 60 percent.

THE COURT:  I want to clarify something.  You were -- you were asked the percent of the electric -- of the electorate as 4.6.  So that would imply to me that that's the percent of Asian US citizens as opposed to all Asian people of Asian origin that are living in Arizona.

THE WITNESS:  Yes.

THE COURT:  So I'm correct it's citizens, 4.6?

THE WITNESS:  Yes.

THE COURT:  Thank you.

BY MR. MAKKER:

Q.   So let's focus in on that number for a second, the 4.6 percent of the electorate, so citizens that are able to vote.

Why would this 4.6 percent be the target of law such as those challenged?

MR. HORLEY:  Foundation.

THE COURT:  Overruled, you may answer.

THE WITNESS:  My -- my sense is that 4.6 percent is significant, in part, because of the really thin margins of victory in recent elections, right, and that in some ways that 4.6 percent could prove to be a decisive factor.

BY MR. MAKKER:

Q.    Thinking about specifically the pattern that you've described and looking at these recent demographic numbers from Arizona, can you explain the relationship between the pattern you've been describing throughout history and what we see in Arizona right how?

A.    Right -- and, again, the slides -- as the slides illustrate, there's an increased number of AAPIs in the state in general, right.  There's an increased number or there's a relatively large number of AAPI voters, both naturalized and native born in the state and that that -- the percentage of the electorate toward AAPI voters could prove to be a decisive -- a decisive vote in elections.

That indicates to me, at least in sort of demographic terms -- in broad demographic terms that the AAPI population is one in which -- is one which might engender a kind of negative reaction in order to, as historical cases that I cite in my report indicate, to limit the influence of AAPIs in the state.

Q.    Are you familiar with the birthplace and documentary proof of citizenship of some of the Challenged Laws here?

A.    I am.

Q.    And earlier you discussed -- and we just talked about it, the kind of high percentage of naturalized citizens in the Asian voting eligible population.  How does this point on naturalization relate to your opinions about those particular

requirements of the Challenged Laws?

A.   So in some ways, the idea of asking for additional information around, say, birthplace for AAPIs, to me it's a kind of -- both a freighted question because of the particular history of naturalization and barriers to citizenship of AAPIs based on activity, and so it has a particular kind of set of meanings and understandings for AAPI people; and that in some cases the documentary proof of citizenship, right, can -- can have a -- let's see how to put this -- can be a kind of a barrier, right, to AAPI participation.

Q.   And let's focus on that for a second.  So what does history tell us about AAPI populations and birthplace or documentary proof of citizenship requirements?

A.   So, again, we have to go back to the Second World War example.  You know, Japanese Americans who were living on the West Coast of the United States were identified, in part, by their birthplace as the US Government was looking to locate every Japanese American who lived on the West Coast to incarcerate them.

     And so birthplace has a kind of -- you know, there's a history in AAPI communities of the ways in which that information might be used.

Q.   Thinking about other requirements in the Challenged Laws, are you familiar with -- so we talked about documentary proof of citizenship, but also the 35-day notice period provisions,

are you familiar with those?

A.    Yes.

Q.    And did you analyze how those provisions sort of together fit into these historical patterns that you've looked at in the history behind sort of laws in AAPI voting?

A.    So around that particular provision, I was interested in the ways in which limited English proficiency voters of Asian descent might be affected by those laws, right.

Q.    Let me pause you first before we go on.  I think we have a demonstrative on that as well.  Can we have the third slide, please?

          THE COURT:  Before we get into this, let's take our morning break and reconvene at quarter -- at 10:45.

          MR. MAKKER:  Thank you.

          COURTROOM DEPUTY:  All rise.

          (Recess taken at 10:31 a.m.)

          COURTROOM DEPUTY:  All rise.  Court is now in session.

          (Back on the record at 10:46 a.m.)

          THE COURT:  Please continue with your questions for Dr. Chang.

          MR. MAKKER:  Just a few more questions, Dr. Chang.

          Yes, if we could have the slide back up.

BY MR. MAKKER:

Q.    Let me just start with a slide.  If you could, Dr. Chang,

just briefly describe -- hold on.

Just briefly describe what we're looking at in terms of the data here.

A.   So we're looking at -- as the title of the slide suggests, "Limited English Proficiency Rates" for Asian only people in the State of Arizona, and it comes from the US Census Bureau's data and, really, the numbers that are -- I think there's a few sort of lines that are significant in particular.

Limited english proficiency of Asians over the age of 18, but also the percentage -- the percentage of LEP Asians over 18.  So those are voting age.

Q.   And before we broke we were talking about sort of DPOC and 35-day notice requirements.  Can you just describe your analysis in terms of those provisions and how they fit into history and what we've seen in the past as well?

A.   Right.  So generally speaking, I look at the ways in which the Voting Rights Act not in its original passage in 1965 but in subsequent reauthorizations and amendments focused on the kind of -- I think at one point they refer to them as disabilities of LEP voters or limited English proficiency voters, and the attention paid to making sure that those voters have access to the ballot; and looking at Arizona and LEP rates -- the graphic's not in front of me right now, but the 28 percent or so of LEP Asians, LEP people of voting age,

UNITED STATES DISTRICT COURT

that 35-day notice, which I believe is a reduction from the previous time window places a kind of undue burden on AAPI voters and LEP voters, in particular.  It's harder for them to access resources to translate materials, in particular.

Q.   Okay.  And then my last question is just focusing on the pattern that we've discussed going through the history and the recent population increase that we have discussed in Arizona in the AAPI community, can you just explain do the Challenged Laws fit that same pattern?

A.   Yes, I believe they do.  They reflect a kind of -- they reflect a response to the increased number of AAPIs generally, but especially the increase in AAPI voters and even potential voters.

Q.   Okay.

        MR. MAKKER:  With that, no further questions.  I'll pass the witness.

        MR. HORLEY:  Good morning, Your Honor, and good to see you again, Professor Chang.  My name is Tim Horley, and I represent the State and Attorney General in this case

                    CROSS-EXAMINATION

BY MR. HORLEY:

Q.   So, Professor Chang, you noted that you use "Asian American" and "AAPI" interchangeably.  Do you mind if I follow suit and generally refer to them as Asian Americans acknowledging that that also includes Pacific Islanders?

A.   Yes, that's fine.

Q.   Okay, great.  Thank you.  And another point of clarification, the opinions you offer in this case focus on discrimination against Asian Americans, correct?

A.   Yes.

Q.   And so you do not offer any opinions about discrimination against other communities, such as African Americans or Latinos?

A.   That is correct.

Q.   And is it fair to say that, in your opinion, Arizona has a history of racial discrimination?

A.   There is a -- yes, there is a history there, yes.

Q.   Would you agree that all 50 states in the United States have a history of racial discrimination?

A.   I think broadly speaking in a general sense, yes.

Q.   Okay.  And you opined on direct that the Challenged Laws will create problems for Asian American voters with limited English proficiency, right?

A.   Yes.

Q.   And before your report in this case you had never written about the effects of English language proficiency on political participation, right?

A.   That is correct.

Q.   Okay.

     MR. HORLEY:  Could we please pull up Page 4 of the

demonstrative.

BY MR. HORLEY:

Q.    And here it says that 21.8 percent of the Asian voting age population have limited English proficiency, correct?

A.    Could you repeat that again?  Did you say 21.8 percent?

Q.    I'm sorry.  If I did, I meant to say 28.1 percent.

A.    Yes.

Q.    And this percentage refers to the entire Asian voting age population, correct?

A.    I mean, can you -- I'm getting caught by the distinction "the entire."

Q.    Yes, sir.  It's not limited to those who are citizens?

A.    Yes, that is correct.

Q.    Okay.  And your work as a historian focuses on qualitative sources, correct?

A.    I'm primarily a qualitative historian, yes.  I do use census data broadly in sort of very general terms but my -- I characterize myself as a qualitative historian, yes.

Q.    And so, yes, as I believe we discussed in your deposition, when you use data from the US Census, you are not doing fine-grained statistical analysis of that data, correct?

A.    That is correct.

Q.    Okay.  And you testified that aspects of the Challenged Laws are likely to have negative effects on naturalized

citizens; is that right?

A.    Yes.

Q.    And you're aware that the Challenged Laws are not being implemented, correct?

A.    I'm aware of that, yes.

Q.    And you are not familiar with Arizona's Elections Procedures Manual, correct?

A.    That is correct.

Q.    And you did not review any of the voter registration lists produced in this litigation, right?

A.    That is correct.

Q.    And you are a historian, not a predictive social scientist, correct?

A.    That is correct.

Q.    And predicting the future is generally not a historian's job, correct?

A.    That is generally not a historian's job.  I think historians can try to understand or help us to understand a contemporary moment by looking to the historical past, but it is not predictive.

Q.    Understood.

        MR. HORLEY:  I believe I have no further questions, thank you.

        MR. LANGHOFER:  Thank you, Your Honor.

        Kory Langhofer for the RNC.

CROSS-EXAMINATION

BY MR. LANGHOFER:

Q.   Good morning, Professor.  Welcome back to Arizona.  I understand the last time were you here was about 17 years ago; is that right?

A.   That is roughly correct.  I don't recall the particular year, yeah.

Q.   And as I understand it, in all of your visits to Arizona you've never been to the State Archives; is that right?

A.   That is correct, yes.

Q.   Never been to ASU's library?

A.   No.  The lovely thing about the last especially ten or fifteen years of doing historical research is an awful lot of materials had been digitized, and so there's access to other kinds of materials through -- through digital sources.

Q.   In fact, you did most of your research for this on-line, didn't you?

A.   I hesitate to characterize the percentage or the amount, but I did do on-line research for this, yes.

Q.   You've never been to University of Arizona's library?

A.   I have not.

Q.   Nor Northern Arizona University?

A.   No, I have not.

Q.   Nor Grand Canyon University?

A.   Not to their libraries, no.

Q.   All right.  Well, before we get into your opinions, I would like to ask you some general questions about Arizona to just sort of test your familiarity with our state.

MR. LANGHOFER:  Elaine, could we please have the podium laptop, please.

BY MR. LANGHOFER:

Q.   And what I'd like to do is start with Page 2 of your demonstrative.  Did you prepare this demonstrative, sir?

A.   This was prepared in consultation with -- with my attorneys.

Q.   Okay.  But on the slide you talked the Court through some demographic statistics by county, right?

A.   Yes.

Q.   Including Gila County?

A.   That was part of the demonstrative, yes.

Q.   Which one is Gila County?

A.   So I am not familiar with the particular political geography of the State of Arizona, but for me the important -- the important data on that demonstrative were the numbers.

Q.   Have you ever been to Gila County?

A.   Pardon?

Q.   Have you ever been there to Gila County?

A.   Not to my knowledge.

Q.   All right.  How many female governors of Arizona can you name?

MR. MAKKER:  Objection, relevance.

THE COURT:  Sustained.

BY MR. LANGHOFER:

Q.    Do you know who Quang Nguyen is?  Q-u-a-n-g, the last name is N-g-u-y-e-n.

A.    That name doesn't ring a bell.

Q.    You have in the past accused other organizations of acting -- being complicit with racism; have you not?

A.    Other organizations?

Q.    Correct.

A.    Can you give me a sense of --

Q.    Sure.

A.    Yeah.

Q.    September 2020 you signed an open letter to the University of Cornell?

A.    To Cornell University?  I'm -- it's possible that I did that.  I don't recall the specific letter.

Q.    Okay.  You don't recall signing a letter to your employer accusing it of being complicit in countless ways with reproduction of white supremacy?

A.    Okay, that sounds familiar.

Q.    You did sign such a letter?

A.    Yes.

Q.    Okay.  And --

A.    I'm sorry, can you repeat the date for me, please?

Q.    September of 2020.

A.    Yes.

Q.    And in this letter you said that the colorblind events at the University perpetuate racial disparities?

A.    Yes.  I should clarify that I was not an author or co-author of the letter, but I was a signatory to it, yes.

        THE COURT:  Was this a letter that was signed by several people?

        THE WITNESS:  It was.

        THE COURT:  More than several people?

        THE WITNESS:  I don't know the actual numbers. Certainly, more than dozens.

        THE COURT:  So you signed on to a letter that contained these statements that was drafted by another signatory?

        THE WITNESS:  By one of my colleagues, I believe, yes.

BY MR. LANGHOFER:

Q.    In this letter you called for the partial defunding of the Cornell Police Department because it is quote "a policing apparatus predicated on the maintenance of a racist order"?

        MR. MAKKER:  Objection, mischaracterizes authorship and relevance.

        THE COURT:  Overruled, you may answer.

        THE WITNESS:  Yes.

UNITED STATES DISTRICT COURT

BY MR. LANGHOFER:

Q.   And you made 39 demands for change?

A.   I believe -- and, again, it was a while ago so my recollection of the particular demands eludes me right now, but it -- it sounds familiar.

Q.   Was one of those demands to abolish colorblind recruitment of faculty?

A.   As far as I can remember -- and, again, without the letter in front of me and without refreshing my memory I could not say for certain, but that sounds correct.

Q.   Let's take a look.  We're looking at -- let's see, what's been marked for identification as Impeachment Exhibit 6.  I'm just going to go back to the beginning so you can see it.

     Do you see the first page here "Faculty, graduate students and staff," et cetera?

A.   Yes.

Q.   All right.  Let's take a look at your signature on Page -- bear with me one moment -- 16.

     That's your signature, sir?

A.   That is.

Q.   Digital signature?

A.   That's my name, yes.

Q.   All right.  So let's go now to Page 10 of that document so we can get back to the question I was asking.

     One of your demands was to abolish the colorblind

recruitment for faculty?

A.   Yes.

Q.   One of your demands was also to implement a racial quota system for undergraduate admissions?

A.   Can you repeat that again?

Q.   Sure.  It's to implement -- the top here, LT11, is to implement a racial quota system for undergraduate admissions?

A.   Yes.

Q.   To have a racial quota system for graduate admissions?

        THE COURT:  Excuse me, I don't know what those letters stand for, BIPOC.  Do you?

        THE WITNESS:  That's black, indigenous people of color.

        MR. MAKKER:  And, Your Honor, objection.  The question mischaracterizes the document.

        THE COURT:  The only question before the witness was mine.

        MR. MAKKER:  I'm sorry, I thought Mr. Langhofer's question was still pending.

        THE COURT:  No, my -- he's going to ask -- either ask it again or ask a different one because I interrupted because I didn't have any idea what those letters stood for.

BY MR. LANGHOFER:

Q.   Did your letter call for funding students based on the color of their skin?

MR. MAKKER:  Objection, mischaracterizes the document.

THE COURT:  Overruled, you may answer "yes" or "no."

I think he's got it highlighted and he -- he didn't quote.  He characterized what it said.  So you can agree or disagree whether that's what it was asking for.

THE WITNESS:  So I think what I would say is color of their skin is a -- race isn't merely about the color of their skin, right.  So I would -- I would say that "no."

BY MR. LANGHOFER:

Q.   Well, in LT15 here on the page it says you wanted to -- you want to make funding available to what you describe as black students, right?

A.   Right, yes.

Q.   Not dependent in your letter on socioeconomic status?

A.   No.

Q.   Okay.  Well, let's talk about some of the authorities that you considered in offering your opinions here today.

You do agree that it's important as a historian to only rely on credible authorities, don't you?

A.   Yes, yes.

Q.   And in arriving at your opinions in this case, you considered a shooting of an Asian place of business in Atlanta, right?

MR. MAKKER:  Objection, outside the scope.

THE COURT:  Overruled, you may answer.

THE WITNESS:  Are you referring to the -- what we -- I referred to in my report as the Atlanta spa shootings?

MR. LANGHOFER:  Yes.

THE WITNESS:  Yes.

BY MR. LANGHOFER:

Q.    And that's Atlanta, Georgia, right?

A.    Yes.

Q.    Okay.  And you asserted that the Atlanta spa shooting was tied up with perception of Asian Americans that GIs developed while serving overseas, right?

A.    That is one strand of the argument.  It's related to that, yes.

Q.    And this is cited in your report because it's part of what led you to your conclusions about Arizona, right?

A.    Yes.

Q.    All right.  In support of your assertion about GI's serving overseas you quoted an author named Viet, Thanh, Nguyen.  I'm going to spell that.  V-i-e-t, T-h-a-n-h, N-g-u-y-e-n.  Didn't you?

A.    I -- can you show me on the report?

Q.    Yes, sir.

A.    I believe I did.  I just want to make sure that I'm getting the right Viet Nguyen.  There are lots of people named Viet Nguyen.

MR. LANGHOFER:  Yes, sir.  By stipulation, let's show you Page 53 of your report.

THE WITNESS:  Yes.

BY MR. LANGHOFER:

Q.   All right. Mr. Nguyen, he's not a quantitative scientist, is he?

A.   No, he's a novelist and a scholar of Asian American studies.

Q.   He writes fiction?

A.   But he also writes scholarship, yes.

Q.   Okay.  And the article that you cited, let's see, is Footnote 184.  It's "*From Colonialism to COVID*," right?

A.   Yes.

Q.   That article actually says that -- among the things it asserts is that war is erotic?

A.   I -- I don't recall the particular -- I would have to look at the article.

Q.   Let's do that.

A.   Yeah.

Q.   We're gonna look at Page 3 of -- well, let me -- I'll flip back.  This is the article you're citing, correct?

A.   Yes.

Q.   All right.  Let's look at Page 3, and why don't you give that a read -- actually, why don't you give both of those highlighted sections a read, and then I'm going to ask you

questions about those in a moment.

A.   Is there something above the highlighted section that I'm missing?  I'd like to sort of see it in context.

Okay, there we go.

Q.   Got that?

A.   Can you scroll down?

Q.   Yes, sir.

A.   Thank you.  I missed the -- you cut off the top of that -- that paragraph there.  There we go, thank you.

Okay, thank you.

Q.   You finished?

A.   Can you scroll down?

Q.   Yes.

A.   Okay.

Q.   All right.  So one of the things he teaches is his understanding that war is erotic?

MR. MAKKER:  Objection, relevance.

THE WITNESS:  Erotic?

THE COURT:  I'm sorry, there were too many people speaking at the same time.

MR. MAKKER:  My objection was relevance.

THE COURT:  Sustained.

BY MR. LANGHOFER:

Q.   So you've considered the article.  Did you also consider whether Arizona ended school segregation before *Brown v. Board*

*of Education?*

A.    I did not, no.

Q.    Okay.  You did consider a bill called HB2376, right?

A.    Is that -- can you remind me what that bill says?

It sounds like a lot of numbers, sorry.

Q.    Yep.  Why don't we look at it, and I'm going to show you here HB2376 from 2023.  Just --

THE COURT:  I'm having trouble keeping the numbers straight, too.  Is this the one that was vetoed?

MR. LANGHOFER:  No, Your Honor.  This is a completely different bill.

THE COURT:  Okay, thank you.  I didn't think the number sounded familiar, but the number doesn't tell me much except for the two that we're concerned with here.

MR. LANGHOFER:  It's the first time we're talking about this one.

THE COURT:  Okay, thank you.

MR. LANGHOFER:  There's a lot of bills that start with "2," as you know.

BY MR. LANGHOFER:

Q.    All right.  Sir, why don't you -- well, let's first talk about what you said about bill HB2376.

Do you remember what you --

A.    I don't off the top of my head, no.

Q.    Okay, so let's start with what you said; and we're going

to look at your report, Page 36.

MR. MAKKER: Your Honor, given that the reports are not coming into evidence and this wasn't testified to, objection on relevance and scope grounds.

THE COURT: Overruled. I need to know what the question is, and he can be reminded from what's in his report since none of us off the top of our head know what HB2376 is, except Mr. Langhofer, because he's getting ready to ask the question.

BY MR. LANGHOFER:

Q. Sir, have you had a chance to read this highlighted portion on Page 36 of your report to yourself?

A. I have.

Q. Okay. So in your report you said that HB2376 is like a modern day alien land law in Arizona, right?

A. That's what it says. This is like the historical alien land laws, yes.

Q. Did you read that bill before writing about it in your report?

A. Did I read the bill? I did not read the bill in its entirety, no.

Q. Okay. Well, let's take a look -- let's go back now to the bill itself and -- here we go.

We're going to look at Page 2 of this bill. Why don't you give this section a read to yourself.

UNITED STATES DISTRICT COURT

A.    Okay.

Q.    In your report, didn't you say that this bill was limited to certain Asian countries of origin?

A.    I believe that's what I said.

Q.    Okay.  Part 7(A)(i) applies to all foreign governments and state-colored enterprises, doesn't it?

A.    Yes.

Q.    And part (ii) includes Cuba and Venezuela?

      Cuba and Venezuela are in part (ii)?

A.    Yes, and -- yes.

Q.    Okay.  This bill was never limited to Asian countries of origin, was it?

A.    So -- and, again, it's been a while since I drafted this. I want -- the way in which I read that bit that you showed me of the report is that certain Asian -- it doesn't cover the entirety of Asian countries, right.  Not every Asian country is represented in this bill, right, that it is North Korea, China.  If we want to be capacious about our understanding of Asia, it might include, perhaps, at a stretch, Syria or Saudi Arabia and maybe Russia as well; but it doesn't cover, say, Japan.

Q.    And every foreign government or state-controlled enterprise?

A.    Yes.

Q.    Okay.  Did you watch the hearings about this bill before

describing it as a modern day alien land law?

A.    I did not.

Q.    Okay.  So you don't know what the rationale was for coming up with these countries?

A.    So my analysis was based on, again, like the broad historical patterns and the broad historical similarities, really, between this piece of legislation and the legislation passed in Arizona in 1921, but also in California, Washington State and Oregon around the same time as Arizona's 1921 law in which this -- the very states were extremely concerned with not just the settlement of -- especially in this case, Japanese immigrants within their borders, but also were concerned about the Japanese immigrants being agents of the Japanese empire at the time.

So part of the conversation around why they would want to pass those bills to target a particular -- a particular group was that -- was that legislators connected Japanese immigrants and their children to the Japanese empire as somehow a potential invading and foreign influence within the US. Despite the fact that there's no real evidence to suggest that Japan had any imperial -- any sort of broad military or political imperial design on the United States.

And so I was looking at that as a kind of -- not just a precedent for but, in fact, a kind of similarity to the current -- the current legislation.

Q.   Are you aware of the problems that the state has had -- our state has had with foreign governments overusing our natural resources, like water, when owning land?

A.   I don't know what you necessarily mean by "problems," but I'm not familiar with this, yeah.

Q.   Okay.  You also built your opinion partially on Senator Lindsey Graham's introduction of a bill concerning birthright citizenship; am I right?

A.   That is mentioned in the report, yes.

Q.   Okay.  And you describe that as a bill that rests on a racial rationale that links citizenship to race --

A.   Right.

Q.   -- and are rooted in the concern about the political powers of communities of color, right?

A.   It is part of a long line of attempts to do away with, actually, birthright citizenship.  Often those historical examples have pivoted on the citizenship of people of Asian descent.

Q.   But my description -- or my recitation of your description was faithful to your description; was it not?

A.   I believe so, yes.

Q.   Okay.  Senator Graham never said any such thing, did he?

A.   No.

Q.   Okay.  And, in fact, you rely on an article that -- to support your assertion, you rely on an article that pre-dates

Graham's bill by five years?

A.    Yeah.  So, as I said, these are -- these are sort of reoccurring patterns in -- in American history.

Q.    And the article that you rely on asserts that quote "the global regime of citizenship perpetuates white supremacy"?

A.    Can you point me to that?

Q.    I can, yes.

A.    I want to see who I'm citing specifically.

Q.    Do you want to start with your report or with the article you cite?

A.    Can I start with my report just to see the footnote would be nice.

Q.    All right.  So let's go to Page 33 of your report.  Bear with me.  I may be on the wrong page.

    Bear with me one moment.

    We're gonna come back to this in just a moment rather than making everyone wait through it.

    You cited -- and you've already discussed a number of laws that are more than a hundred years old, right?

A.    I missed the first part of the question, I'm sorry.

Q.    You built your opinion on a series of laws that are more than 100 years old?

A.    My opinion uses the laws from more than a hundred years old to establish a pattern, yes.

Q.    And most of those laws were not in Arizona because

Arizona didn't exist much more than a hundred years ago, right?

A.   Most of the laws I cite are not Arizona laws, yeah.

Q.   Laws from the United States Congress, for example?

A.   Many of the laws are federal laws, yes.

Q.   And laws from California?

A.   There are laws from California, yes.

Q.   Do you know if anyone in the Arizona State Legislature when these -- the Challenged Laws in this case were passed were even alive when those laws were passed?

A.   I do not know of anybody, yeah.

Q.   All right.  So we're going to go back now to the Senator Graham issue.  Thanks to Mr. Horley for his assistance.

     And we're looking at Footnote 99, and I'll give you a minute to read that.

A.   Okay, thank you.

Q.   Okay.  And now let's look at what's been marked for identification as Impeachment Exhibit 59.  This is the document you were citing; is it not?

A.   It is.

Q.   Okay.  And the argument in this document is that the global regime of citizenship perpetuates white supremacy.

A.   That is the highlighted portion of, I believe, the abstract, yes.

Q.   Okay.  Now, did you look for -- did you consider Lindsey

Graham's explanation for his bill when asserting that his bill is based on a racialized view of citizenship?

A.    I believe I did.  My recollection is I do not cite his particular words in the report, but certainly I was aware that he didn't cite a kind of -- an intent explicitly to discriminate against non-white potentially -- or non-white citizens.

You know my -- my -- my experience as an historian, looking at historical records particularly from the mid 20th Century forward, this is something I teach my classes -- or we talk about in my classes, it's relatively rare -- certainly rarer -- or more rare post mid 20th Century for historical actors or key political figures to state their racist intents explicitly.

So what we do is we look at the broader context of their actions, and we try to understand them within a kind of historical context; but even prior to the mid 20th Century, you know, if we were just to rely on President Roosevelt's Executive Order 9066 and say that it was national security and military necessity was the reason why Japanese Americans were incarcerated during the Second World War and left it at that, we would have -- we would land on one -- one conclusion; but if we look at both the sort of context around the issuance of Executive Order 9066 and the preceding, especially, 30 or 40 years around Japanese immigration to the United States, then

we begin to understand the broader motive around what he did

rather than focusing exclusively on what he said.

Q.   Well, you said "focusing exclusively."  Actually, you're -- with respect to these laws, you didn't focus on them at all, right?  The legislative history, you ignored that?

A.   I missed the last part of your question, I'm sorry.

Q.   It may be compound.

You didn't look at the legislative history for the Challenged Laws in this case at all, right?

A.   No, I looked at the historical record and I tried to place the laws within the context of the historical record.

Q.   And one of the reasons you gave for not looking at the legislative history in this case is because you thought it would not be quote "particularly damming," right?

A.   I don't recall what I said during the deposition, but that sounds about right.  I should say that subsequent to the deposition, because it came up in the deposition, I went back and looked at the legislative record; and nothing I found in the legislative record would have changed my -- my opinion.

Q.   All right.  Well, in arriving at your opinions, did you consider whether Arizona repealed its anti-miscegenation laws before *Loving v. Virginia*?

A.   So I was -- I was aware that they had repealed the law before *Loving*, yes.

Q.   Okay.  Didn't mention that in your report, though?

A.    No.

Q.    You mentioned on direct examination and in your report an increase in violence against Asian Americans in Arizona, right?

A.    Did I say that about Arizona specifically?

Q.    In our report certainly.

A.    In the report, okay.  Can you point me to the --

THE COURT:  I don't recall in his testimony he spoke specifically about Arizona.  It may be in the report.

MR. LANGHOFER:  Perhaps I'm confusing it.

BY MR. LANGHOFER:

Q.    In your report didn't you say that the incidents of -- the reports of violence against Asian Americans had increased 50 percent from 2019 to 2020 in Phoenix?

A.    I believe that is in the report.  I would have to look at the -- at the particular citation, at the particular section of the report to -- to be absolutely certain.

Q.    All right.  And on your direct testimony you said that there had been a marked increase, perhaps nationally, perhaps in Arizona, but you said there was a marked increase, right?

A.    I believe in my direct testimony I was referring to the national -- the national crime data.

Q.    Let's look at what you said about Arizona in your report.

Just read that to yourself to refresh your recollection, please.

A.   Yes.

Q.   How big was the -- so you said in Arizona there had been a 50 percent increase between 2019 and 2020, right?

A.   Yes.

Q.   And you're citing in Footnote 172 the Center for Study of Hate and Extremism?

A.   Yes.

Q.   How big was the actual increase?  Not the percent, but the actual increase?

A.   I don't recall off the top of my head, but as I -- you know, as part of this broader pattern, right, this deep historical pattern, often it's not the absolute numbers that matter, right.  So, again, sort of referencing, I believe it's in the 1860s when people in Prescott, Arizona, were worried about an increase of one person in their town.

That's a -- that's a kind of -- that's part of this pattern, right.  So it can be real or perceived.  It can be a percentage.  It can be absolute numbers, but absolute numbers aren't a necessity.

Q.   Okay.  Well, you did rely on the Center for Study of Hate and Extremism, and what I'm showing you now marked for identification as Impeachment Exhibit 54 is the report that you relied on; is it not?

A.   Yes.

Q.   Okay.  And it's got a line.  The third line is -- the

UNITED STATES DISTRICT COURT

fourth line is for Phoenix, Arizona, right?

A.    Yes.

Q.    And the actual increase was from two to three reports, right?

A.    Yes.

Q.    Okay.  And were these prosecutions and convictions or just reports?

A.    I believe they were just reports, but I don't recall off the top of my head.

Q.    Did you disclose anywhere in your report that it was an increase of one?

A.    No, it's not -- I believe I used the percentage.

Q.    All right.  Part of your opinion in this case was based on the cold-blooded murder of a Sikh resident, I think citizen of Arizona, shortly after 9/11, right?

A.    I do mention that incident in my report, yes.

Q.    Do you mention in your report what happened to the murderer after that?

        MR. MAKKER:  Objection, relevance.

        THE COURT:  Overruled, you may answer.

        THE WITNESS:  What happened to the murderer?

BY MR. LANGHOFER:

Q.    What happened to the murderer?

A.    I don't recall off the top of my head.  It's --

Q.    Wasn't he prosecuted and convicted immediately?

Well, "immediately" is my characterization.  Was he not prosecuted and convicted?

A.    I believe he was, but I don't -- I don't recall.

Q.    Do you know anyone in Arizona who thought that was -- anyone in Arizona who condoned that murder?

A.    I have no way of knowing who condoned it and who didn't condone it.

Q.    Okay.  Are you -- do you believe that somehow representative of Arizona's views on race?

A.    I don't believe in my report I'm characterizing it as representative of the State of Arizona's views on race.  I believe I use it in my report to help establish the pattern of the ways in which people of Asian descent have in the deep historical past, but also in the more recent historical past, been treated and been understood to be not American, right.

So that the murder of that gentleman after 9/11, part of the rationale for his murder was based on the idea that somehow he was not an American, that he was associated with the people who committed the attacks on the World Trade Center and on the Pentagon on 9/11/2001, right.  That is a deep and consistent pattern in American history, right, sometimes with tragic, tragic consequences.

Q.    You're not arguing or offering the opinion that Arizona's failing to meet its language assistance obligations under the

UNITED STATES DISTRICT COURT

Voting Rights Act, are you?

A.   I am -- I did not use the Voting Rights Act evidence in my report to argue that Arizona is somehow -- I'm not an expert in its application in Arizona.

I was using it mostly to identify limited English proficiency as an area of concern and that access to -- access to translated materials, in particular, was or is and continues to be a focus of the Voting Rights Act.

Q.   You talked about Korematsu, and you are unable to identify any political leader in Arizona who condones Korematsu, are you?

A.   I don't recall the context in which I mentioned Korematsu in my report, but I have no way of knowing whether anybody condones or doesn't condone that particular decision.

Q.   Did you consider whether other programs that have required documentary proof of citizenship have been able to distinguish between citizens and non-citizens without denying benefits to citizens?

A.   So my experience in this as a historian, some of which I note in the report, but also through my own research, is mostly through immigration procedures and the history of the question of whether someone is a citizen or not when they try to regain entry into the United States.

Q.   Okay.  So you have not -- you did not look at studies assessing whether documentary proof of citizenship

requirements for government benefits in other context have

resulted -- have failed to distinguish between citizens and

non citizens in a way that prejudices the rights of citizens,

did you?

A.    Not for government benefits; but, as I said, for entry

into the United States, yeah.

MR. LANGHOFER:  Thank you, Your Honor.

We have no more questions for this witness.

THE COURT:  Thank you.

Any questions, Ms. Porter?

MS. PORTER:  Sorry.  No, Your Honor.

THE COURT:  Redirect?

MR. MAKKER:  Brief redirect, Your Honor.

If I could have Impeachment Exhibit 6.

MR. LANGHOFER:  "6"?  That wouldn't of -- oh, 16.

REDIRECT EXAMINATION

BY MR. MAKKER:

Q.    Okay.  Professor Chang, do you recall Mr. Langhofer

asking you questions about this page?

A.    I do.

Q.    And, in particular, looking at LT11 and 13, neither of

those refer to quotas, correct?

A.    That is correct.

Q.    And in the context of this letter and these provisions,

are you asking for quotas or are you advocating for diversity

that is reflective of our country?

A.   My recollections is that we did not ask for specific quotas, but that we were pushing the University to admit students and to support students based on a broad sort of bold diversity.

MR. MAKKER:  That's all I have, Your Honor.

THE COURT:  May this witness be excused?

MR. MAKKER:  Yes.

MR. HORLEY:  No objection.

THE COURT:  Thank you, sir.  You may step down and you are excused as a witness.

Plaintiffs may call their next witness.

MR. JOHNSON:  Good morning.  I actually forgot to enter my appearance this morning.  So I'm Hayden Johnson for the LUCHA plaintiffs.  Apologies for that to the Court, and we're next calling Dr. Vernon Burton and he's just coming in now.

COURTROOM DEPUTY:  Sir, if you want to step up here, please.

THE WITNESS:  Yes, ma'am.

COURTROOM DEPUTY:  Just step right here and raise your right hand for me, please.

(Witness is sworn.)

COURTROOM DEPUTY:  Thank you very much.  You can put your hand down.  Could you state your name for the record.

THE WITNESS:  Yes, Orville, O-r-v-i-l-l-e, Vernon V-e-r-n-o-n, last name Burton, B-u-r-t-o-n.

COURTROOM DEPUTY:  Thank you.

If you could please take a seat.

THE COURT:  You may proceed, Mr. Johnson.

MR. JOHNSON:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. JOHNSON:

Q.   Good morning, Mr. Burton -- Dr. Burton.

Were you retained as an expert witness in this case for the plaintiffs?

A.   Yes.

Q.   And did you prepare an expert report?

A.   Yes.

MR. JOHNSON:  Stephen, would you please pull up Exhibit 329 that we'll use as a demonstrative for your testimony today, Dr. Burton.

BY MR. JOHNSON:

Q.   Do you recognize this as a copy of your expert report?

A.   Yes.

MR. JOHNSON:  And, Your Honor, I also have a physical copy for Dr. Burton.  May I approach and provide that to him?

THE COURT:  Yes -- well, actually, if you'd give it to Elaine and she'll hand it to the witness.

UNITED STATES DISTRICT COURT

MR. JOHNSON:  Yes, Your Honor.

THE WITNESS:  Thank you, ma'am.

BY MR. JOHNSON:

Q.   Dr. Burton, let's turn first to Section II of your report, which starts on Page 2.  Does Section II sort of summarize your background and qualifications?

A.   Yes, at the time I submitted the report.

Q.   Okay.  And then you also include a full bio and CV that was also at the time of your report?

A.   Yes.

Q.   And I won't go through that in detail, but just to hit a few highlights of your qualifications, what is your current occupation?

A.   I am the Judge Matthew J. Perry Distinguished Professor of History and Geography, Professor of Global Black Studies, Professor of Sociology and Anthropology, and Professor of Computer Science at Clemson University.

Q.   And how long have you been at Clemson?

A.   Since 2010.

Q.   What did you do before joining Clemson?

A.   Most of my career was spent at the University of Illinois for 34 years.  I went to Coastal Carolina to become the Burroughs Distinguished Professor of Southern History and Culture in 2008, and then from there went to Clemson.

Q.   And you were two years at Coastal Carolina?

UNITED STATES DISTRICT COURT

A.   Yes.

Q.   Can you just briefly describe your educational background for us?

A.   Yes.  I went to public schools in the small rural community -- textile community of Ninety Six, South Carolina, and that's the name of the town.  It's actually spelled out as two words.  I lived a little bit outside in the country.

And then from there I went to Furman University where I got my BA, and from there I did ROTC.  So I had to go into the Army to complete the ROTC.  From there I went to the University of Illinois in 1969, I believe, and got my MA in United States history.

Was writing my dissertation on US history when I was called back into the Army to fulfill the ROTC requirement, and then went directly from the Army to the University of Illinois where I had a job and finished the degree, which I think was awarded in '76, finished it in 1975, that first year at the University of Illinois in American history.

Q.   So just to clarify, then, your Ph.D. is still from Princeton; is that right?

A.   Yes.

Q.   Okay.  And what were some of your main research areas while you were at Princeton?

A.   Well, race relations -- the first, of course, is US history.  Race relations, voting behavior, legislative

UNITED STATES DISTRICT COURT

histories, discrimination, and I looked at regions of the United States was one of my fields of study.

Q.   And sort of within discrimination, does that also include sort of socioeconomic inequality?

A.   Absolutely.

Q.   In general, is that still your focus of your academic expertise and study today?

A.   Yes, a large part of it.  I've also -- though it's related -- written on the scholarship of teaching and learning and quite a bit on what is now referred to as digital humanities, digital history or computer, the digital world and how that relates.

Q.   Do you use, like, social science in your political science techniques in your field?

A.   Yes.

Q.   About how many publications have you produced total?

A.   More than 20 books and about 300 essays or articles.

Q.   And would you say that most of your topics -- or, excuse me, most of your publications are about the topic that you just discussed?

A.   Yes.

Q.   And have you edited many other publications?

A.   Yes.

Q.   Have some of the publications that you've published or edited, does that include research related to Arizona history

and socioeconomic conditions?

A.   Yes.

Q.   Can you provide just a quick example of that?

A.   Well, the one that comes most to mind is the most recently authored instead of edited book *Justice Deferred: Race and the Supreme Court*, where Arizona is looked at quite a bit in there explicitly.

Q.   And how about -- how about things you've edited?

A.   Well, just within the last month a book on reconstruction at 150, sesquicentennial, has just come out and one of the big focuses of the new literature on reconstruction is reconstruction in the west and particularly dealing with Native Americans, and their essays there relate to Arizona and particularly Native Americans is where the new literature is focused.

In *Lincoln's Unfinished Work*, which I did a conference on at Clemson before COVID -- COVID delayed it -- and that book appeared where I wrote both an introduction and an afterwards, and that deals with a lot of issues stretching from, in fact, the new literature on reconstruction in Native --

Q.   Okay.  So do you also teach courses on the topics of the areas of expertise that you mentioned?

A.   Yes.

Q.   And have you taught classes that touch on Arizona history and political conditions?

A.   Well, I taught US History for 34 years and explicitly I talked about Arizona in those lectures.  Though that's not publication, it requires research and looking into it.  I've taught courses on the civil rights movement and now some on the history of race and the law, which we have a good bit comes out of Arizona.  As you know, two Supreme Court Justices related to here in Arizona.

Q.   Turning to Page 5 and 6 of the demonstrative, have you been asked to provide an expert opinion for a voting rights case before?

A.   Yes.

Q.   Can you estimate just roughly about how many times?

A.   Are you asking for testimony, reports or investigations?

Q.   Just where you've provided an expert opinion.

          THE COURT:  But that didn't narrow the question.

          Are you talking about did he testify?  Did he just provide an expert report with opinions?

          MR. JOHNSON:  Sure.  What I'm getting at is both testify and provide an expert report, that -- that category with both of those.

          THE WITNESS:  Okay.  You mean it satisfies both of your questions?  I am guessing -- and, again, I started in 1980 with *Mobile v. Bolden* is when I got involved, the actual times I have been in court and provided a report.  In fact, the first time I believe I didn't even provide a report, but I

testified.

BY MR. JOHNSON:

Q.   I guess I'm just looking for the number of -- give us a sense of the full scope of how many times you've provided an expert opinion in a voting rights case.

A.   In court I am guessing somewhere between 10 and 20 times. That's an estimate.

Q.   Okay.  And in these other voting rights related cases, what have been the categories of the subjects that you've provided an expert opinion?

A.   Of course, United States history, voting behavior, discriminatory laws, the intent of laws, the socioeconomic equality or unequality of various groups, and there are probably others.

Q.   Okay.

A.   But that's off the top of my head.

Q.   Are these along the same lines of the subjects that you're offering your expertise here?

A.   Yes.

Q.   Have you ever been asked to provide an expert report for a political party?

A.   Yes.

Q.   For the Democratic Party?

A.   Yes.

Q.   The Republican Party?

UNITED STATES DISTRICT COURT

A.   Yes.

Q.   Have you ever been asked to provide an expert report for a government entity?

A.   Yes.

Q.   And what was that?

A.   Department of Justice.

Q.   Did you offer testimony recently in the -- what's called the *Pendergrass v. Raffensperger* case in Georgia decided last month that concerns history and conditions of discrimination?

A.   Yes.

Q.   Have you reviewed the Court's decision in that case?

A.   I skimmed it.

Q.   Did the Court in that case credit your analysis?

A.   Yes.

Q.   And so you read the portion where it discusses your analysis?

A.   Yes.

Q.   Did the Court state your testimony was, according to the Court, highly credible and extremely helpful to the Court. Thus, the Court will assign great weight to Dr. Burton's testimony?  Do you recall that?

A.   Yes.

Q.   Have you also provided an expert opinion in voting rights related cases outside of areas around Georgia, the deep south?

A.   And you're asking have I testified or have I provided

reports or --

Q.   I guess both.  Have you brought an expert opinion?

A.   Yes.

Q.   And can you name a few of those?

A.   Yes, Ohio, Massachusetts, New York, California.  And Texas, like Arizona, parts of it claim not to be the south not the deep south, border south, are the ones that come to mind.

Q.   Okay.

A.   There may be others.

Q.   In addition to that Georgia case we just talked about, have Courts generally credited your analysis?

A.   Yes.

Q.   And for reports and opinions that you've offered in those cases, do you apply the same methodology that you've applied here?

A.   Yes.

Q.   Has a Court ever excluded your expert testimony for any reason?

A.   No.

Q.   Let's turn to Page 10 and 11 of your report.

     What were some of the broad categories of issues that you were asked to provide an opinion on in this case?

A.   And you're at Page 10 and 11?

Q.   Yeah, the paragraph starting at the bottom of Page 10 and going onto 11.  I'm just asking about the categories of issues

UNITED STATES DISTRICT COURT

that you were asked to give an opinion on in this case?

A.    Well, I was asked to look at the history of voter discrimination, particularly state official discrimination that occurred in voting in the history of Arizona, as well as other discrimination, particularly as it related to minority groups and naturalized citizens.

I was asked to take the two bills that are being challenged in this case and put them into historical context and into the historical context of those discriminatory or history of discrimination and particularly how it would affect -- how it affected minority voters.

I was asked to look at the socioeconomic status of these minority groups, particularly those that dealt with health, education and housing, sort of what is known commonly as the Senate 5 factors, and to also look at the historical use of racial appeals over time, sort of the Senate Factor No. 6 over time how it's been used and if racial appeals are still being used currently or in modern times in Arizona.

Q.    And briefly, what were your top line conclusions after looking at these topics?

A.    That Arizona has a long history of official discrimination -- State-sponsored discrimination that has affected particularly minorities; but, also, there's a lot of discrimination in general, not just State sponsored, that there are significantly differences in socioeconomic equality,

particularly with education and income and housing and employment that really makes a disparate burden on voters, particularly with laws like those sections being challenged in the case here that racial campaign -- that racial appeals and campaign has a very long history beginning before Arizona becomes a state and continuing and it's particularly -- it's currently being used in very active, particularly with what we call code racial appeals.

Q.   Okay.  And based on that information that you found, did you conclude that these two laws are marked by discriminatory effects and intent?

A.   Yes.

        MR. LANGHOFER:  Object to foundation for intent, Your Honor.

        THE COURT:  The objection comes too late.

        The answer will stand.

BY MR. JOHNSON:

Q.   In a -- in a broad sense, what were the categories of sources that you consulted in forming your opinion?

A.   Well, I consulted the sources that I would do if I was writing a book or an article and that I've always done in other court cases that have been credited by the courts.

    I first look at all the secondary literature that I can to help guide me as I'm looking particularly, you know, for laws and the history that other scholars built upon the work

of other scholars.

I particularly believe historians are probably more better trained to evaluate newspapers.  So I use newspapers, which are primary evidence quite a bit.  I always look at relevant court cases, including expert witness reports, the Court records that I can get, used to find on-line, to give me guidance as to where to go.

Q.   And on that topic, did you look at the report of Dr. David Berman from the *DNC v. Brnovich* --

A.   I did.

Q.   -- case that came out of Arizona?

A.   Sorry, I did.

Q.   Starting out by looking at prior expert reports in the state you're evaluating is something you commonly do when giving an expert opinion?

A.   Yes.

Q.   Do you consider that a common practice among experts in your field?

A.   I do, the ones that I know.  You know, you want to build upon what other scholars have done and that -- if there's a case that specifically looks at a state, it's a good place to quickly get an overview; and in particular for me, I use it to find sources and then get those sources myself.

Q.   On the topic of sources, you have many of them listed in footnotes; but are there sources that you considered that have

UNITED STATES DISTRICT COURT

Orville Vernon Burton, Ph.D. - Direct Exam by Mr. Johnson 1402

not necessarily made it into the footnotes?

A.    There's more sources -- many more sources that are in the footnote that were considered, but I tried to use the footnotes to show where I got the evidence for what I am arguing in the report to support those findings.

Q.    Do you employ a comparative history approach to your research?

A.    I've actually written about this, argue that history differs from antiquarianism because to be history it has to be comparative.  Particularly somebody who studies regions always use comparison.  It may not be explicit in what is written, but to understand how Arizona works or whether it's part of the south or it's part of the west or part of the southwest or how unique, you put it in to a comparative framework.

Q.    Okay.

A.    I try to put it in a comparative framework.

Q.    Okay.  In this comparative framework, is that a similar methodology that you've applied in the other cases you've given expert opinion?

A.    Always.

Q.    And the same is true for your academic research?

A.    Yes.

Q.    How does your approach to examining history relate to giving an opinion on how patterns will unfold in the future?

A.    Well, history is not predictive, as a lot of people would

UNITED STATES DISTRICT COURT

like to say; but you look for patterns and you understand -- you try to understand how you got to where you are now and how it might relate to the -- to the future.

You know, as Faulkner says, the past is not really dead and tomorrow will be the past; but you want to look and you do sometimes find patterns there that can help you understand where you are, but also might give you a guide to what will happen in the future.

Q.   So ahead of today's testimony, did you review any reports from any other expert witnesses in this case?

A.   No, I don't even know the experts -- other experts are in this case.  I have not reviewed any other reports.

Q.   Okay.  And are you aware of any rebuttal reports submitted in response to your report?

A.   No.

Q.   Okay.

MR. JOHNSON:  Your Honor, we're aware of the sort of open question about qualifying expert witnesses; but I just wanted to go through the formality of offering Dr. Burton as an expert in American history, voting behavior, discrimination, socioeconomic status and equality and historical intent.

THE COURT:  Without objection, you may proceed with your questions.

BY MR. JOHNSON:

Q.   Your Honor -- or Dr. Burton, as you noted just a moment ago, in this case you provide expertise concerning history discrimination, conditions of inequality, racial appeals in the electoral environment, and then there's some sub topics in between.

     Well, now I'll ask you some questions about those broader topics one at a time.  So let's start with history.

          THE WITNESS:  Can -- can I ask just a moment.  This is embarrassing, but I'd like to pour some water and I think I need to stand up.

          THE COURT:  I'm going to do you one better.  Because we're getting ready to launch into his opinions, we'll take our lunch break and reconvene at 1:00 o'clock.

          MR. JOHNSON:  Thank you, your Honor.

          COURTROOM DEPUTY:  All rise.

(Whereupon the proceedings adjourned at 11:55 a.m.)

**_REPORTER'S CERTIFICATION_**


I, TERI VERES, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 14th of November, 2023.


                              _____s/Teri Veres_____
                              TERI VERES, RMR, CRR

UNITED STATES DISTRICT COURT